# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PATRICIA YOUNG,** | : | **No. 3:07cv854** |
| **WILLIAM YOUNG, and** | : | |
| **PATRICIA YOUNG, on behalf** | : | **(Judge Munley)** |
| **of her minor daughter,** | : | |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **PLEASANT VALLEY SCHOOL** | : | |
| **DISTRICT,** | : | |
| **PLEASANT VALLEY SCHOOL** | : | |
| **BOARD,** | : | |
| **JOHN J. GRESS, Principal, in his** | : | |
| **individual capacity,** | : | |
| **DR. FRANK A. PULLO,** | : | |
| **Superintendent, in his individual** | : | |
| **capacity, and** | : | |
| **BRUCE H. SMITH, JR.,** | : | |
| **Defendants** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## MEMORANDUM

Before the court are defendants' motion for summary judgment and plaintiffs' motion for partial summary judgment. Having been fully briefed and argued, the matters are ripe for disposition.

## I. Background

This case arises from plaintiffs' conflicts with the defendant school district over events in the United States history classroom of Defendant Bruce H. Smith at the Pleasant Valley, Pennsylvania high school in the spring of 2007. The material in question included photographs of murder victims, reading assignments that included

a sexually explicit memoir written by Smith, and classroom discussions and assignments that addressed sexual matters in a way that the plaintiffs found offensive. At the time of the incidents in question Smith taught twentieth-century United States history at Pleasant Valley High School. (Defendants' Concise Statement of Material Facts (Doc. 88) (hereinafter "Defendants' Statement") at ¶¶ 1-2). The minor daughter of Plaintiffs William and Patricia Young was a student in Smith's classroom during the second semester of her junior year at Pleasant Valley High School. (Id. at ¶ 3). She was sixteen years old. (Plaintiffs' Disputed Statement of Facts (Doc. 103) (hereinafter "Plaintiffs' Statement") at ¶ 3).

In March 2007, the plaintiffs' minor daughter complained to a guidance counselor at her school about the atmosphere and curriculum in Smith's classroom. (Defendants' Statement at ¶ 4). She told Donna Yozwiak, the counselor, that she "felt uncomfortable with the material, and she was questioning the graphics that were shown during the class." (Deposition of Donna Yozwiak, Exh. 3 to Defendants' Statement (hereinafter "Yozwiak Dep." at 5). Yozwiak suggested that the student speak with the building principal, Defendant Gress. (Id.). The counselor later called the student for a follow-up appointment. (Defendants' Statement at ¶ 6). Yozwiak also spoke with the plaintiffs about their daughter's concerns. (Id. at ¶ 7). She told the parents they should speak with Mr. Gress. (Yozwiak Dep. at 7).

The material about which the plaintiffs' daughter complained included a book written by Smith. (Defendants' Statement at ¶ 22). This book was a memoir of

Smith's youth, and plaintiffs' daughter was particularly offended by stories in the book that described Smith losing his virginity and interrupting his mother having sex. (Plaintiffs' Statement at ¶ 22). Defendants contend that this book was not presented as required reading, but plaintiffs's daughter testified that Smith urged students to read the book to prepare for required state exams. (Defendants' Statement at ¶ 23; Plaintiffs' Statement at ¶ 23). In any case, the plaintiffs' daughter did not read the entire book. (Defendants' Statement at ¶ 25). Smith did not obtain approval from the school district before introducing this book. (Id. at ¶ 24). Plaintiffs' daughter also complained about photographs of mutilated murder victims Smith showed the class. (Id. at ¶ 26).

On March 8, 2007, the plaintiffs met with Defendant Gress to discuss their concerns about Smith's teaching. (Defendants' Statement at ¶ 9). The plaintiffs complained about the content of Smith's teaching, as well as his behavior in the classroom. (Id.). Defendant Gress promised plaintiffs he would keep their complaint confidential. (Id. at ¶ 10). Gress testified that he had never had another complaint about Smith's teaching. (Id. at ¶ 11). Plaintiffs dispute this claim, but do not cite to any evidence in the record that indicates Gress was aware of previous complaints about Smith. (Plaintiffs' Statement at ¶ 11).[1] Plaintiffs, citing to Smith's deposition, also contend that Smith had been showing the material to his classes for five years,

---

[1]Plaintiffs' objection reads as follows: "Denied as stated. Gress states he had no complaints, but we do not have proof that that is the case." (Plaintiffs' Statement at ¶ 11). The court is unsure how Gress could prove a negative.

and that school officials were aware of his lesson plans. (Id. at ¶ 14).

Gress began an investigation of Smith's teaching after his conversation with the plaintiffs. (Defendants' Statement at ¶ 12). He contacted Smith and asked him about the photographs and assigned reading the plaintiffs found offensive. (Id. at ¶ 13). Gress directed Smith to cease using the material. (Id.). He also interviewed other students in Smith's class about the material he used. (Id. at ¶ 14). Gress completed a memorandum reporting on his investigation on March 15, 2007. (Id. at ¶ 19). He provided Defendant Pullo, the Pleasant Valley Superintendent, with this memo. (Id.). Plaintiffs contend that this investigation was inadequate, in part because they had warned Gress that Smith planned to show inappropriate photographs of the Charles Manson and Ed Gien murders to his class. (Plaintiffs' Statement at ¶ 12). Gress did not prevent this display. (Id.). Gress also failed to respond when plaintiffs complained to him after Smith showed these photographs. (Id.). According to the plaintiffs, Gress acted against Smith only after they complained to the local District Attorney's Office. (Id.).

Defendant Pullo called the plaintiffs to discuss their complaints. (Defendants' Statement at ¶ 15). The parties dispute the timing of this call; defendants claim Pullo called the day after the plaintiffs made their complaint, while plaintiffs insist that Pullo contacted plaintiffs only after they spoke to the District Attorney's office. (Plaintiffs' Statement at ¶ 15). Pullo, Gress, the plaintiffs and their daughter participated in a conference call on March 20, 2007. (Defendants' Statement at ¶ 16; Plaintiffs'

Statement at ¶ 16).  The participants discussed with the plaintiffs' daughter what occurred in Smith's classroom.  (Defendants' Statement at ¶ 16).

On March 15, 2007, Defendant Pullo informed Smith that he had been suspended three days with pay.  (Id. at ¶ 19).  Plaintiffs contend that Smith continued to teach his students using videos during this suspension.  (Plaintiffs' Statement at ¶ 19).  Pullo suspended Smith without pay for ten days on March 21, 2007.  (Id. at ¶ 20).  Plaintiffs also insist that Smith taught by video during this second suspension.  (Plaintiffs' statement at ¶ 20).  Gress told Smith not to speak to any students about the reason for his absence from school.  (Defendants' Statement at ¶ 21).  The parties disagree about whether Smith obeyed this instruction.  (See Defendants' Statement at ¶ 21; Plaintiffs' Statement at ¶ 21).  Plaintiffs claim that "there is no evidence in the record to prove or disprove whether Smith talked to any students about his suspension.  However, it is known that he told his students his absence was because of his mother."  (Plaintiffs' Statement at ¶ 21).  They point to an e-mail Smith sent on March 25, 2007, which explained that he had to travel to Maryland that week to care for his ailing mother, who doctors suspected needed a lung transplant.  (Exh. G to Plaintiffs' Statement).  This e-mail does not mention the controversy surrounding Smith's teaching and does not address his suspension. (Id.).  Smith also had a substitute teacher show a videotape about Daniel Ellsburg and the consequences of whistleblowing, which plaintiffs contend was an attempt to intimidate their daughter.  (Defendants' Statement at ¶ 42; Plaintiffs' Statement at ¶

5

42).

After Smith returned to teaching, administrators put in a place a plan to monitor his teaching and lesson plans. (Defendants' Statement at ¶ 28). He was also required to obtain authorization to use materials in the classroom. (Id.). Plaintiffs dispute the efficacy of this monitoring. (Plaintiffs' Statement at ¶ 28). They point to evidence which indicates that Smith showed pictures of a women naked from the waist up and discussed homosexuality during a lecture about Nazism after returning from his initial suspension. (Id.). After Plaintiff William Young complained, Gress responded by warning Smith that he would receive an unsatisfactory rating if he continued such teaching practices. (Id.). Smith also continued to discuss "sexual topics" in class, such as his college sexual experiences. (Id.). At the end of the year, Smith received an unsatisfactory evaluation. (Defendants' Statement at ¶ 29).

On April 23, 2007, plaintiffs complained again to Gress about Smith's teaching, contending that he had shown inappropriate and sexually explicit material. (Defendants' Statement at ¶ 44; Plaintiffs' Statement at ¶ 44). Gress called the plaintiffs the next day to suggest they remove their daughter from Smith's class. (Defendants' Statement at ¶ 45). Plaintiffs contend that Gress did not acknowledge their concerns, but instead emphasized that Smith was a valuable teacher. (Plaintiffs' Statement at ¶ 45).[2] When Gress informed Smith about a second

---

[2]The record cited by the plaintiff does not appear to support this claim that Gress addressed Smith's value as a teacher during this conversation. Plaintiff Patricia Young's affidavit contends that Gress had called Smith a valuable teacher when she complained

complaint about his teaching regarding Nazism, Smith asked Gress for permission to call the parents and discuss the matter. (Defendants' Statement at ¶ 46). Smith nevertheless called the plaintiffs. (Id.). Gress reprimanded Smith after Smith admitted making this call. (Id. at ¶ 56).

Smith's call was prompted by plaintiffs' complaints. The parties disagree about whether Gress told Smith that plaintiffs had complained about his teaching. (Defendants' Statement at ¶ 27). Smith denied at his deposition that Gress told him who complained about his teaching. (Smith Dep., Exh. 8 to Defendants' Statement at 32). He claimed that another parent, Kim Dalmas, informed him by e-mail that plaintiffs had complained about him. (Id. at 33). Still, upset by plaintiffs' accusations and by their criticism of his teaching, Smith called them after his initial suspension. (Id. at 35). Smith testified that when Plaintiff William Young asked him if Defendant Gress had instructed him to call, he replied that Gress had. (Id.). Smith testified that he misspoke due to "nervousness," and quickly corrected himself to say he had called "on my own volition." (Id.). William Young, by contrast, testified that Smith called the house and asked to speak to his wife regarding her concerns about his teaching. (William Young Dep. at 25). When Young asked Smith who had told him to call Patricia Young about the issue, Smith hesitated, and then named Gress. (Id.).

---

about his course content, but the affidavit appears to reference an earlier conversation. (See Doc. 105). The other document referenced by the plaintiff, Gress's report on Smith's teaching, documents many of the grounds for their complaints, but does not document the contents of Gress's April 24 conversation with William Young.

Other evidence in the record indicates that plaintiffs complained to several other parents about Smith's teaching, and that some of these parents repeated their complaints to others. (See Defendants' Statement at ¶¶ 30-39). Some of these parents deduced that plaintiffs had made the complaint about Smith. (Id. at ¶ 40).

Plaintiffs contend that public knowledge about their complaints led to intimidation and harassment. The plaintiffs' minor daughter claims she was "too scared to go back" to school after the local newspaper, the Pocono Record, published a story about the filing of her lawsuit. (Id. at 49). Plaintiffs contend that school administrators did nothing to stop this harassing treatment. (Plaintiffs' Statement at ¶ 49). They insist that administrators offered a public commendation for students who held a pep rally in support of Smith. (Id.). Threats and name calling eventually led plaintiffs to move out of the school district. (Id.). On May 13, 2007, before the family moved, William Young requested homebound instruction for his daughter. (Id. at ¶ 50).

The Pleasant Valley school district provided teachers with yearly training on sexual harassment and maintaining a proper work environment. (Defendants' Statement at ¶ 51). The district also provided training on retaliation at personnel meetings, legal seminars hosted by attorneys and in-service training. (Dep. of Anthony Fadule, Exh. 9 to Defendants' Motion (Doc. 92) at 71). Gress attended a monthly leadership council meeting at which he sometimes received training in sexual harassment. (Defendants' Statement at ¶ 53). The district also had a written

sexual harassment policy. (Id. at ¶ 54). Plaintiffs argue that this policy was ineffective, as Smith taught topics which the policy should have prohibited. (Plaintiffs' Statement at ¶ 54).

On May 9, 2005, plaintiffs filed a complaint in this court alleging violations of their First Amendment rights in the school district's reaction to their complaints. (See Doc. 1). Plaintiffs filed this complaint anonymously. Defendants responded with a motion to dismiss that complaint because plaintiffs had not provided their real names and had not sought the court's permission to file the complaint anonymously. (See Doc. 5). Plaintiffs then filed a motion for permission to proceed anonymously due to safety concerns (See Doc. 9). In addition to responding to that motion, defendants filed a motion to stay discovery pending the outcome of our decision on those motions. (See Docs. 11-12). On August 1, 2007, the court issued a memorandum and order denying plaintiff's motion to proceed anonymously and the defendants' motion to stay discovery. (See Doc. 16). The court also ordered the plaintiff to file an amended complaint that provided the plaintiffs' real names.

The plaintiffs filed their amended complaint on August 10, 2007. Defendants filed a motion to dismiss the amended complaint. (See Doc. 18). After briefing and oral argument, the court granted the motion in part and denied it in part. (See Doc. 33). The court also directed the plaintiffs to file a second amended complaint, which they did on February 18, 2008 (Doc. 35). On August 9, 2008, plaintiffs filed a third amended complaint, which added now-ripe claims under Pennsylvania law. (Doc.

54). Discovery continued and the parties eventually filed motions for summary judgment. The parties then briefed those motions and the court held argument, bringing the case to its present posture.

## II. Jurisdiction

As this case is brought pursuant to 42 U.S.C. § 1983, the court has jurisdiction pursuant to 28 U.S.C. § 1331. ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). The court has supplemental jurisdiction over the plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

## III. Legal Standard

Granting summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (citing FED. R. CIV. P. 56(c)). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. Int'l Raw

<u>Materials, Ltd. v. Stauffer Chemical Co.</u>, 898 F.2d 946, 949 (3d Cir. 1990).  The

burden is on the moving party to demonstrate that the evidence is such that a

reasonable jury could not return a verdict for the non-moving party.  <u>Anderson</u>, 477

U.S. at 248 (1986).  A fact is material when it might affect the outcome of the suit

under the governing law.  <u>Id.</u>  Where the non-moving party will bear the burden of

proof at trial, the party moving for summary judgment may meet its burden by

showing that the evidentiary materials of record, if reduced to admissible evidence,

would be insufficient to carry the non-movant's burden of proof at trial.  <u>Celotex v.

Catrett</u>, 477 U.S. 317, 322 (1986).  Once the moving party satisfies its burden, the

burden shifts to the nonmoving party, who must go beyond its pleadings, and

designate specific facts by the use of affidavits, depositions, admissions, or answers

to interrogatories showing that there is a genuine issue for trial.  <u>Id.</u> at 324.

**IV.  Discussion**

The parties have each filed a motion for summary judgment.  The court will

address each in turn.

**A.  Defendants' Motion**

Defendants seek summary judgment on several grounds.  The court will

address each.

**i.  Retaliation**

Defendants seek summary judgment on plaintiffs' First Amendment retaliation

claim.  A plaintiff seeking to recover on a First Amendment retaliation claim "must

allege: (1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory actions." Thomas v. Independence Twp., 463 F.3d 285, 296 (3d Cir. 2006).

Defendants' argument focuses on whether plaintiffs have any evidence of retaliatory conduct. The Third Circuit has declared in the context of workplace retaliation that "the key question in determining whether a cognizable First Amendment claim has been stated is whether 'the alleged retaliatory conduct was sufficient to deter a person of ordinary firmness from exercising his First Amendment rights.'" McKee v. Hart, 436 F.3d 165, 170 (3d Cir. 2006) (quoting Suppan v. Dadonna, 203 F.3d 228, 235 (3d Cir. 2000)). The sort of conduct that would count as retaliatory "'need not be great in order to be actionable,' but it must be more than de minimis." Id. (quoting Suppan, 203 F.3d at 235).

Plaintiffs complain that Gress retaliated against them by revealing their names to Smith in connection with their complaints. The court finds that a reasonable juror could conclude that Gress revealed to Smith that plaintiffs had complained about his teaching, and that such conduct would discourage an ordinary person from complaining in the future. The evidence related above indicates that the Youngs had asked Gress not to reveal their names because they worried that bringing a complaint about a popular teacher would lead other parents and students to harass them and their daughter. There is a question of fact over whether Gress revealed

that plaintiffs complained about Smith's teaching. If a jury concluded that Gress purposefully revealed the plaintiffs' names, that juror could reasonably find that a person of ordinary firmness would be deterred from complaining again. Such retaliatory conduct would also be causally related to the plaintiff's complaints.[3] As such, the court will deny Defendant Gress's motion on this point.

No evidence indicates, however, that Defendant Pullo was involved in releasing plaintiffs' names to Smith. Plaintiffs point to other instances of retaliation, however. They argue that Gress permitted Smith to teach by video while on suspension, and that he showed a video about whistleblowers designed to intimidate the plaintiffs' minor daughter. As other grounds for finding retaliation, plaintiffs contend that Gress's offer to move the minor plaintiff to another classroom was retaliation as well. They also contend that Gress "singled out" the plaintiff to ridicule by calling her out of class to discuss her complaints and announcing to the school that he was proud students had protested Smith's suspension. Finally, they argue that the homebound instruction provided to the minor plaintiff was deficient and thus retaliatory.

Defendant Pullo was involved in only one of these alleged incidents of retaliation, the provision of homebound instruction to the plaintiffs' minor daughter. The evidence indicates that on May 13, 2007, plaintiffs wrote Defendant Pullo

---

[3]As a jury need only find one instance of retaliation, the court will not address whether a jury could conclude that other actions complained of by plaintiffs constitute retaliation.

13

requesting that their daughter receive homebound instruction. (E-mail from Youngs to Pullo, 5/13/2007, exh. 7 to Defendants' Motion). Plaintiffs cited "numerous threats," written and verbal, to their daughter as grounds for such instruction. (Id.). They asked Pullo to have Donna Yozwiak, a guidance counsellor, arrange an appropriate tutor to assist their daughter in Physical Education, Chemistry II, Calculus I and 20th Century History. (Id.). Plaintiffs' daughter received homebound instruction as requested, but her mother found that "we didn't get sufficient teachers to teach what she needed to be taught." (Patricia Young Dep. at 67). A physics teacher provided the instruction, and he could not provide her with instruction in chemistry, calculus or twentieth-century history. (Id.). The school "expected her to do the work on her own." (Id.).

Here, the evidence of record demonstrates only that Pullo responded to a request for homebound instruction by arranging for that instruction, and that plaintiffs found the instruction inadequate because the teacher assigned to supervise the teaching was not trained sufficiently in all of their daughter's courses. According to the plaintiffs, this insufficient instruction was retaliation for their complaints. The court finds that a person of ordinary firmness would not be prevented from exercising her first amendment rights by this conduct. Plaintiffs have not introduced any evidence to indicate that Pullo was involved in the contents of this instruction. The evidence only indicates that Pullo received the request for homebound instruction, which the plaintiffs' daughter received. No evidence of record indicates that Pullo

directed that the homebound instruction be insufficient. Thus, even assuming that plaintiffs' daughter did not receive the instruction to which she was entitled, no evidence indicates that this deficiency stemmed a reaction to plaintiffs' complaint. Moreover, a reasonable juror could not conclude that a person of ordinary firmness would be deterred from further complaints because they were dissatisfied with the quality of instruction that they requested and received. A reasonable person could not expect to receive personalized instruction on every subject from a separate teacher while homebound. The court will therefore grant the motion on this claim as it relates to Defendant Pullo.

### b. Failure to Train

Defendants argue that they should be granted summary judgment on plaintiffs' failure-to-train claims against them. As a general matter, torts committed by employees do not make a municipality liable under Section 1983 and "a local governing body can be held liable only for an official policy or custom." San Filippo v. Bongiovanni, 30 F. 3d 424, 445 (3d Cir. 1994). Under the standard first articulated in Monell v. Dept. of Soc. Servs., "local governing bodies . . . can be sued directly under §1983 . . . where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell v. Dept. of Soc. Servs. of the City of New York, 436 U.S. 658, 690 (1978). Thus, "[a] public entity . . . may be held liable for the violation of a constitutional right under 42 U.S.C. § 1983

15

only when the alleged unconstitutional action executes or implements policy or a decision officially adopted or promulgated by those whose acts may fairly be said to represent official policy." Reitz v. County of Bucks, 125 F.3d 139, 144 (3d Cir. 1997). Liability exists when "'there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.'" Brown v. Muhlenberg Twp., 269 F.3d 205, 214 (3d Cir. 2001) (quoting City of Canton v. Harris, 489 U.S. 378, 385 (1989)).

Here, plaintiffs claim that the defendants failed properly to train employees to avoid violating students' rights. The Supreme Court has held that "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." City of Canton v. Harris, 489 U.S. 378, 389, (1989). Further, "[w]hen a plaintiff alleges that a municipality has not directly inflicted an injury, but has caused an employee to do so, stringent standards of culpability and causation must be applied to ensure that the municipality in a § 1983 suit is not held liable solely for the conduct of its employee." Reitz v. County of Bucks, 125 F.3d 139, 145 (3d Cir. 1997). These strict standards exist because "in enacting § 1983, Congress did not intend to impose liability on a municipality unless *deliberate* action attributable to the municipality itself is the 'moving force' behind the plaintiff's deprivation of federal rights." Bd. of the County Commissioners of Bryan County, Oklahoma v. Brown, 520

U.S. 397, 399 (1997). To avoid summary judgment on such a claim, plaintiffs "must present evidence that the need for more or different training was so obvious and so likely to lead to the violation of constitutional rights that the policymaker's failure to respond amounts to deliberate indifference." Brown, 269 F.3d at 216.

Defendants argue that the evidence indicates that there had never been a complaint about Smith's conduct before, and that the district acted quickly when apprised of the problem and began an investigation. The district also provides training on sexual harassment and on responding to sexual harassment complaints. Thus, no evidence exists by which a jury could conclude that defendants were deliberately indifferent to their rights. Plaintiffs argue that the district failed to provide training on appropriate images to display in class, and that such failing represents a deliberate indifference to the possibility of harassment. The district should also have instituted a policy of monitoring lesson plans to insure that no such inappropriate material appeared.

The Pleasant Valley School District had a sexual harassment policy in place at the time of the incidents in question. (See Exh. B. to Plaintiffs' Brief in Opposition to Defendants' Motion (Doc. 101)). The policy "prohibits all forms of unlawful harassment of employees and third parties by all district students and staff members, contracted individuals, vendors, volunteers, and third parties in the schools." (Id.). The policy defines sexual harassment as "unwelcome sexual advances, requests for sexual favors: and other inappropriate verbal, written, graphic

17

or physical conduct of a sexual nature when . . . [s]uch conduct is sufficiently severe, persistent or pervasive that it has the purpose or effect of substantially interfering with the employee's job performance or creating an intimidating, hostile or offensive working environment." (Id.). Included in the district's description of conduct "that may constitute sexual harassment" are "graphic or suggestive comments about an individual's dress or body . . . jokes; pin-ups; calendars; objects; graffiti; vulgar statements; . . . references to sexual activities . . . or any conduct that has the effect of unreasonably interfering with an employee's ability to work or creates an intimidating, hostile or offensive working environment." (Id.). The policy also sets out procedures for reporting and investigating complaints. (Id.). The evidence indicates that Smith received training under this policy, as did Gress.

The court finds that no evidence indicates that "the need for more or different training was so obvious and so likely to lead to the violation of constitutional rights that the policymaker's failure to respond amounts to deliberate indifference." Brown, 269 F.3d at 216. Here, the defendants provided training that prohibited material and comments of the sort that Smith engaged in. Plaintiff argues that this training was inadequate, and defendant should have reviewed every lesson plan and examined each of the images introduced by teachers like Smith to ensure that nothing appropriate appeared. The court notes, however, that no evidence indicates that anyone had complained about Smith's teaching or the images he used before plaintiffs raised the issue. Thus, the district was not aware that its policies had failed

to prevent inappropriate behavior from teachers. Moreover, the district did provide training about what sorts of images and subjects were inappropriate and could lead to a hostile environment which should have prevented Smith from his inappropriate behavior, as well as procedures for reporting and investigating incidents of harassment. The plaintiffs' suggestion that failing to monitor every image shown in the classroom and every lesson plan used by every teacher amounts to a claim "that a different training program than the one in place would have been more effective" in preventing the hostile environment, and does not represent evidence of a training program "so obviously inadequate that it amounts to deliberate indifference" to plaintiffs' rights. Grazier v. City of Philadelphia, 328 F.3d 120, 125 (3d Cir. 2003). No evidence of deliberate indifference on this matter exists, and summary judgment is appropriate on this claim.

Plaintiffs also argue that their failure-to-train claim should survive summary judgment because the district failed to provide training to prevent retaliation against parents who complain about curriculum or teachers' activities. They point to the deposition of Anthony J. Fadule as evidence of this lack of training. (See Exh. 9 to Defendants' Statement). During his deposition, plaintiffs' counsel asked Fadule if the district had provided "specific training on retaliation." (Id. at 71). Fadule replied that retaliation has "been a topic at our IU personnel meeting. We monthly get together with all the HR people, superintendents as well, and we discuss a whole host of topics." (Id.). He admitted, however, no one had ever "[come] into your

facility and [trained him] on retaliation, how not to retaliate." (Id.). The district provided no "formal training with that topic specifically." (Id.). Plaintiffs contend that not providing such formal training about retaliation amounts to deliberate indifference.

At issue, then, is whether the failure to provide specific training on retaliation amounts to deliberate indifference on the district's part. In many cases, "the existence of a pattern of tortious conduct by inadequately trained employees may tend to show that the lack of proper training, rather than a one-time negligent administration of the programs or factors peculiar to the officer involved in a particular incident, is the 'moving force' behind the plaintiff's injury." Bd. of County Commissioners, 520 U.S. at 407-408. Here, however, plaintiff points to no pattern of retaliation on the part of Gress or other district officials, but instead insists that this single instance of retaliation demonstrates a failure in training that amounts to a constitutional violation. Still, liability for failure to train could occur when "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." Brown, 269 F.3d at 215 (quoting City of Canton, 489 U.S. at 390).

The court finds that the failure to provide specific training to employees on how not to retaliate does not amount to "deliberate indifference to the rights of

20

persons with whom the [district administrator] come[s] into contact." City of Cannon, 489 U.S. at 388. The offending conduct here–retaliation–is the sort of behavior that is so obviously wrong and contrary to right that an ordinary person could recognize it as inappropriate even without any additional training, and thus failing to provide more training on retaliation would not obviously lead to a constitutional violation and does not constitute deliberate indifference. See, e.g., Walker v. New York, 974 F.2d 293, 299-300 (2d Cir. 1992) (finding that "[w]here the proper response–to follow one's oath, not to commit the crime of perjury, and to avoid prosecuting the innocent–is obvious to all without training or supervision, then the failure to train or supervise is not 'so likely' to produce a wrong decision as to support an inference of deliberate indifference by city policymakers to the need to train or supervise."); Kline v. Mansfield, 255 Fed. Appx. 624, 639 (3d Cir. 2007) (finding that "because not committing the crime of sexually abusing a child is obvious, the failure of Hamburg to train its employees to spot signs of sexual abuse . . . was not deliberately indifferent."). The court will thus grant the defendants' motion on this claim.

### c. Title IX Hostile Environment and Retaliation

Defendants seek summary judgment on plaintiffs' claims for sexual harassment and retaliation pursuant to Title IX. Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

Federal courts have found that Title IX is aimed at preventing institutional discrimination on the basis of sex, not on regulating individual behavior. As a result, persons acting in their individual capacities cannot be liable for discrimination under Title IX. See, e.g., Nelson v. Temple University, 920 F. Supp. 633, 635 (E.D Pa. 1996) (concluding that "[a] majority of the few cases explicitly addressing the issue have concluded that Title IX does not authorize a cause of action against individuals."); Bougher v. University of Pittsburgh, 713 F. Supp. 139, 143 (W.D. Pa. 1989) (finding that because individual defendants did not receive funds under Title IX, "no Title IX claim can be stated against them."); Lipsett v. University of Puerto Rico, 864 F.2d 881, 901 (1st Cir. 1988) (finding that officials of a university were liable, "if at all, under section 1983, rather than under Title IX"). The question in this case is therefore whether a jury could find the school district liable under Title IX.

Under Title IX, a school district can be liable for money damages to a private plaintiff who suffers sexual harassment. See Gebser v. Lago Vista Ind. Sch. Dist., 524 U.S. 274, 283-284 (1998). The Supreme Court has concluded, however, that such liability is not unlimited, and thus "in cases . . . that do not involve official policy of the recipient entity . . . a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond." Id. at 290. Liability for a school district therefore occurs only when an "appropriate person"

22

has "actual knowledge" of the prohibited activity. <u>Bostic v. Smyrna School Dist.</u>, 418 F.3d 355, 361 (3d Cir. 2005). In most cases, "a school principal who is entrusted with the responsibility and authority normally associated with that position will ordinarily be 'an appropriate person' under Title IX." <u>Warren v. Reading Sch. Dist.</u>, 278 F.3d 163, 171 (3d Cir. 2002); <u>see also</u> <u>Chancellor v. Pottsgrove Sch. Dist.</u>, 501 F. Supp. 2d 695, 704 (E.D. Pa. 2007) (holding that "a school district may be liable for a teacher's sexual relationship with a student if (1) the school district received federal financial assistance, (2) the student was subjected to discrimination on the basis of sex, and (3) an 'appropriate person' (4) had actual notice of, and was deliberately indifferent to, the discrimination."). Even when an appropriate person has actual knowledge of discrimination, the school district escapes liability unless its "response . . . amount[s] to deliberate indifference to discrimination." <u>Id.</u> The Court found this standard to amount to "an official decision by the recipient not to remedy the violation." <u>Id.</u>

The dispute between the parties here is whether the appropriate person acted with deliberate indifference to the discrimination the minor plaintiff faced in Smith's classroom, not about whether the material shown by Smith was appropriate. The evidence in the record indicates that Gress undertook an investigation as soon as plaintiffs raised their concerns about Smith's teaching. Gress spoke to Smith about his methods, interviewed students in the class and examined the controversial materials Smith presented to the class. He told Smith to stop using material he

23

considered inappropriate. Pullo also acted, suspending Smith for three days with pay and ten days without pay. The superintendent instituted a program reviewing Smith's lesson plans when he returned to teaching. Despite these efforts, Smith continued his inappropriate teaching.

The court finds that no evidence exists by which a jury could conclude that an appropriate person was deliberately indifferent to the harassment that allegedly occurred in Smith's classroom. No evidence indicates that administrators had ever received complaints about Smith's teaching before they heard from plaintiffs. A log of Gress's investigation reveals that he met with plaintiffs on March 8, 2007. (See Exh. 7 to Defendants' Motion (Doc. 92)). Over the next week, he spoke with the parents about the status of the investigation, had a conversation with the district attorney about the case, and met with Smith about the complaint. (Id.). Gress ordered Smith to stop teaching his book and to eliminate explicit video and images. (Id.). He also made a close examination of Smith's autobiographical novel and screenplay, noting inappropriate material and references to sexual behavior and drinking. (Id.). By March 15, Gress had produced a report for Pullo that found Smith's class assignments "inappropriate," "unprofessional" and bearing "no relationship to the curriculum." (Id.). On that date, Pullo wrote Smith to inform him that he had been suspended for three days with pay, and that Gress had been instructed to undertake a "full investigation" of complaints against Smith. (Id.). After this investigation, Pullo suspended Smith for 10 days without pay. (Id.). Upon

24

Smith's return to school, he was to provide Gress with his lesson plans each week, obtain permission before showing any media to his classes, and refrain from discussing the investigation or its results with his classes. (Id.). The letter also warned Smith that subsequent "transgressions" could lead to "more stringent" action. (Id.). In the end, the evidence shows, administrators monitored Smith's teaching closely, if not always successfully. That they did not entirely succeed is not evidence of deliberate indifference, but perhaps of Smith's unwillingness to hew to administrative guidelines in his teaching. No evidence indicates, however, that Gress and Pullo were aware of a problem and chose to ignore it. The court will therefore grant the defendants' motion on this point.

Defendants also argue that they should be granted summary judgment on plaintiffs' Title IX retaliation claim. They argue that the standard of proof for such a claim is essentially the same as for a First Amendment retaliation claim. Since, they contend, the court should grant summary judgment to the defendants on plaintiff's First Amendment claim, they should receive such judgement on the Title IX retaliation claim. For the reasons described above, the court finds that plaintiff's Title IX retaliation claim should survive summary judgment. The motion will be denied on this point.

### d. Defendant Smith

Defendants argue that plaintiffs' Section 1983 claims against Smith should be dismissed. The plaintiffs' claim against Smith is an equal protection claim based on

the alleged sexual harassment that occurred in his classroom. The Supreme Court

has recently held that "§ 1983 suits based on the Equal Protection Clause remain

available to plaintiffs alleging unconstitutional gender discrimination in schools."

Fitzgerald v. Barnstable Sch. Comm., 129 S. Ct. 788, 797 (2009). "In order to

recover under § 1983, a plaintiff must show that the defendant, under color of state

law, subjected the plaintiff to a deprivation of a right, privilege, or immunity secured

by the constitution or laws of the United States." Renda v. King, 347 F.3d 550, 557

(3d Cir. 2003).

Defendants do not appear to dispute that Smith, in his role as teacher, acted

under color of state law. Nor could they. "[A] public employee acts under color of

state law while acting in his official capacity or while exercising his responsibilities

pursuant to state law." West v. Atkins, 487 U.S. 42, 50 (1988). Courts have

consistently found that teachers in their role as teachers act under color of state law.

See, e.g., Walker-Serrano ex rel. Walker v. Leonard, 325 F.3d 412 (3d Cir. 2003)

(finding that teacher and school administrators had not unlawfully restricted plaintiff's

petition rights because the school did not take action against petitioner, not because

teacher was not a state actor); S.M. ex rel. L.G. v. Lakeland School Dist., 33. Fed

Appx. 635 (3d Cir. 2003) (finding that teacher was not liable for violating students

substantive due process rights because teacher's behavior did not shock the

conscience, not because he failed to act under color of state law). The question,

then, is whether Smith's conduct in some way subjected the plaintiff to a deprivation

of a right, privilege, or immunity secured by the constitution or laws of the United States."  <u>Renda</u>, 347 F.3d at 557.

Defendants' argument is that Smith could be liable only if he acted in a way "deliberately indifferent to a known federal right."  (Defendants' Brief (Doc. 87) at 18). They cite to <u>Stoneking v. Bradford Area School Dist.</u>, 882 F.2d 720 (3d Cir. 1989) for this proposition.  The court finds that case inapposite, since the <u>Stoneking</u> court faced the question of whether school officials could be held liable for the actions of a band director who sexually abused and harassed a high-school student, and whether qualified immunity applied.  The court did not address the grounds upon which an individual accused of violating a federal right could be liable, especially where the claim is an equal protection one grounded in sexual harassment.  The allegations against Smith are not that he failed in his duty to supervise a teacher who sexually harassed his students.  Instead, Smith himself allegedly engaged in sexual harassment in violation of plaintiff's rights.  Thus, the court must determine whether Defendant Smith could be liable for unconstitutional gender discrimination under Section 1983.

An explanation of the Supreme Court's recent decision in <u>Fitzgerald</u> is helpful here.  In <u>Fitzgerald</u>, the Supreme Court considered whether the prohibitions of sexual harassment in Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), precluded an action under Section 1983 for "unconstitutional gender discrimination in schools."  <u>Fitzgerald</u>, 129 S. Ct. at 792.  The case arose out of the

27

persistent sexual harassment faced by plaintiffs' third-grade daughter by older students in her school.  Id.  Believing that the school district's response to their complaints was inadequate, the parents sued under both Section 1983 and Title IX. Id. at 792-93.  The district court granted the defendants' motion to dismiss the Section 1983 and state-law claims, and granted defendants' motion for summary judgment on the Title IX claim.  Id. at 793.  The First Circuit Court of Appeals affirmed.  Id.

The Supreme Court noted that the Courts of Appeals were split in deciding whether Title IX precluded Section 1983 claims to address unconstitutional gender discrimination in schools.  Id.  The Third Circuit Court of Appeals had previously found that Title IX "subsumed" sexual harassment claims brought pursuant to Section 1983.  Pfeiffer by Pfeiffer v. Marion Center Area School Dist., 917 F.2d 779, 789 (3d Cir. 1990); Williams v. School Dist. of Bethlehem, Pa., 998 F.2d 168, 176 (3d Cir. 1993).  The Court found that Title IX, unlike statutes that precluded a constitutional remedy through Section 1983, lacked an "'unusually elaborate,' 'carefully tailored,' and 'restrictive' enforcement scheme."  Fitzgerald, 129 S. Ct. 795. Because Title IX has no administrative exhaustion requirement or notice provisions, and plaintiffs can file their claims directly in court "parallel and concurrent § 1983 claims will neither circumvent required procedures, nor allow access to new remedies."  Id.  Moreover, the rights and protections, as well as the standard of proof, under the two statutes "diverge," and thus Congress could not have intended

to have Title IX serve as the sole means of vindicating gender discrimination.[4]  Id. at

796.   Thus, the court found that "§ 1983 suits based on the Equal Protection

Clause remain available to plaintiffs alleging unconstitutional discrimination in

schools."  Id. at 797.

The question, then, is what would make Smith liable pursuant to Section 1983.

The court did not address that question in Fitzgerald.  Plaintiffs urge that the court

adopt the standard for "traditional hostile environment analysis" in deciding whether

plaintiffs' equal protection sexual harassment claim can survive summary judgment.

(Plaintiffs' Brief in Opposition (Doc. 101) at 30).  Because of prior holdings on the

relationship between the two statutes, the Third Circuit Court of Appeals has not

examined the relationship between harassment claims brought pursuant to Title IX

and claims brought under Section 1983.   Circuit courts that have allowed plaintiffs to

bring sexual harassment claims under these circumstances, however, have adopted

Title VII standards for determining whether a sexually harassing environment

existed.  See, e.g., Hayut v. State Univ. of New York, 352 F.3d 733, 745 (2d Cir.

2003) (holding that "Section 1983 sexual harassment claims that are based on a

'hostile environment' theory . . . are governed by traditional Title VII 'hostile

_____

[4]The court noted that "Title IX reaches institutions and programs that receive federal
funds . . . , which may include nonpublic institutions . . . but it has consistently been
interpreted as not authorizing suit against school officials, teachers, and other individuals . .
. The Equal Protection Clause reaches only state actors, but § 1983 equal protection
claims may be brought against individuals as well as municipalities and certain other state
entities.  Fitzgerald, 129 S. Ct. at 796.  That is the precise situation in this case: Defendant
Smith, as an individual, cannot be liable under Title IX.  He can, however, as a state actor,
be liable for unconstitutional gender discrimination pursuant to Section 1983.

environment' jurisprudence."); Jennings v. Univ. of N.C., 482 F.3d 686, 701 (4th Cir. 2007). Moreover, the Third Circuit Court of Appeals applies a Title VII analysis to a determination of whether a hostile environment exists for Title IX purposes. See, e.g., Saxe v. State College Area Sch. Dist., 240 F.3d 200, 205 (3d Cir. 2001) (applying Title VII standards to Title IX sexual harassment). Thus, the court will apply Title VII analysis to plaintiff's hostile environment claim.

A plaintiff seeking to prove hostile environment discrimination pursuant to Title VII most have evidence of conduct this is "both: (1) viewed subjectively as harassment by the victim and (2) be objectively severe or pervasive enough that a reasonable person would agree that it is harassment." Saxe, 240 F.3d at 205. "In determining whether an environment is hostile or abusive, we must look at numerous factors, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether it unreasonably interferes with an employee's work performance.'" Weston v. Pennsylvania, 251 F.3d 420, (3d Cir. 2001) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)).

A jury could find that the evidence in this case indicates that plaintiffs subjectively found Smith's teaching and conduct to be harassing. Both parents and daughter complained about his course materials, including photographs and reading materials, as well as the topics that Smith discussed with the students. The minor plaintiff testified that she was often offended by the material Smith presented in

class, and that after some classes she "felt sick and . . . wanted to pass out." (M. Plaintiff. Dep. at 9, 31). She also found offensive explicit classroom discussions of sex, which occurred "over and over," even after she complained. (Id. at 36). She "felt intimidated every time I walked in the room. It seemed weird that he was–as the semester progressed that he was always buddy-buddy and that he would talk about his sex life. I was grossed out." (Id. at 33). After she complained about Smith's methods, things got worse, and she became convinced she could not return to school because she would be "miserable." (Id. at 35). The plaintiffs and their daughter eventually found the environment at school too painful to endure, and decided that she should stop attending school. (Id. at 13). They moved and the minor plaintiff graduated from a different high school. (Id. at 6).

A jury could also find that the conduct was objectively severe and pervasive enough as to offend and harass a reasonable person. The evidence indicates that Smith frequently discussed sexual topics of a graphic nature, and that he often addressed his own sexual history and asked his students about theirs. He also showed pictures of naked and dismembered corpses, urged students to read sexually graphic material, and ignored demands from administrators that he stop such behavior. A jury could conclude that such activity was not simply offensive, but that it unreasonably interfered with students' attempts to learn about twentieth-century United States history. While a reasonable juror may find the material Smith presented simply an example of the unpleasantness and violence characteristic of

the twentieth century, the court finds that a reasonable jury could conclude that Smith's material and methods created a hostile environment as defined by the law. Summary judgment is therefore inappropriate on this claim.

### e. Qualified Immunity

The individual defendants contend that they are entitled to qualified immunity. "'Government officials performing discretionary functions . . . are shielded from liability for civil damages insofar as their conduct does not violate clearly established constitutional rights of which a reasonable person would have known.'" <u>Merkle v. Upper Dublin Sch. Dist.</u>, 211 F.3d 782, 797 (3d Cir. 2000) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 8181 (1992)). Such "qualified immunity" applies "if reasonable officials in the defendant's position at the relevant time 'could have believed, in light of clearly established law, that their conduct comported with established legal standards.'" <u>Merkle</u>, 211 F.3d at 797 (quoting <u>Stoneking v. Bradford Area Sch. Dist.</u>, 882 F.2d 720, 726 (3d Cir. 1989)).

Qualified immunity could apply to each of the individual defendants who have claims remaining against them. Defendants' argument in relation to Defendant Gress is that no evidence exists to support a claim that he purposely revealed the plaintiffs' identities after promising not to, and thus retaliated against them. Such an argument applies to liability, not to immunity. The question in the qualified immunity context is whether "reasonable officials in the defendant's position at the relevant time 'could have believed, in light of clearly established law, that their conduct

comported with established legal standards.'" Merkle, 211 F.3d at 797. The court has already concluded that a reasonable juror could find that Gress revealed plaintiffs' names to Smith. A reasonable official, the court finds, could not have believed that retaliating against a plaintiff by reporting their names to the public despite plaintiffs' request for anonymity comported with clearly established law. As there is evidence by which a jury could find that Gress purposefully revealed plaintiffs' names, qualified immunity is not appropriate here.

In arguing that Smith is eligible for qualified immunity, defendants insist that no record evidence exists to demonstrate that "Smith felt his conduct or treatment of Plaintiffs was, in effect, depriving them of their constitutional rights." (Defendants' Brief at 19). Smith had never in five years of teaching the same materials faced a previous complaint about his methods. As such, he could reasonably have believed that his conduct comported with federal law. The court disagrees. A jury could find that Smith taught material that was highly offensive, and which served to expose the plaintiffs' minor daughter to sexual harassment. A jury could also find that a reasonable person in Smith's position–a teacher of high school students–would know that continually discussing matters of a sexual nature largely unrelated to course topics, showing offensive pictures of naked murder victims, and exposing students to graphic sexual material he had written himself and which bore little or no relation to course topics could have the effect of creating an intolerable environment and depriving students of their right to equal access to education. Moreover, a

reasonable teacher in Smith's position would have stopped teaching material that could have the effect of denying students their rights after being warned by administrators about the subjects he was teaching. Summary judgment is therefore inappropriate on qualified immunity grounds.

### f. Punitive Damages

Finally, defendants dispute plaintiffs' claims to punitive damages. To obtain punitive damages on a Section 1983 claim, "defendant's conduct [must be] shown to be motivated by evil motive or intent, or . . . [involve] reckless or callous indifference to the federally protected rights of others." Smith v. Wade, 461 U.S. 30, 56 (1983). According to the Third Circuit Court of Appeals, punitive damages require that "the defendant's conduct must be, at a minimum, reckless or callous. Punitive damages might also be allowed if the conduct is intentional or motivated by evil motive, but the defendant's action need not necessarily meet this higher standard." Savarese v. Agriss, 885 F.2d 1194, 1204 (3d Cir. 1989).

Here, if the jury were to believe that Gress intentionally disseminated plaintiffs' names to Smith, that jury could conclude that Gress acted with callous indifference to plaintiffs' federally protected rights. In the same manner, if a jury were to find that Smith intentionally created a sexually harassing environment, that jury could find that Smith acted with callous indifference to plaintiffs' federally protected rights. As such, the court will deny the plaintiffs' motion on this point.

### B. Plaintiffs' Motion

Plaintiffs seek summary judgment on their sexual harassment claim. They argue that the minor plaintiff was subject to a hostile environment in Smith's classroom, and that this hostile environment continued even after Smith returned from his suspension. Plaintiffs contend that the facts that gave rise to the hostile environment are not in dispute. They also contend that the defendant school district and administrators were aware that Smith engaged in offensive teaching practice for at least five years, and did nothing to halt those actions until plaintiffs complained. The failure of the district and school officials to act, plaintiffs claim, constitutes deliberate indifference to the environment Smith created. The court has already found that summary judgment is appropriate for the defendants on this claim. As explained above, the mere existence of a hostile environment is not enough to subject a school district to liability–an appropriate person must be deliberately indifferent to the situation. Thus, summary judgment is inappropriate for the plaintiffs here, and the court will deny the motion.

## V. Conclusion

For the foregoing reasons, the court will grant defendants' motion in part and deny it in part. The court will deny the plaintiffs' motion. As a result of this opinion, only plaintiffs' retaliation claim against Defendant Gress, plaintiffs retaliation claims pursuant to Title IX, plaintiffs' equal protection claim against Defendant Smith, and plaintiffs' punitive damages claim against Smith and Gress will remain. Defendant Pullo will be dismissed from the case. An appropriate order follows.

35

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PATRICIA YOUNG,                     :     No. 3:07cv854
WILLIAM YOUNG, and                  :
PATRICIA YOUNG, on behalf           :     (Judge Munley)
of her minor daughter,              :
          Plaintiffs          :
                                :
    v.                          :
                                :
PLEASANT VALLEY SCHOOL              :
DISTRICT,                           :
PLEASANT VALLEY SCHOOL              :
BOARD,                              :
JOHN J. GRESS, Principal, in his    :
individual capacity,                :
DR. FRANK A. PULLO,                 :
Superintendent, in his individual   :
capacity, and                       :
BRUCE H. SMITH, JR.,                :
          Defendants          :

## ORDER

**AND NOW**, to wit, this 4th day of January 2010, the defendants' motion for summary judgment (Doc. 87) is hereby **GRANTED** in part and **DENIED** in part, as follows:

1) The motion for summary judgment as to plaintiffs' First Amendment retaliation complaint against Defendant Pullo is hereby **GRANTED**;

2) The motion for summary judgment as to plaintiffs' failure-to-train complaint pursuant to 42 U.S.C. § 1983 is hereby **GRANTED**; and

3) The motion is **DENIED** in all other respects.

The plaintiffs' partial motion for summary judgment (Doc. 85) is hereby **DENIED**.

The case against Defendant Pullo is hereby **DISMISSED**, as no claims remain against him.

**BY THE COURT:**

s/ James M. Munley
**JAMES M. MUNLEY**
**UNITED STATES DISTRICT JUDGE**