**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PATRICIA YOUNG, et al.,** | : | |
| **Plaintiffs** | : | |
| | : | **Civil Action No. 3:07-CV-00854** |
| **v.** | : | |
| | : | **(Chief Judge Kane)** |
| **PLEASANT VALLEY SCHOOL** | : | |
| **DISTRICT, et al.,** | : | |
| **Defendants** | : | |

**MEMORANDUM**

Currently pending before the Court are Defendants' motion for a new trial (Doc. No. 288)

and motion for judgment as a matter of law (Doc. No. 289).

**BACKGROUND**

The genesis of this federal civil rights action is the admitted acts of poor judgment by an

enthusiastic and popular high school teacher in selecting and commenting on classroom materials

that he believed would make twentieth century history "come alive."  Although no other student

had objected to these materials in the seven previous school years that Defendant Bruce Smith

had taught Twentieth Century History at Pleasant Valley High School, in the Spring of 2007,

Plaintiff M. Young,[1] a talented high school junior who was enrolled in Defendant Smith's class,

complained to her parents about the inappropriate nature of references, photographs, books, and

videos that were part of Defendant Smith's history course.

Plaintiffs Patricia Young and William Young were understandably concerned and made

immediate complaints on their daughter's behalf to the Pleasant Valley School District through

---

[1] Because the jury did not return a verdict in favor of Plaintiffs Patricia and William
Young, where the Court refers only to "Plaintiff" the Court is referring to Plaintiff M. Young.

its Principal John J. Gress.  As is set forth in great detail below, this complaint unleashed a series of truly unfortunate and troubling consequences that derailed Plaintiff's previously happy and successful high school career.  Defendant Smith was quickly suspended without pay after Mr. and Mrs. Young made their complaint.  Two months later, Plaintiffs brought this lawsuit against Defendants Pleasant Valley, Smith, and Gress.[2]  Its highly publicized filing brought notoriety to the Youngs and an angry backlash against Plaintiff M. Young that affected her so profoundly that she left her junior year of high school and the extracurricular activities she once enjoyed in favor of home schooling for the remainder of the school year.  She ultimately did not return to the Pleasant Valley School District for her senior year.  What might have been Plaintiff's happiest years were instead anxious and unhappy times for her and her family.

Since that time, Plaintiff M. Young has enjoyed a successful adjustment to college in one of the country's most prominent universities, and Defendant Smith has left teaching to fulfill life-long career goals away from the classroom.  In spite of these events, the lawsuit that sprang from the unhappy events of 2007 has labored on, with the parties enduring five years of lengthy discovery and the most contentious, voluminous, and vitriolic motions practice ever seen by this Court.   After at least four attempts by officers of this Court to mediate an amicable end to this unfortunate matter, the case was finally tried to a jury in August 2011.

The jury credited two of Plaintiffs' claims, finding against Pleasant Valley School District on Plaintiff M. Young's First Amendment retaliation claim and against Defendant Smith on

---

[2] Plaintiffs also filed suit against Superintendent Frank Pullo and the Pleasant Valley School Board; however, those defendants have since been removed from the case.

Plaintiff M. Young's Section 1983 equal protection claim.[3]  The jury awarded Plaintiff M. Young $200,000 in compensatory damages from Defendant Pleasant Valley, $25,000 in compensatory damages from Defendant Smith, and $100,000 in punitive damages from Defendant Smith.  (Id.)

In another heated exchange of briefs following trial, the parties have addressed multiple errors that Defendant claims tainted the result of the five-day jury trial.  Though the parties' submissions contain an extraordinary amount of personal sniping that exceeds even the most spirited style of advocacy, when the rhetoric is separated from the legal challenges to the jury's verdict as outlined by Defendant, for the reasons explained at length below, the unavoidable conclusion is that the law dictates that this verdict be set aside.

## STANDARDS OF REVIEW

## I.      MOTION FOR JUDGMENT AS A MATTER OF LAW

To prevail on a renewed motion for judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, the moving party must establish that there was no "legally sufficient evidentiary basis for a reasonable jury to have found for [the prevailing party] on that issue."  Fed. R. Civ. P. 50(a)(1).  In determining whether to grant judgment as a matter of law, the court "must view the evidence in the light most favorable to the non-moving party, and determine whether the record contains the 'minimum quantum of evidence from which a jury might reasonably afford relief.'"  Glenn Distribs. Corp. v. Carlisle Plastics, Inc., 297 F.3d 294,

---

[3] Following cross-motions for summary judgment, Judge James Munley ruled that the claims remaining in this action were: (1) claims for First Amendment retaliation by all Plaintiffs against Defendants Pleasant Valley and Gress; (2) a claim for Title IX retaliation by Plaintiff M. Young against Defendant Pleasant Valley; (3) a Section 1983 equal protection claim by Plaintiff M. Young against Defendant Smith; and (4) a claim of retaliation under the Pennsylvania Human Relations Act by Plaintiff M. Young against Defendant Pleasant Valley.  (Doc. No. 117.)

299 (3d Cir. 2002) (quoting <u>Mosley v. Wilson</u>, 102 F.3d 85, 89 (3d Cir. 1996)).  A court may

grant judgment as a matter of law "only if, viewing the evidence in the light most favorable to the

nonmovant and giving it the advantage of every fair and reasonable inference, there is

insufficient evidence from which a jury reasonably could find liability."  <u>LePage's Inc. v. 3M</u>,

324 F.3d 141, 145-46 (3d Cir. 2003) (quoting <u>Lightning Lube, Inc. v. Witco Corp.</u>, 4 F.3d 1153,

1166 (3d Cir. 1993)).  "The court may not weigh evidence, determine the credibility of witnesses

or substitute its version of the facts for that of the jury."  <u>Parkway Garage, Inc. v. City of

Philadelphia</u>, 5 F.3d 685, 691 (3d Cir. 1993).  Rather, the Court may grant a Rule 50 motion only

"if upon review of the record it can be said as a matter of law that the verdict is not supported by

legally sufficient evidence."  <u>Id.</u> at 691-92.

## II.    MOTION FOR NEW TRIAL

"The court may, on motion, grant a new trial on all or some of the issues . . . after a jury

trial, for any reason for which a new trial has heretofore been granted in an action at law in

federal court . . . ."  Fed. R. Civ. P. 59(a)(1)(A).  The decision whether to grant a new trial

following a jury verdict is within the sound discretion of the trial court.  <u>See</u> <u>Allied Chem. Corp.

v. Daiflon, Inc.</u>, 449 U.S. 33, 36 (1980); <u>Blancha v. Raymark Indus.</u>, 972 F.2d 507, 512 (3d Cir.

1992).  The standard to be applied to a motion for new trial varies depending on the grounds

upon which the motion rests.  <u>Klein v. Hollings</u>, 992 F.2d 1285, 1289-90 (3d Cir. 1993).  Where

the motion is based on matters within the district court's discretion, such as evidentiary rulings or

prejudicial statements by counsel, the court has broad latitude in ordering a new trial.  <u>Id.</u> (citing

<u>Bhaya v. Westinghouse Elec. Corp.</u>, 922 F.2d 184, 187 (3d Cir. 1990); <u>Lind v. Schenley Indus.,

Inc.</u>, 278 F.2d 79, 90 (3d Cir. 1960)).  Where the motion argues that the jury's decision is against

the weight of the evidence, however, the motion may be granted "only where the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." Williamson v. Consol. Rail Corp., 926 F.2d 1344, 1353 (3d Cir. 1991). Notably, when reviewing a motion for a new trial "the trial judge may consider the credibility of witnesses and the weight of the evidence." 9B Wright & Miller, Federal Practice & Procedure § 2531 (3d ed. 2012); see also Simco v. Ellis, 303 F.3d 929, 932 (8th Cir. 2002) (holding that when considering a motion for new trial on the ground that the verdict is against the weight of the evidence, the trial court "is entitled to interpret the evidence and judge the credibility of witnesses"); Watkins v. Prof'l Sec. Bureau, Ltd., No. 98-2555, 1999 U.S. App. LEXIS 29841, at *10 n.8 (4th Cir. Nov. 15, 1999); Fount-Wip, Inc. v. Reddi-Wip, Inc., 568 F.2d 1296, 1302 (9th Cir. 1978); MLMC, Ltd. v. Airtouch Commc'ns, Inc., 215 F. Supp. 2d 464, 470 (D. Del. 2002); Valentin v. Crozer-Chester Med. Ctr., 986 F. Supp. 292, 298 (E.D. Pa. 1997). Of course, the Court must proceed cautiously and avoid simply substituting its own judgment of the facts and credibility of the facts for those of the jury. Williamson, 926 F.2d at 1353.

## III.    MOTION FOR REMITTITUR

The use of remittitur is committed to the discretion of the trial court. Evans v. Port Auth. of N.Y. & N.J., 273 F.3d 346, 354 (3d Cir. 2001). Remittitur is warranted when an award of damages shocks the judicial conscience. Id. at 355. Where an award of damages does shock the judicial conscience, the trial court may remit the award of damages to an amount no less than the maximum recovery that does not shock the judicial conscience. Gumbs v. Pueblo Int'l, Inc., 823 F.2d 768, 774 (3d Cir. 1987). To accomplish this task the Court should compare the award of

5

damages with damages awarded in similar cases.  See, e.g., Delli Santi v. CNA Ins. Cos., 88 F.3d

192, 206 (3d Cir. 1996).

## DISCUSSION

Defendants have raised some twelve issues in support of their motions for judgment as a

matter of law, or alternatively, a new trial.  In attacking the jury verdict against Defendant

Pleasant Valley on Plaintiff's First Amendment retaliation claim, Defendants raise the following

issues: (1) Plaintiff failed to establish Monell liability against Defendant Pleasant Valley; (2)

Plaintiff failed to establish that she engaged in protected First Amendment activity; and (3) the

jury verdict in favor of Defendant Gress and against Defendant Pleasant Valley is inconsistent.[4]

In attacking the jury verdict against Defendant Smith on Plaintiff's Section 1983 equal protection

claim, Defendants raise the following issues: (1) as a matter of law, individual liability is not

available for Section 1983 equal protection claims based on a hostile school environment; and (2)

the jury verdict was against the weight of the evidence.  Defendants raise the following

arguments challenging the award of damages: (1) Plaintiff failed to produce evidence supporting

a finding of damages related to the Section 1983 equal protection claim; (2) the punitive damages

award against Defendant Smith was excessive and without evidentiary support; and (3) Plaintiff

failed to produce evidence supporting a finding of $200,000 in damages related to the First

Amendment retaliation claim.  Defendants also argue that the Court made the following errors

justifying a new trial: (1) four evidentiary rulings; (2) three errors in the verdict slip; and (3) three

errors in the jury instructions.  Finally, Defendants contend that Plaintiff's counsel's conduct

---

[4] Defendants also argue that Plaintiff failed to produce evidence of retaliation.  The Court will address this issue in the section addressing whether Plaintiff established Monell liability.

warrants the ordering of a new trial.  The Court will address these issues in turn.[5]

## I.  FIRST AMENDMENT RETALIATION

### A.  **Monell Liability Against Defendant Pleasant Valley**

Defendants first contend that the jury verdict in favor of Plaintiff and against Defendant

Pleasant Valley as to Plaintiff's First Amendment retaliation claim is defective.  Specifically,

Defendants note that Judge Munley previously ruled that, as a matter of law, Defendant Pullo

took no action that would constitute retaliation for Plaintiff exercising her First Amendment

rights.  Defendants further note that the jury returned a verdict indicating that the only other

relevant policymaker, Defendant Gress, did not unlawfully retaliate against Plaintiff.

Accordingly, Defendants conclude that Plaintiff's First Amendment retaliation claim fails as a

matter of law.  Plaintiff responds that Defendants did not preserve this claim via a Rule 50(a)

motion, and that even if they did, the motion would necessarily fail.  The Court will first consider

Plaintiff's argument regarding whether the claim has been preserved.  The Court will then

consider the merits of Defendants' position.

### 1.  **Whether Defendants' Motion is Properly Raised**

A party may only file a post-verdict motion for judgment as a matter of law pursuant to

Rule 50(b) where that party has first filed a pre-verdict motion for judgment as a matter of law

pursuant to Rule 50(a) that is "sufficiently specific to afford the party against whom the motion is

directed with an opportunity to cure possible defects in proof which otherwise might make its

case legally insufficient."  Lightning Lube, 4 F.3d at 1173 (emphasis in original).  The Rule 50(a)

---

[5] Although the resolution of some issues will render the resolution of others moot, the Court will address each issue.

motion must "specify the judgment sought and the law and the facts on which the moving party

is entitled to the judgment."  Fed. R. Civ. P. 50(a)(2).  The purpose of this rule is to ensure that

the non-moving party will have an opportunity to cure the defect cited by the moving party prior

to the case going to the jury.  See Fineman v. Armstrong World Indus., Inc., 980 F.2d 171,

183-84 (3d Cir. 1992).

At the close of Plaintiff's case-in-chief, Defendants' counsel made a verbal Rule 50(a)

motion in which he argued, as it pertains to the retaliation claims against Defendant Pleasant

Valley:

> Your Honor, at this time we would move for judgment under Rule 50 for the three defendants, the school district, Mr. Gress, and Mr. Smith, and I'll state my reasons for each as we go.
>
> With regard to – I'll combine Mr. Gress and the district. I think it's important to remember what is actually before the Court, what causes of action are left, and then what causes of action the jury is going to be asked to determine.  And with regard to Mr. Gress and the school district, they are actions for retaliation, the First Amendment with regard to Mr. Gress, the First Amendment and Title IX with regard to the school district.
>
> Your Honor, I suggest that we have heard no evidence, no evidence by which a reasonable jury could conclude that there was any retaliatory activity on the part of either Mr. Gress or on the part of the school district, could conclude that a person of reasonable firmness would be deterred from exercising their rights.
>
> The worst thing that we've heard is that potentially Mr. Gress may have told someone, but as a result of that, what has – the only evidence that there is is that there was a call  from Mr. Smith, and I'd suggest, as a matter of law, no reasonable juror could say that that was retaliatory.
>
> There's no evidence that it was made in malice, there's no threats that were made, it was made – all the testimony is consistent in that Mr. Smith called to try to see what the problem was and to straighten

things out.  No reasonable juror could say that that was retaliatory activity.

The other matters with regard to the blogs and so forth, Your Honor, cannot be reasonably – cannot be legally ascribed to either defendant. They would be actions of third parties all reacting to the story in the paper about the lawsuit. No reasonable juror could conclude that that retaliatory activity came from the school or Mr. Gress.

(Doc. No. 304 at 515:9-516:17.)   Defendants renewed this motion at the close of the evidence.[6]

(Doc. No. 305 at 762:22-763:4.)

In the oral motion, Defendants' counsel argued that there was "no evidence, no evidence by which a reasonable jury could conclude that there was any retaliatory activity on the part of either Mr. Gress or on the part of the school district."  (Doc. No. 304 at 515:21-24.)  Plaintiff is correct that counsel for Defendants did not utter the word "Monell" when making Defendants' oral motion; however, Monell simply stands for the proposition that to hold a municipality liable pursuant to Section 1983, that a plaintiff must establish that the municipality itself acted.  Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978).  The Court is satisfied that Defendants' argument that Defendant Pleasant Valley did not engage in retaliatory activity was sufficient to put Plaintiff on notice that Defendants would be arguing that Defendant

_____

[6] Plaintiff objected at trial, and renews her objection in her post-trial briefs, to Defendants renewing their Rule 50(a) motion after Defendants rested.  Defendants renewed their motion at trial on the final day of testimony and shortly after Defendants rested their case-in-chief.  The motion was made before either counsel gave closing arguments and before the jury was charged. The Court finds no support for the proposition that a Rule 50(a) motion must be made prior to the moving party resting their case.  Rather, the text of the rule only requires that the motion be made before the case is submitted to the jury.  Fed. R. Civ. P. 50(a)(2).  Plaintiff was at liberty to call rebuttal witnesses or present additional evidence after Defendants rested their case-in-chief, thus ensuring that the rule's purpose of preventing unfair surprise was not undermined.  Plaintiff cannot say, simply because she declined to take advantage of the opportunity to present evidence to bolster her claims, that the renewed motion was defective.

Pleasant Valley did not engage in retaliatory activity.  Accordingly, the Court finds that

Plaintiff's objection is without merit and Defendants' motion is properly raised.

### 2.  Whether Defendant Pleasant Valley is Entitled to Judgment as a Matter of Law

In Monell v. New York City Department of Social Services, the United States Supreme

Court held that municipalities are "persons" subject to liability pursuant to 42 U.S.C. § 1983.

436 U.S. at 690.  A Section 1983 claim will not lie against a municipality, however, if it is based

solely on a theory of respondeat superior.  Id. at 691-92.  Rather, a municipality may only be held

liable pursuant to Section 1983 if a plaintiff is able to identify a policy or custom of the

municipality that caused the constitutional violation.  A.M. v. Luzerne Cnty. Juvenile Det. Ctr.,

372 F.3d 572, 580 (3d Cir. 2004) (citing Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown,

520 U.S. 397, 403 (1997)).  A municipal policy is made when an official with final

decision-making authority issues an official proclamation, policy, or edict.  Andrews, 895 F.2d at

1480 (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986)).  A custom or practice

may give rise to municipal liability where a course of conduct, though not authorized by law, is

so permanent and widespread as to virtually constitute law.  Id. (quoting Monell, 436 U.S. at

690).  To establish municipal liability based upon a custom or practice, a plaintiff must

demonstrate that "through its deliberate conduct, the municipality was the 'moving force' behind

the injury alleged."  Brown, 520 U.S. at 404 (emphasis in the original).

The only relevant school officials in this action are the school board, Superintendent

Pullo, and Defendant Gress.[7]  Concerning Superintendent Pullo, Judge Munley previously held

---

[7] In her brief in opposition, Plaintiff argues that an assistant principal, Robert Hines, was also an official with final decision-making authority.  The evidence is scant that Assistant

that as a matter of law he did not engage in any acts of retaliation against Plaintiff.  See Young v. Pleasant Valley Sch. Dist., No. 3:07-cv-854, 2010 U.S. Dist. LEXIS 119, at *17-*19 (M.D. Pa. Jan. 4, 2010).  Plaintiff argues, however, that Superintendent Pullo retaliated against Plaintiff by permitting Defendant Smith to present a videotaped lesson on the Pentagon Papers while he was on suspension.  The Court questions whether permitting a teacher to present such a lesson in the context of the Twentieth Century History class could possibly be considered retaliation.  It is hardly clear that Defendant School District's failure to intervene to prevent Defendant Smith from showing the Pentagon Papers "whistle blower" video establishes retaliation, or that upon viewing the video a person of ordinary firmness would be deterred from exercising her First Amendment rights.  Setting these issues aside, however, contrary to Plaintiff's assertion in her brief, there is no evidence that would support a finding that Superintendent Pullo approved the videotape.  Plaintiff cites to Superintendent Pullo's testimony that Defendant Smith was given permission to teach via video; however, she ignores Superintendent Pullo's testimony when

---

Principal Hines did anything that could possibly be considered retaliation against Plaintiff.  The only evidence that Assistant Principal Hines did anything in this case is testimony that he monitored Defendant Smith's classroom (Doc. No. 305 at 608:11-12) and that he reviewed and approved a videotape lesson that Defendant Smith submitted while he was on suspension that included material on the Pentagon Papers and Daniel Ellsberg (Id. at 667:16-17).  There can be no question that monitoring Defendant Smith cannot be retaliatory against Plaintiff.  Similarly, the Court is skeptical that permitting a teacher to present a videotaped history lesson on the Pentagon Papers in a Twentieth Century History class could be viewed as a retaliatory act.  In any event, Plaintiff has put forth no evidence from which the Court could conclude that an assistant principal could be an official with final decision-making authority.  See Nawrocki v. Twp. of Coolbaugh, 34 F. App'x 832, 837 (3d Cir. 2002) (quoting Pembaur, 475 U.S. at 480) (noting that whether an official has "final policymaking authority" is a question of state law).  Because Assistant Principal Hines took no actions that could be considered retaliatory and because Plaintiff has provided no authority to support the proposition that Assistant Principal Hines was an official with final policymaking authority, Assistant Principal Hines's actions cannot support a finding of municipal liability against Defendant Pleasant Valley.

examined by Plaintiff's counsel that he was not even aware of the videotape of the Pentagon Papers lesson until after a complaint was made.  (Doc. No. 304 at 568:9-13.)  Because there is no evidence of record that would support a conclusion that Superintendent Pullo ever saw the Pentagon Papers lesson prior to the tape being shown to Plaintiff's class and because there is no reason to believe the conduct would have constituted unlawful retaliation even if he had, the Court must conclude that Superintendent Pullo's actions cannot support a claim against Defendant Pleasant Valley.[8]

In the alternative, Plaintiff alleges that the school board itself retaliated against Plaintiff by failing to act to protect her.  That is, Plaintiff contends that the school board is guilty of retaliation for failing to "commend or support the minor Plaintiff's right to express her opinions" after students held a "rally" on a Saturday in front of the school in support of Defendant Smith when Plaintiff's lawsuit became public.  While there is ample room for debate regarding the manner in which school authorities managed the controversial discipline of Defendant Smith and the news of Plaintiff's lawsuit, the Court finds no legal basis for concluding that a claim of retaliation is properly premised on a defendant's failure to voice support for a plaintiff who files a lawsuit against him.

Plaintiff further contends that the school's inaction constitutes a "deliberate failure to prevent [student-on-student] harassment," which justifies a jury finding of retaliation.  Plaintiff cites no support for this theory of unlawful retaliation.  The Third Circuit has held that "failures to act cannot form the basis of a valid [Section] 1983 claim."  Kaucher v. Cnty. of Bucks, 455

---

[8] Plaintiff also cites the provision of homebound instruction for Plaintiff as evidence of retaliation.  Judge Munley, however, specifically found that these actions could not as a matter of law constitute unlawful retaliation.  Young, 2010 U.S. Dist. LEXIS 119, at *19-*20.

F.3d 418, 433 n.11 (3d Cir. 2006) (collecting cases).  Even if Plaintiff were able to articulate a

claim of deliberate indifference as to the conduct of her fellow students, there has been no

evidence that any administrator was aware or should have been aware of threatening or harassing

speech made directly to Plaintiff on school property.  Indeed, there is precious little evidence that

any comments were made directly to Plaintiff at school at all.  Instead, most of the offending

comments appear to have been relayed to Plaintiff by her friends or were found in comments

made on an article about Plaintiff's lawsuit on a newspaper's website.  While the comments were

undoubtedly upsetting and at times disturbing, Plaintiff points to no authority for the proposition

that the failure of school administrators to police anonymous comments made on a newspaper's

website is actionable.  Accordingly, the Court finds no basis for concluding that an alleged

failure to prevent third parties from discussing Plaintiff's lawsuit could serve as the basis for a

claim of unlawful retaliation.

      Regarding the final potential policymaker, Defendant Gress, the Court notes that the jury

concluded that he did not engage in unlawful retaliation.  Defendants and Plaintiff both appear to

accept that this means that a jury <u>could</u> <u>not</u> find that he engaged in unlawful retaliation.  The

Court disagrees.  A jury verdict that Defendant Gress did not unlawfully retaliate against Plaintiff

indicates only that the jury resolved any disputes of fact in Defendant Gress's favor.  As Judge

Munley explained in his order addressing Defendants' motion for summary judgment, "a

reasonable juror could conclude that Gress revealed to Smith that plaintiffs had complained

about his teaching, and that such conduct would discourage an ordinary person from complaining

in the future."  <u>Young v. Pleasant Valley Sch. Dist.</u>, No. 3:07-cv-854, 2010 U.S. Dist. LEXIS

119, at *16 (M.D. Pa. Jan. 4, 2010).  At trial, evidence was introduced that suggested Defendant

13

Gress may have told Defendant Smith that Plaintiff had complained about his classroom. While the Court is skeptical that this evidence is sufficient to support a claim of retaliation, Judge Munley's prvious ruling on this issue binds this Court to so find. Defendants' real objection is not that there was no evidence to support retaliation, but rather, that the verdict finding retaliation by Defendant Pleasant Valley was inconsistent with the jury's finding that there was no retaliation by Defendant Gress. Accordingly, the Court finds that because a jury could have found that Defendant Gress engaged in retaliatory conduct, the Court cannot find that Defendant Pleasant Valley is entitled to judgment as a matter of law on this issue.

### B.   Whether Plaintiff Engaged in Protected First Amendment Activity

Defendants next argue that Defendant Pleasant Valley is entitled to judgment as a matter of law because Plaintiff did not engage in protected First Amendment conduct. Plaintiff responds that Defendant's argument has not been preserved, and that to the extent it has, it fails as a matter of law. The Court will consider whether the motion has been preserved before reviewing the merits of Defendants' contentions.

Regarding the issue of whether Defendants properly preserved their motion for judgment as a matter of law on the issue of whether Plaintiff engaged in protected First Amendment activity, the Court finds that Defendants have properly preserved this claim in part. As has been previously noted, a Rule 50(b) motion may only be made where the moving party has first filed a motion pursuant to Rule 50(a) on the issue. In the present matter, Defendants made a Rule 50(a) motion at the close of Plaintiff's case-in-chief, which was then renewed at the close of Defendants' case-in-chief. Nowhere in those motions did Defendants argue that Plaintiff did not engage in protected First Amendment activity. Defendants counter that they raised the issue via

14

a Rule 12(b)(6) motion and renewed the issue during the charging conference.  Defendants did

raise the issue of whether Plaintiff engaged in protected activity:

> I don't think that they ever stated a cause of action under the First
> Amendment expression clause.
>
> I think that they – if a cause of action exists under the First
> Amendment, it's under the petition clause.  And I'll phrase that as an
> objection and ask that instead of protected speech, it's a right to
> petition government, because that's what was argued here.  At one
> point I think we argued that the mere reporting of teacher misconduct
> didn't qualify as First Amendment.  I'd say it's not protected speech,
> I'd say it's petitioning government.
>
> [. . .]
>
> Okay.   Again, I'll just preserve that, as well.  It's an interesting
> question. I think that there are different aspects that may come into
> play with regard to what standards apply and whether or not, in fact,
> this is a public matter.

(Doc. No. 315 at 803:11-804:20.)  Although the motion was not technically raised in the context

of a Rule 50(a) motion, other courts have found that a motion for judgment as a matter of law

raised in the form of an objection to proposed jury instructions may excuse technical

noncompliance with Rule 50(b).  See, e.g., Lentz v. City of Cleveland, 333 F. App'x 42, 55 (6th

Cir. 2009); Scottish Heritable Trust, PLC v. Peat Marwick Main & Co., 81 F.3d 606, 610 (5th

Cir. 1996)).  Because the issue was raised before either party delivered their closing arguments

and before the case was sent to the jury, Plaintiff still could have moved for leave to call rebuttal

witnesses or provide any additional evidence that she felt she needed to cure the defect.

Accordingly, the Court is satisfied that the issue of whether complaints about a teacher are

protected speech is preserved.  Defendants did not, however, raise the issue of whether Plaintiff's

parents could speak on her behalf for purposes of a First Amendment retaliation claim.

Accordingly, that issue is not preserved, and the Court will not consider it.[9]

While the issue of whether complaints about a teacher are protected was preserved, the Court finds no merit to Defendant Pleasant Valley's contention that Plaintiff did not engage in protected First Amendment activity because she did not speak out on a matter of public concern. Defendants, relying on Azzaro v. County of Allegheny, contend that "[t]o be protected by the First Amendment, speech must 'involve a matter of public concern.'"  (Doc. No. 316 at 21 (quoting Azzaro v. Cnty. of Allegheny, 110 F.3d 968, 976 (3d Cir. 1997).)  Defendants, however, fail to accurately grasp the context of this rule, namely, that "a public employee's expressive

_____

[9] The Court acknowledges that there is conflicting authority on this issue.  Compare. Mullin v. Las Lomitas Elem. Sch. Dist., 109 F. App'x 146, 148 (9th Cir. 2004) (finding no error with jury instructions that permitted the jury to take into account the speech of a student's parents when evaluating the student's First Amendment retaliation claim); with Morris v. Lindau, 196 F.3d 102 (2d Cir. 1999) (finding that an individual who alleged that he was denied an interview for a position with the police department because of his father's speech did not have standing to assert his father's First Amendment rights); Rojas v. Town of Cicero, No. 08-c-5913, 2010 U.S. Dist. LEXIS 109871 (N.D. Ill. Oct. 14, 2010) (finding that a wife's speech could not be imputed to the husband in his First Amendment retaliation claim).  Although the Court is skeptical that for First Amendment purposes a child could claim retaliation based on her parent's speech, the Court finds that this issue has not been preserved.

The Court further notes that the parties dispute whether Plaintiff reporting Defendant Smith's conduct to her guidance counselor and Defendant Pullo could constitute protected activity.  The Court, relying on Seamons v. Snow, 84 F.3d 1226 (10th Cir. 1996), would conclude that such conduct is protected.  Neither party, however, suggested at trial that this conduct formed the basis of the First Amendment claim.  Accordingly, the Court instructed the jury, without objection from either party, that only the complaints raised to Defendant Gress supported the First Amendment retaliation claim.  (Doc. No. 315 at 869:5-11.)  Accordingly, although the Court believes such conduct might support the First Amendment claim, based on the jury instructions the Court is unable to conclude that such activity formed the basis of the jury's verdict in this matter.

Finally, the Court notes that testimony was produced to the effect that on March 14, 2007, Defendant Gress did speak to Plaintiff.  Plaintiff's testimony, however, indicates that the sole topic of conversation was whether Plaintiff wished to be transferred to a different history class.  (Doc. No. 303 at 185:19-22.)  The Court has reviewed its notes and its transcript and finds no basis for concluding that any further conversations directly between Defendant Gress and Plaintiff took place.

conduct" is only protected when the speech is about a matter of public concern.  Azzaro, 110

F.3d at 976 (emphasis added).  There can be no doubt that speech regarding private matters is

still subject to First Amendment protection.  See Connick v. Myers, 461 U.S. 138, 147 (1983)

(citing United Mine Workers v. Illinois State Bar Ass'n, 389 U.S. 217, 223 (1967)).  As Judge

Munley explained in rejecting Defendants' motion to dismiss the First Amendment retaliation

claims:

> [T]o determine whether plaintiffs – in particularly the two parents
> named as plaintiffs – engaged in constitutionally protected conduct
> we simply ask whether plaintiffs engaged in protected activity, here
> speech.  The Third Circuit Court of Appeals has held that "except for
> certain narrow categories deemed unworthy of full First Amendment
> protection – such as obscenity, 'fighting words' and libel all speech
> is protected by the First Amendment."  Eichenlaub v. Twp. of
> Indiana, 385 F.3d 274, 283 (3d Cir. 2004) (citing R.A.V. v. St. Paul,
> 505 U.S. 377, 382-90 (1982)).  Such "protection includes private
> expression not related to matters of public concern."  Id.  Thus,
> "'speech unrelated to a matter of public concern is not, like obscenity,
> entirely outside the protection of the First Amendment.  While the
> government as employer may discharge a public employee for such
> speech, the government as sovereign may not sanction the same
> individual when she engages in speech as a citizen, outside the
> employment context.'"  Id. at 284 (quoting Azzaro v. Cnty. of
> Allegheny, 110 F.3d 968, 976 n.3 (3d Cir. 1997)).  In complaining to
> the school district about the content of Defendant Bruce's instruction,
> then, the plaintiffs engaged in a protected activity.

Young v. Pleasant Valley Sch. Dist., No. 3:07-cv-854, 2008 U.S. Dist. LEXIS 10829 at *12-*13

(M.D. Pa. Feb. 13, 2008).  Because Judge Munley's decision remains the law of this case, the

Court finds no basis for concluding that Plaintiff was only entitled to First Amendment

protection if she was engaged in speech on a matter of public concern.

In addition, because Plaintiff has advanced an "imputed speech" theory whereby she

argues Plaintiffs William and Patricia Young's speech should be imputed to Plaintiff, Defendant

Pleasant Valley argues that the jury verdict against Plaintiffs Patricia and William Young and in favor of Plaintiff M. Young is inconsistent. The Court disagrees. The jury's verdict does not necessarily require a finding that Plaintiffs Patricia and William Young did not engage in protected activity. The jury could have concluded that Plaintiff's parents engaged in protected activity, but that Defendant Pleasant Valley only retaliated against Plaintiff. Accordingly, the Court finds no inconsistency in the verdicts and no basis to overrule them on these grounds. Therefore, the Court declines to enter judgment as a matter of law on the issue of whether Plaintiff engaged in protected First Amendment activity.

### C.   Inconsistent Verdict as to School District and Gress

Defendants next argue that Defendant Pleasant Valley is entitled to a new trial on Plaintiff's First Amendment retaliation claim because the jury returned an inconsistent verdict. Where a jury returns a verdict that is genuinely inconsistent, the proper remedy is to order a new trial. Mosley v. Wilson, 102 F.3d 85, 91 (3d Cir. 1996) (quoting Los Angeles v. Heller, 475 U.S. 796, 805 (1986) (Stevens, J. dissenting)). Defendants argue that the verdict was inconsistent in the following ways: (1) finding liability as to Defendant Pleasant Valley is inconsistent with the jury finding that Defendant Gress, the only relevant policymaker, was not liable; and (2) finding liability as to Defendant Pleasant Valley as to Plaintiff M. Young but finding no liability as to Plaintiffs Patricia and William Young. The Court has already addressed the second alleged inconsistency. Accordingly, the Court will only consider whether the jury's verdict against Defendant Pleasant Valley is inconsistent with its finding that Defendant Gress did not violate Plaintiff's rights.

As discussed, supra, to state a claim against a municipal entity pursuant to Section 1983,

a plaintiff must identify a policy, practice, or custom of that municipal entity to support liability. Monell, 436 U.S. at 694. Applying this principle to the facts of this case, municipal liability is possible only on a finding that Defendant Gress retaliated against Plaintiff in violation of her First Amendment rights. In response to the query as to whether Plaintiff proved that "Defendant John Gress retaliated against [M. Young] for exercising her First Amendment right to speech," the jury answered, "No." (Doc. No. 280.) Yet in response to the same question as to Defendant Pleasant Valley, the jury made an affirmative finding of retaliation. Either the jury misunderstood the principle of municipal liability and held Defendant Pleasant Valley responsible on a respondeat superior theory, or the jury ignored the Court's instructions and arrived at a compromise verdict. It is plain, in light of the Court's previous analysis of the actions of all relevant policymakers, that the verdicts against Defendant Pleasant Valley and in favor of Defendant Gress are entirely inconsistent and irreconcilable. Accordingly, the Court finds that a new trial is warranted pursuant to Rule 59(a) of the Federal Rules of Civil Procedure as to the First Amendment retaliation claims against Defendants Gress and Pleasant Valley.

## II.    EQUAL PROTECTION

### A.    Individual Liability for Section 1983 Hostile Educational Environment Claim

Defendants contend that Plaintiff's Section 1983 equal protection claim against Defendant Smith must fail as a matter of law. Defendants argue that hostile educational environment claims are analyzed under a Title VII rubric, and because Section 1983 claims premised under Title VII may not proceed against individuals, Defendant Smith may not be held liable in his individual capacity. Judge Munley, however, previously ruled that Plaintiff's hostile educational environment claim could proceed pursuant to Section 1983. See Young, 2010 U.S.

Dist. LEXIS 119, at *43.  Accordingly, it appears that the law of the case doctrine bars this Court from revisiting this decision.[10]  See Farina v. Nokia, Inc., 625 F.3d 97, 117 n.21 (3d Cir. 2010) ("The law of the case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.") (internal citation and quotation omitted).

Even if the law of the case doctrine did not bar this Court from revisiting Judge Munley's ruling, the authority marshaled by Defendants in support of their position is decidedly underwhelming.  Defendants rely exclusively on cases decided well over a decade ago and are unable to cite a single case arising in the context of an educational environment or decided by the Third Circuit.  Further, Defendants fail to grapple with the number of recent cases that have recognized that a plaintiff may proceed against a teacher under Section 1983 pursuant to a hostile school environment theory.  See, e.g., Delgado v. Stegall, 367 F.3d 668, 675 (7th Cir. 2004); Hayut v. State Univ. of N.Y., 352 F.3d 733, 743-46 (2d Cir. 2003); Jennings v. Univ. of N.C., 444 F.3d 255, 279 (4th Cir. 2006) (recognizing the cause of action but granting summary judgment because plaintiff could not prove that her soccer coach's actions were objectively abusive).  Rather, Defendants continue arguing that Title VII[11] must by implication invalidate Section 1983.  However, as explained by Judge Posner in rejecting the notion that Title IX

_____

[10] The Court acknowledges that the matter was decided by Judge Munley prior to this matter being reassigned to this Court.  Simply reassigning a case from one district judge to another, however, does not restart a case ab initio.

[11] Title VII does not, of course, apply to this action; rather Title IX is the proper corresponding statute in the educational context.  Defendants appear to argue that because Title IX hostile school environment claims adopt the Title VII hostile work environment rubric, see Jennings, 444 F.3d at 279, that all Title VII decisional law must similarly apply to Title IX hostile school environment claims.

precludes a Section 1983 hostile educational environment against a teacher:

> [Plaintiff] is asking us in effect to rule that Congress in Title IX repealed by implication a swatch of [S]ection 1983, though there is no possible conflict between these two federal statutes in cases in which relief is sought against a teacher or other nonmanagerial employee and no hint of such a purpose in the background or history of Title IX.  The Supreme Court has said that where two federal statutes can coexist, the later one is not to be deemed to have repealed the earlier one unless there is some indication of a congressional intent to do so, even though the result may be (though not in this case) to give the plaintiff a choice of federal remedies.  Even without a presumption against repeals by implication, [Plaintiff's] argument would fail because there is no reason to suppose that holding that Title IX wiped out a big piece of [S]ection 1983 would serve any of the purposes that animated Congress in passing Title IX.

Delgado, 367 F.3d at 675.

Defendants' argument that Section 1983 does not permit individual liability for hostile school environment claims must fail.  Judge Munley has decided this issue, and Defendants provide no basis for the Court to set aside the law of the case doctrine and revisit the issue. Moreover, even if the Court did have the authority to rule on the issue, the Court finds there is no support for the proposition that a student may not pursue Section 1983 hostile school environment claims against an individual teacher.  Accordingly, the Court will not grant judgment as a matter of law on this basis.

**B.     Verdict Against the Weight of the Evidence as to Defendant Smith**

Defendants next argue that the jury's determination that Defendant Smith was liable to Plaintiff based on her hostile educational environment claim was against the weight of the evidence.  Specifically, Defendants contend that Defendant Smith's conduct was neither objectively offensive nor did it affect Plaintiff's ability to perform in the classroom.  Plaintiff

argues first that the motion is unpreserved and, in the alternative, that there was sufficient evidence to find that Defendant Smith violated Plaintiff's equal protection rights by creating a sexually hostile educational environment. The Court will address the issue of whether Defendants have properly preserved their motion first. The Court will then address the merits of their argument.

Plaintiff is indisputably correct that Defendants never challenged the sufficiency of the evidence as to the hostile educational environment claim against Defendant Smith in a Rule 50(a) motion. Rather, the record indicates that Defendants only challenged the hostile educational environment claim against Defendant Smith on the ground that as a matter of law Defendant Smith could not be held individually responsible. (Doc. No. 304 at 516:18-517:8.) Accordingly, Plaintiff is correct that a motion brought pursuant to Rule 50(b) of the Federal Rules of Civil Procedure requesting judgment as a matter of law based on the sufficiency of the evidence would necessarily fail. Defendants have not, however, filed a Rule 50(b) motion on this issue. Rather, they argue that the verdict is against the weight of the evidence and request a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure.

The Third Circuit has explained that:

> [W]here the undisputed evidence results in a verdict that is totally without legal support justice requires a new trial despite counsel's failure to move for a directed verdict prior to submission of the case to the jury. To rule that an unintended flaw in procedure bars a deserving litigant from any relief is an unwarranted triumph of form over substance, the kind of triumph which, commonplace enough prior to our more enlightened days, we strive now to avoid whenever possible. The purpose of decisions that refuse to grant relief to those who make procedural mistakes is to deter their commission in future cases and thereby promote the orderly administration of justice. Our decision today does not undermine that objective, for had counsel

> first moved for a directed verdict and then moved for a verdict n.o.v.,
> he would be entitled to an entry of judgment in his favor. This relief
> is denied him, but we consider it fair to remand for a new trial on the
> merits. Perhaps at the new trial the defendant may offer sufficient
> evidence, if available, to raise factual questions that would justify a
> decision in its favor.

Cowger v. Arnold, 460 F.2d 219, 222 (3d Cir. 1972) (quoting Oliveras v. Am. Exp. Isbrandtsen

Lines, Inc., 431 F.2d 814, 817 (2nd Cir. 1970)); see also Keller v. Cnty. of Bucks, 209 F. App'x

201, 205 (3d Cir. 2006) (citing Greenleaf v. Garlock, 174 F.3d 352, 365 (3d Cir. 1999)) (holding

that "the failure to move for judgment as a matter of law does not preclude review on a 'weight

of the evidence'"). Accordingly, the Court will consider whether the evidence produced at trial,

or lack thereof, justifies ordering a new trial on Plaintiff's hostile educational environment claim.

In ruling on Defendants' motion for summary judgment, Judge Munley, held that Title

VII standards should be used in determining whether a sexually hostile educational environment

existed in violation of Plaintiff's equal protection rights. See Young, 2010 U.S. Dist. LEXIS

119, at *40 (citing Jennings, 482 F.3d at 701; Hayut, 352 F.3d at 745). Under Title VII, in order

to prove that a hostile environment existed, a plaintiff must establish that the environment was

"permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an abusive working

environment." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 (2002). It is not

sufficient for an individual to perceive an environment as hostile, rather the conduct must create

an objectively hostile environment. Weston v. Pennsylvania, 251 F.3d 420, 426 (3d Cir. 2001).

Determining whether a hostile environment existed requires a holistic examination of the

environment. Harris v. Forklift Sys., 510 U.S. 17, 23 (1993). One must consider "the frequency

of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or

a mere offensive utterance; and whether it unreasonably interferes with an employee's work

performance." Id. "[S]imple teasing, offhand comments, and isolated incidents (unless

extremely serious) will not amount to discriminatory changes in the 'terms and conditions of

employment.'" Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (internal citations and

quotations omitted).  Finally, it is important to remember that context matters, and what may be

abusive in one setting, is not necessarily abusive in another.  See Oncale v. Sundowner Offshore

Servs., 523 U.S. 75, 81 (1998) (explaining that a football player's environment is not hostile "if

the coach smacks him on the buttocks as he heads onto the field – even if the same behavior

would reasonably be experienced as abusive by the coach's secretary (male or female) back at the

office").

Against this backdrop, the Court reviews the evidence that forms the basis of Plaintiff's

hostile educational environment claim.  Plaintiff has identified eight black-and-white

photographs shown over the course of two class sessions depicting victims of Charles Manson

and Ed Gein, all of whom were women.  (Doc. No. 303 at 185:14-18; Pl. Ex. 1.)  Prior to

showing the class a photograph of Sharon Tate after she was murdered, Plaintiff contends that

Defendant Smith showed the class a photograph of Sharon Tate before she was murdered and

asked the class if they thought she was pretty.  (Doc. No. 303 at 177:8-22.)  In addition, Plaintiff

contends that Defendant Smith informed the class that the Ed Gein victims that were shown were

found with semen in their mouths.  (Doc. No. 303 at 178:11-13.)  Plaintiff has also identified a

book, Memoirs of a Class President, which Defendant Smith gave students the option of reading;

however, according to Plaintiff while she did request to read the book, she stopped reading as

soon as she realized "something was not right" and gave the book to her parents.  (Doc. No. 303 at 203:20-23.)  Plaintiff testified that she was unsure of how much of the book she read, but was confident that she read "no more than one hundred [pages]" of the book, which totals 739 pages (Pl. Ex. 2; Doc. No. 303 at 201:9-12.)   Plaintiff identified a photograph that was shown of an individual in a Nazi Sturmabteilung uniform and an individual in plain clothes burning books, two of which appear to have images of a woman with her breasts exposed on the cover.  (Def. Ex. 35.)  Finally, Plaintiff has identified a number of comments alleged to have been made by Defendant Smith, specifically:

[1]   Once he talked about how he didn't believe women should be president because we get our monthly visitor each month.

[2]   He talked about how he would skip class to bang the cheerleader in college.

[3]   He talked about a girl who slept around at school with all of his guy friends and he knew about it and that he didn't want to stick his where all theirs was.

[4]   He talked about glow-in-the-dark condoms and seeing in the dark while having sex.

[5]   He asked me what I was wearing during a pillow fight, if I was in my underwear.

[6]   He told us to go home and have oral sex and make sure our parents were watching.

[7]   He commented on, I believe, cars in the 1920s and how it was prostitution on wheels, and there was a cartoon that went along with that.

[8]   He talked about the flapper, how she drank, she smoked, she has sex when she wants it.

[9]   He talked about Ed Gein and how his mother took care of his teenage

25

urges.

[10] He discussed Victoria's Secret models and pushup bras, asked the students in the class if they thought her breasts were firm enough, what the ideal woman would be for the men in the class or boys and what the ideal size of a breast should be, and he commented that a boy in another class said that one handful was enough.

(Doc. No. 303 at 179:2-24.)

Upon a review of all of the evidence of alleged sexually offending material and resolving all doubts in favor of Plaintiff, the Court cannot find that Defendant Smith's actions meet the high legal standard for a sexually hostile educational environment.  The Manson and Gein photographs that were shown in class are unquestionably violent, and indeed gruesome.  While the Court agrees with Plaintiff that they are unpleasant to look at, the Court cannot find that they create a hostile environment based on sex.  Further, these images had historical value.  The Manson murders were an unquestionably important part of twentieth century American history. While some might question the choice of actually showing an image of Sharon Tate's murdered body, the images serve a purpose of demonstrating the brutality of Charles Manson.[12]  While Ed Gein is a more obscure historical figure, at least an argument can be made, as Defendant Smith did, that teaching about Ed Gein served to make his students aware that the 1950s were not as "sanitary" as "Leave it to Beaver" or "Happy Days" would suggest.  (Doc. No. 305 at 621:5-15.) That Mr. Gein apparently served as inspiration for a number of figures in popular culture could also further the reasonably legitimate pedagogical purpose of de-glorifying the violence prevalent in contemporary American culture.  (Id. at 621:12-622:4.)  Similarly, the image of the Nazi book

---

[12] The uncontested evidence indicated that the photographs in question came from the Discovery Channel website.  (Doc. No. 305 at 616:23-617:1.)

burning has a clear pedagogical purpose.  Of course, Defendant Smith could have found a photograph where pornography was not being burned.  Having reviewed the photograph, and actually measured the size of the images of women in question, however, neither of the two objectionable book covers seen by the Court in the photograph is larger than approximately one hundredth of the total area of the photograph.  Accordingly, the Court questions the extent to which any of these images could support a finding that Defendant Smith had created a sexually hostile educational environment.

Having read the first one hundred pages of Defendant Smith's <u>Memoirs of a Class President</u>,[13] the Court finds that there are three brief passages that could support a claim of a sexually hostile environment, specifically:

[1]  "I didn't like the guy I caught my mom having sex with.  He was planning to marry her and move us to Stroudsburg.  I was ten years old and pissed off at the world."  (Pl. Ex. 2 at 6.)

[2]  Troy would never subject you to listening to records.  If you were going to sit around his place, time was going to be spent looking at some good quality porn that he kept stashed in his room.  I think I got my first glimpse at a pink, exposed vagina from one of our summertime reading sessions on Troy's back deck.  I didn't know those things looked like <u>that</u>.  (Pl. Ex. 2 at 53 (emphasis in original).)

[3]  The development was basically a boy's club.  All of the girls were around 5 or 6 so that ruled out any type of romance.  John Hallock's half-sister, Vicki was a hot little number, but she talked like Elmer Fudd.  When you first met her, you saw this pretty, petite blonde with a demure smile and bright blue eyes.  Then she spoke and it all went to hell.

"I tried getting past that," Troy once said to me, referring to Vicki's

---

[13] As was noted, Plaintiff claimed to have read "no more than one hundred [pages]" of the book.  Although Plaintiff only testified to the passage on page six, the Court will give Plaintiff the benefit of the doubt and assume she did in fact read the entire first one hundred pages.

> speech impediment.  "Then she asked if she could give me a <u>bwo</u> [sic] job."
>
> Tami Hineline moved in a month after I did.  She lived right across the street from Troy.  She was a year older than Troy and I and was a bubbly, good-looking girl with a loud laugh and a love for country music.  She wore T-shirts with sayings like: "Foxxy Lady" or "Good Girls Don't But I Do."  She had baby fat in her face, strawberry blond hair and she had boobs.  <u>Big</u> boobs.  (Pl. Ex. 2 at 55 (emphasis in original).)

In some contexts, even these passages in the book would be perfectly acceptable.[14]  In the context of a history class, however, the Court finds that granting Plaintiff's request to read his <u>Memoirs</u> was a clear error in judgment and may have only tangentially served any pedagogical aim.

Next, regarding the comments Plaintiff has attributed to Defendant Smith, the Court notes that while Plaintiff did list the comments, she did not place them in any context.  Standing alone, they certainly raise concerns.  Defendant Smith did attempt to explain the circumstances under which he made the statements.  Regarding Defendant Smith's statement that "he didn't believe women should be president because we get our monthly visitor each month," Defendant Smith explained that in discussing society's view of women, a female student in 2002 "said that we should not have a woman president because we get our monthly visitor and we might nuke the world."  (Doc. No. 305 at 629:21-630:2.)  Defendant went on to explain that "[i]n fact, I said in my class and in [Plaintiff]'s class that this was patently one of the most ridiculous statements I

---

[14] The Court notes for example, that in the College Board's description of an Advanced Placement English Literature Class, Nobel Laureate Toni Morrison is listed as an author who is "representative" of the "quality and complexity" of work high school students should read in preparation for the Advanced Placement English Literature Examination.  Accordingly, a high school English teacher could not seriously be accused of creating a sexually hostile educational environment because he assigned <u>The Bluest Eye</u>, which vividly grapples with incest and molestation, to his students.

had ever heard." (Id. at 630:2-4.)

      In his testimony, Defendant Smith also disputed Plaintiff's characterization of his comments regarding what she wore in a pillow fight.  Defendant Smith explained that this was a sarcastic comment offered in response to a student in his classroom who suggested that at slumber parties girls have pillow fights in their underwear.  (Id. at 635:10-12.)  Defendant Smith contends he sarcastically and rhetorically asked the class "is that what you do?"[15]  (Id. at 635:12-15.)

      Regarding the allegation that he told his students to "go home and have oral sex and make sure our parents were watching," Defendant Smith explained, and Plaintiff M. Young agreed (Doc. No. 303 at 213:19), that the statement was made in the context of a discussion of President Clinton's impeachment.  (Doc. No. 305 at 626:3-627:12.)  Specifically, Defendant Smith explained that in the discussion of the impeachment, questions arose regarding whether the President lied, and Defendant Smith used the examples of "splitting hairs over what 'is' is, [and] what is sex." (Id. at 626:3-5.)  At some point in the discussion Defendant Smith then claims to have said, "if you went home and had oral sex and you were caught by your parents . . . what do you think they're going to say?  Do you think they're going to walk in and say, oh, okay, that's okay because it's not sex?  I said, we all know what it is." (Id. at 627:2-7.)

      Regarding the comments about flappers and women in the 1920s, Defendant Smith asserts that the comments Plaintiff objects to were quotations from individuals in the 1920s.  (Id.

---

[15] This is one of many examples where a cold reading of the trial transcript is inadequate to conveying the meaning of a witness's testimony, and the Court feels compelled to note the apparent disgust in the witness's voice recalling the student's comment, and the derision with which he contends he responded.

at 632:19-24, 633:24-634:4.)  As he explains it, he was attempting to show his students "the emergence of the independent woman . . . who was going out and pursuing independence and basically threatened the male establishment."  (Id. at 633:1-7.)  The purpose of the quotation, from Life Magazine, about the automobile being a house of prostitution on wheels, was to show "the change in cultural landscape that took place in the United States in the 1920s and early 1930 as a result of the automobile and that the automobile allowed freedom and it allowed all kinds of freedom, from economic, all the way through – through independent freedom through romance and sexual freedom."  (Id. at 634:10-18.)

Defendant Smith also conceded that he discussed Victoria's Secret and pushup bras; however, he claims that he discussed these things in the larger context of the pressures American society places on women and has placed on women throughout the twentieth century.  (Id. at 628:3-631:20.)  In this context, Defendant Smith contends that he discussed the creation of the "Gibson Girl" as the ideal female form as well as Barbie Dolls, Marilyn Monroe, and Victoria's Secret models.  (Id. at 628:16-631:12.)  He claims that his point in bringing these issues up was to highlight the impossible standards that American society has placed on women's appearances, and compare that to the lack of such pressures on men.  (Id. at 629:4-631:20.)  In short, when placed in context, most of Defendant Smith's comments support a finding that he conducted his classroom as an outspoken feminist, rather than a hostile misogynist.

Three of the comments Defendant Smith is alleged to have made about himself were not explained, namely comments regarding having skipped class to "bang the cheerleader," a girl "who slept around at school," and using "glow-in-the-dark condoms."  Looking at those comments, the Court cannot conceive of a circumstance under which any of those comments

could possibly be acceptable in the context of a history class and they could support a finding that Defendant Smith created a sexually hostile educational environment.

Ultimately, the Court must look at the totality of the alleged conduct.  Many of the examples of a hostile educational environment cited by Plaintiff, appearing alone, may support a hostile educational environment in some contexts.  However, the totality of the allegations, even viewed out of context and in a light most favorable to Plaintiff, do not reasonably support a finding that the environment was "permeated with discriminatory intimidation, ridicule, and insult," such that it changed the terms and conditions of Plaintiff's education.  The Court is sensitive to the fact that this conduct did not take place among adults in a workplace, but by an adult to students in a public school classroom.  However, at the same time, the Court is wary of the chilling effect of subjecting legitimate – or even borderline – decisions regarding curriculum to routine federal judicial review.  Twentieth Century History is a subject that is fraught with complex, and at times uncomfortable, questions of race, religion, violence, and also sex and sexuality.  It may be possible to teach the subject having purged the curriculum of issues which some students and their families find "inappropriate" or inconsistent with their religious or moral beliefs,[16] but the question presented here is not whether this Court or the jury approves of the material in question, but whether the materials and comments about them rise to the level of a constitutional violation.

The Court agrees with Plaintiff that at times Defendant Smith did exercise poor

---

[16] The Court notes, for example, that at one point Plaintiff's father testified that he did not "think it's relevant" that homosexuals were one of the groups targeted in the Holocaust.  (Doc. No. 304 at 448:1-19.)  Moreover, Plaintiff testified that "it was not appropriate" to tell students that the flappers were women who had different attitudes about sex and alcohol.  (Doc. No. 303 at 207:6-12.)

judgment.  For example, it is obvious that he should not have permitted Plaintiff to have access

to his book and should have exercised more caution before speaking informally about mature

subjects with his students.  The Court agrees that Defendant Smith's conduct would have

justified disciplinary action from the school district.  Even if viewed in a light most favorable to

Plaintiff, however, the evidence presented cannot be said to constitute a sexually hostile

environment for Plaintiff.  The alleged incidents were sporadic.  Plaintiff was never singled out.

Even viewing the comments without Defendant Smith's explanation, while crude, the Court

cannot say they would alter the conditions of the educational environment.  The book was

requested by Plaintiff and those portions she contends she read were mostly stories about a young

child coping with moving to a new school and finding a father figure.  The offending images

shown all had historical value.  Plaintiff concedes that most of the offending conduct was done in

the context of a history lesson, albeit one she deemed "inappropriate."

The legal standard to be applied to this matter, however, is not simply whether Plaintiff

viewed the conduct as "inappropriate" or whether Defendant Smith lived up to Plaintiff's moral

code.  Rather, Defendant Smith's conduct is only actionable if, in addition to Plaintiff's

subjective view, the conduct became so objectively hostile and so "permeated with

discriminatory intimidation, ridicule, and insult" as to alter the conditions of the educational

environment.  To the extent the educational environment became hostile – and it clearly appears

to have become hostile – it was the result of students who targeted Plaintiff for filing this lawsuit,

not because of Defendant Smith's teaching.  Accordingly, the Court finds that as a matter of law,

Plaintiff failed to prove her hostile educational environment claim.  Because Defendants did not

move for judgment as a matter of law pursuant to Rule 50(a), however, the Court may only

32

consider whether the verdict was against the weight of the evidence. For the reasons articulated above, the Court must conclude that the jury's finding that Defendant Smith created a sexually hostile educational environment is against the weight of the evidence and that a new trial is warranted on this issue.[17]

## III.   DAMAGES

### A.   Compensatory Damages Against Defendant Smith

Defendants contend that a new trial is warranted as to the damages the jury assigned to Defendant Smith's hostile educational environment because the finding of compensatory damages in the amount of $25,000 was not supported by the weight of the evidence. Plaintiff reiterates her objection to this claim on the basis that Defendants failed to include it in a Rule 50(a) motion at trial. As outlined, supra, however, the Court will consider the Rule 59 motion alleging the jury finding was against the weight of the evidence even if the absence of a Rule 50(a) motion.

"In general, the determination of compensatory damages is within the province of the jury and is entitled to great deference." Spence v. Bd. of Educ., 806 F.2d 1198, 1204 (3d Cir. 1986). However, "if the amount of damages awarded is excessive, it is the duty of the trial judge to require a remittitur or a new trial." Linn v. United Plant Guard Workers, Local 114, 383 U.S. 53, 65-66 (1966); see also Spence, 806 F.2d at 1201. The Third Circuit has explained that a court

---

[17] The Court does not wish to imply that Plaintiffs were wrong to raise complaints about what was happening in Defendant Smith's classroom. To the contrary, Plaintiffs should be commended for taking an interest in what happens in the classroom and raising their legitimate concerns about Defendant Smith's teaching to his superiors. Disagreements about teaching methods, even where legitimate moral objections exist, are not, however, actionable in the mine run of cases.

should only disturb an award of damages where "the damages assessed by the jury [are] so unreasonable as to offend the conscience of the Court." Keller, 209 F. App'x at 207 (quoting Motter v. Everest & Jennings, Inc., 883 F.2d 1223, 1230 (3d Cir. 1989)).  Where the trial court finds that the jury's award of damages was the result of "passion or prejudice" a defendant is entitled to a new trial.  Hurley v. Atlantic City Police Dep't., 174 F.3d 95, 114 (3d Cir. 1999).

Upon a review of the record, the Court notes the very limited evidence produced by Plaintiff connecting her damages to the sexually hostile educational environment alleged to have been created by Defendant Smith.  The only evidence produced connecting any harm to Defendant Smith is the following testimony by Plaintiff:

1. Testimony that viewing black and white photographs of Ed Gein's and Charles Manson's victims on March 12 and March 13, 2007, made her feel "scared," "sick," "disgusted," and "nauseated" and as a result left class because she felt sick.  (Doc. No. 303 at 176:16-18; 178:19-22; 185:14-18.)

2. Testimony that various comments alleged to have been made by Defendant Smith about women made her feel "horrible" and "more self-aware and just thinking about [her] body image more and more and more."  (Doc. No. 303 at 180:2-9.)

There does not appear to be any further evidence of harm related to the allegedly sexually hostile educational environment.[18]  Based on this evidence the jury awarded $25,000 in compensatory damages.

Although respectful of the need to show deference to a jury's factual determinations and conscious of the difficult task this jury faced, upon a review of the evidence the Court can come

---

[18] There was testimony that Defendant Smith "scared the life out of her" when he "tapped [her] on the outside of [her] right arm."  (Doc. No. 303 at 210:4-10.)  The Court cannot find that this would support a finding of compensable harm.  Further, no other alleged harms bear any relationship to the alleged sexually hostile educational environment.  Rather, all harm suffered by Plaintiff appears to be connected to her First Amendment retaliation claims and retaliation by students and anonymous individuals on the internet commenting on her lawsuit.

34

to no other conclusion that the jury's award of damages as to Plaintiff's claims against Defendant Smith bears little to no relationship to the evidence produced at trial.  Even when given the benefit of every doubt, the award of $25,000 in compensatory damages is grossly inconsistent with the damages suffered by Plaintiff at the hands of Defendant Smith.  Plaintiff herself testified that she experienced only brief revulsion upon having seen the images.  There is no indication that the images caused any lasting damage, resulted in nightmares or sleeplessness, or caused any damage beyond some immediate discomfort.  Similarly, assuming Plaintiff's version of what Defendant Smith said and how she reacted was completely accurate, Defendant Smith's comments made her feel self-conscious.  There is no indication that these feelings resulted in any harm related to her health or even social interactions with other students.  Nor is there any allegation that any comment was actually directed at her.  In light of the scant evidence supporting damages and the significant damages ultimately awarded by the jury the Court can only conclude that the jury's decision on damages was the result of inflammatory references made by Plaintiff's counsel to documents and images that Plaintiff never saw and which Plaintiff never alleged had caused her any harm.  Accordingly, the Court finds that the award of damages was the result of passion or prejudice and that a new trial is warranted as to the issue of the compensatory damages award against Defendant Smith.[19]

---

[19] The Court further notes that the evidence put forth in this action is similar to the evidence put forth in those cases where Courts have elected to remit entire compensatory damages awards to $0.  See Dee v. Borough of Dunmore, No. 11-2069, No. 11-2279, 2012 U.S. App. LEXIS 6954, at *8 (3d Cir. Apr. 6, 2012) (affirming remittitur of compensatory damages award and distinguishing the case from those cases where plaintiffs had linked emotional distress to "prolonged symptoms" and "life-altering or long term distress"); Gunby v. Penn. Elec. Co., 840 F.2d 1108, 1120-22 (3d. Cir. 1988) (affirming remittitur of entire $15,000 emotional distress award where only evidence was that plaintiff's testimony that he "had been done wrong" and that he was "very upset"); Spence v. Bd. of Educ., 806 F.2d 1198, 1201 (3d Cir. 1986) (affirming

**B.     Award of Punitive Damages as to Defendant Smith**

Defendants next argue that they are entitled to a new trial on the issue of punitive

damages as to Defendant Bruce Smith.  Plaintiff argues first, that the issue has not been

preserved.  In the alternative, Plaintiff argues that sufficient evidence was produced to support a

finding of wanton and willful violations of Plaintiff's constitutional rights by Defendant Smith.

The Court will first consider whether Defendants' motion is waived.  The Court will then

consider whether Defendants have established that the $100,00 award of punitive damages

against Defendant Smith was "excessive, improper, and largely motivated by the improper

conduct of counsel."

As explained, <u>supra</u>, the Court will consider the Rule 59 motion alleging the jury finding

was against the weight of the evidence even in the absence of a Rule 50(a) motion.  Further, even

if the Court were not permitted to consider a Rule 59 motion in the absence of a Rule 50(a)

motion, Defendants here did make a Rule 50(a) motion at the close of trial.  After resting – and

the day before the parties made their closing arguments and the jury was charged – Defense

counsel informed the Court that he wished to renew his Rule 50(a) motion "[a]nd in addition, at

this point, I'd like to add a motion for – I guess for partial judgment with regard to the punitive

damage clause – or case.  I don't believe that any evidence has been produced in here that would

support malice or deliberate indifference."  (Doc. No. 305 at 762:22-763:4.)  Plaintiff responded

at trial and in her post-trial brief that the motion was improper because it was made after

---

remittitur of entire $22,060 damages award where the evidence of emotional distress was limited
to "plaintiff's testimony that she was depressed and humiliated . . . and that she had lost her
motive to be creative").  Because the Court finds that there is no legal basis for Plaintiff's hostile
educational environment claim, however, this issue is moot.

36

Defendants had rested.  The Court finds this argument to be without merit.  Rule 50 of the Federal Rules of Civil Procedure only requires that motions for judgment as a matter of law be made before the case is submitted to the jury.  Fed. R. Civ. P. 50(a)(2).  The Court finds no evidentiary support for  the proposition that a Rule 50(a) motion must be made prior to the moving party resting their case.  As noted previously, Plaintiff was at liberty to call rebuttal witnesses or present additional evidence after Defendants rested their case-in-chief, thus ensuring that the rule's purpose of preventing unfair surprise was not undermined.  Plaintiff cannot say, simply because she declined to take advantage of the opportunity to present evidence to bolster her claims, that the renewed motion was defective.

Having determined that Defendants' motion as it relates to the punitive damages award against Defendant Smith is not procedurally barred, the Court considers the merits of Defendants' motion.  "A jury may award punitive damages when it finds reckless, callous, intentional or malicious conduct."  Springer v. Henry, 435 F.3d 268, 281 (3d Cir. 2006) (citing Smith v. Wade, 461 U.S. 30, 54-56 (1983); Alexander v. Riga, 208 F.3d 419, 430-31 (3d Cir. 2000)) .  "The defendant's conduct must be, at a minimum, reckless or callous.  Punitive damages might also be allowed if the conduct is intentional or motivated by evil motive, but the defendant's action need not necessarily meet this higher standard."  Id. (quoting Savarese v. Agriss, 883 F.2d 1194, 1204 (3d Cir. 1989)).  Whether sufficient evidence has been presented to support a finding that punitive damages are warranted is a question of law for the Court.  Alexander, 208 F.3d at 430.

The Court cannot find that Plaintiff has produced evidence justifying a $100,000 punitive damages award against Defendant Smith.  No evidence has been introduced that Defendant

Smith ever directed any offending conduct specifically at Plaintiff, that Defendant Smith acted

with an intent to harm, or that Defendant Smith ever engaged in any offending conduct in his

classroom after the complaints were made.[20]  Further, as detailed, supra, the alleged offending

conduct had at least an arguable legitimate pedagogical purpose and nearly all of the alleged

inflammatory remarks made by Defendant Smith, when placed in the proper context, actually

conveyed the precise opposite meaning from what Plaintiff suggested.  As to the remaining items

that appear to have crossed a line – Naked News and the Memoirs – there is no evidence that

Plaintiff saw the former, scant evidence that she read any offending portions of the latter, and the

evidence establishes that she only saw the latter because she requested to see it.  Even if she had

seen these items, there is no evidence that Plaintiff suffered any harm as a result.

In short, Plaintiff has shown that Defendant Smith made pedagogical choices that some,

and perhaps most, teachers would not have made.  Plaintiff has also put forth evidence that

---

[20] Plaintiff has placed great emphasis on an allegation that Defendant Smith showed nudity in the classroom after he was reprimanded.  Plaintiff's counsel made seven references at trial to a photograph of a woman "naked from the waist up" being shown.  (Doc. No. 296 at 43:14-15, 57:7-9, 102:10-12; Doc. No. 303 at 224:8-10; Doc. No. 304 at 561:7-8, 565:9-14; Doc. No. 305 at 670:2-3.)  Plaintiff's counsel alternatively described the image as depicting a woman "naked and boobs hanging out" (Doc. No. 305 at 669:8-10) and showing "bare breasts" (Doc. No. 316 at 827:15-16).  In addition, Plaintiff's counsel referenced Defendant Smith's "showing boobies" in his classroom.  (Doc. No. 315 at 826:9.)
Ultimately, the image was introduced over Plaintiff's objection as Defense Exhibit 35. (Doc. No. 305 at 654:22-656:4.)  The image appears to depict an individual in a Nazi Sturmabteilung uniform as well as another individual in civilian clothing standing on a pile of scores of books and magazines.  (Def. Ex. 35.)  In the pile are two magazines that have women who are "naked from the waist up" on the cover.  The two offending images each comprise less than one hundredth of the total area of the photograph.  The Court further notes that Defendant Smith explained that he obtained the photograph from the National Holocaust Museum.  (Doc. No. 305 at 669:11-13.)  Upon a review of the photograph, the Court finds that a reasonable person could not find that the photograph contributed to a sexually hostile environment or would be sexually offensive.  At the very least, the Court cannot find that the photograph supports a finding that Defendant Smith acted with malice and with disregard to his student's concerns.

would support a finding that Defendant Smith made statements susceptible of being misconstrued. But a thorough review of the record reveals no evidence that Defendant Smith acted recklessly, callously, intentionally, or maliciously in creating a sexually hostile educational environment. At worst, Defendant Smith's conduct would support a finding that he was careless. This is insufficient as a matter of law to support an award of punitive damages. Accordingly, the Court agrees with Defendant Smith that the punitive damages award was clearly against the weight of the evidence and will grant his motion for a new trial on that issue.

### C.   Award of Compensatory Damages Against Defendant Pleasant Valley

Next, Defendants argue that insufficient evidence was introduced to support an award of damages against Defendant Pleasant Valley. Defendants contend that the jury award of $200,000 against Defendant Pleasant Valley was "the result of a speculative and emotional verdict." The three primary arguments advanced by Defendants are: (1) Plaintiff failed to produce evidence of medical treatment that would support a finding of emotional distress; (2) most of the injuries suffered by Plaintiff are properly attributed to students and anonymous individuals on the internet reacting to the lawsuit rather than Defendant Pleasant Valley's conduct; and (3) there is no basis for awarding damages based on a "loss of a normal education." The Court will address these arguments in turn.

Damages are available for violations of Section 1983 "to compensate persons for injuries caused by the deprivation of constitutional rights." Carey v. Piphus, 435 U.S. 247, 254 (1978). An award of damages may not, however, be based on the "abstract value of a constitutional right." Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 308 (1986). Rather, it must be based on evidence of an "actual injury" suffered by the plaintiff. Carey, 435 U.S. at 264; see also

Farrar v. Hobby, 506 U.S. 103, 112 (1992) ("[N]o compensatory damages may be awarded in a [Section] 1983 suit absent proof of actual injury.").  Where proof of an actual injury is not established, a plaintiff is entitled to an award of nominal damages only.  Farrar, 506 U.S. at 112.

     Accordingly, to the extent Plaintiff may recover compensatory damages against Defendant Pleasant Valley, she is only entitled to compensatory damages that have been linked to an actual injury.  Carey, 435 U.S. at 264.  Such injuries are not, however, limited to out-of-pocket loss and monetary harm.   Pryer v. C.O. 3 Slavic, 251 F.3d 448, 454 (3d Cir. 2001) (quoting Stachura, 477 U.S. at 307).  "[I]njuries such as 'impairment of reputation . . ., personal humiliation, and mental anguish and suffering'" are also compensable under Section 1983. Stachura, 477 U.S. at 307 (quoting Gertz v. Robert Welch, Inc., 418 U.S. 323, 350 (1974)); Chainey v. Street, 523 F.3d 200, 216 (3d Cir. 2008).  Such damages must, however, be supported by competent evidence.  Chainey, 523 F.3d at 216 (citing Carey, 435 U.S. at 264 n.20; Gertz, 418 U.S. at 350).  For example, in Gunby v. Pennsylvania Electric Company, the Third Circuit held that testimony from a plaintiff that he was "very upset" was insufficient to justify an award of punitive damages.  840 F.2d 1108,1121-22 (3d Cir. 1988) (reversing a jury award of $15,000 compensatory damages and distinguishing cases where plaintiffs have produced "substantial evidence of humiliation or emotional injury"); see also Erebia v. Chrysler Plastic Prods. Corp., 772 F.2d 1250, 1259 (6th Cir. 1985) (remanding for entry of an award of nominal damages where the "only proof of emotional harm consisted of [the plaintiff's] statements that he was 'highly upset' about the slurs and that 'you can only take so much'").  This is not to suggest that expert medical or psychological testimony is required to establish that a plaintiff has suffered mental or emotional harm.  Bolden v. SEPTA, 21 F.3d 29, 34 (3d Cir. 1994); see also Carey, 435

U.S. at 264 n.20 (explaining that "[a]lthough essentially subjective, genuine injury . . . may be evidenced by one's conduct and observed by others").  Provided there is "a rational relationship between the specific injury sustained and the amount awarded" an award of damages should be upheld.  Gumbs, 823 F.2d at 774.

Against this backdrop, the Court is satisfied that Plaintiff presented sufficient evidence to support a jury finding that she has suffered an actual injury as a result of her emotional distress. The jury heard testimony from a number of witnesses regarding Plaintiff's emotional distress. Plaintiff's father testified that as a result of the publicity surrounding her lawsuit that "she started seeing her friends starting to take sides to a point where eventually they all pretty much disowned her as their friend.  So she became very secluded, very introverted, where she was normally an extroverted person." (Doc. No. 304 at 424:9-20.)  He further testified that "there was a lot of fear, a lot of paranoia, a lot of looking over her shoulder." (Doc. No. 304 at 425:8-12.) Similarly, Plaintiff's mother testified that "she's always looking over her shoulder." (Doc. No. 303 at 257:12-20.)  Plaintiff's aunt, Betty Bennett, testified that Plaintiff is "paranoid.  She's always watching who's there, just worried what if I run into somebody." (Doc. No. 304 at 479:11-13.)  Mrs. Bennett also testified that Plaintiff cried after children shouted something at her and Plaintiff at a gas station in July 2007.  (Doc. No. 304 at 477:15-478:16; 480:2-19.) Plaintiff's guidance counselor, Donna Yozwiak, also testified that she "observed more nervousness, almost a sense of paranoia in the school, wondering if people were following her, watching her back around corners.  She was scared." (Doc. No. 303 at 313:17-19.)  In addition, Plaintiff testified that as a result of the administration's actions she "find[s] it hard to trust administrations now because they wouldn't take care of the situation.  I find it hard to trust

41

people in general and get close to friends because after eleven years, every single one of my friends stopped talking to me." (Doc. No. 303 at 191:12-15.) She further explained that if she had returned for her senior year at Pleasant Valley she "would have been miserable [her] entire senior year looking over my shoulder. I still do. I'm still nervous." (Doc. No. 303 at 191:25-192:2.) Accordingly, the Court is satisfied that Plaintiff has produced sufficient evidence that would justify a jury's determination that she suffered emotional distress.

However, that Plaintiff was injured, does not in and of itself support a finding that Plaintiff is entitled to an award of damages from Defendant Pleasant Valley. Rather, Plaintiff would only be entitled to an award of damages if Defendant Pleasant Valley's conduct played a substantial part in bringing about the injury, and that the injury was either a direct result or a reasonably probable consequence of Defendant Pleasant Valley's conduct. See Hedges v. Musco, 204 F.3d 109, 121 (3d Cir. 2000) (applying proximate cause principles to Section 1983 suits). In the present action, the evidence indicated that Plaintiff's emotional distress stemmed from the reaction of students and unidentified individuals on the internet reacting to Plaintiff's lawsuit. Although a defendant may be responsible in some circumstances for the conduct of third parties, in the present matter Plaintiff has put forth no evidence or made any arguments justifying why Defendant Pleasant Valley would be held responsible for the emotional distress caused by third parties reacting to Plaintiff's lawsuit.[21] The only emotional distress that appears to have resulted from Defendant Pleasant Valley's conduct is Plaintiff's inability to trust

---

[21] To the extent one could find that Defendant Pleasant Valley leaked Plaintiff's name and is thus responsible for the foreseeable backlash against a student complaining about a popular teacher, the Court finds that this is based purely on speculation and further notes that such a finding would be inconsistent with the jury verdict in favor of Defendant Gress, whom Plaintiff alleges leaked her name.

administrators.

Defendant Pleasant Valley further contends that there is no basis for permitting damages based on a loss of a normal education.  Although perhaps inartfully phrased, the Court is satisfied that damages related to being deprived of one's education is a reasonable basis for awarding damages in a case such as this.  In the present mater, however, the Court finds that such an award is against the weight of the evidence.  Plaintiff did, on the request of her parents, receive homebound instruction for the last month of her school year, which Plaintiff contends was insufficient.  The Court notes that, in spite of the obvious challenges Plaintiff faced, she appears to have successfully completed her junior year of school earing a 103 in Honors Chemistry II and a 100 in Twentieth Century History.[22]  (Doc. No. 303 at 196:17-21.)  At the end of her junior year at Pleasant Valley, Plaintiff was ranked second in a class of 646, and she has gone on to earn a full scholarship from Johns Hopkins University where she majors in engineering and archeology. (Doc. No. 303 at 193:10; 197:3-6; Doc. No. 304 at 479:1.)  In light of Plaintiff's obvious continued academic success, the Court must conclude that there is no basis to support a finding that she suffered any compensable harm to her education.

In sum, the Court agrees with Plaintiff that she suffered significant emotional distress. The Court cannot agree, however, that evidence was introduced linking her distress to the conduct of Defendant Pleasant Valley.  Rather, the distress appears to stem from the reaction of third parties to Plaintiff filing her lawsuit.  The Court finds there is no basis for concluding that Defendant Pleasant Valley is responsible for the reprehensible conduct of those individuals who

---

[22] It appears that in addition to History and Chemistry, Plaintiff was also enrolled in AP Calculus; however, there is no indication how Plaintiff did in this class.

elected to attack Plaintiff for raising concerns.  Moreover, in light of Plaintiff's obvious academic

success, the Court finds no basis for concluding that Plaintiff suffered any compensable harm to

her education as a result of Defendant Pleasant Valley's conduct.  In the absence of any other

reason to award compensatory damages, the Court must find that the jury's award of $200,000

against Defendant Pleasant Valley is against the weight of the evidence and a new trial is

warranted as to that issue.

## IV.   ERRORS MADE BY THE COURT

### A.   Evidentiary Errors

Defendants argue that the Court made four evidentiary errors during trial causing

substantial prejudice and asks for a new trial on this basis.  Specifically, Defendants identify the

following four alleged evidentiary errors: (1) admission of Plaintiff's Exhibit 2, Memoirs of a

Class President; (2) admission of Plaintiff's Exhibit 3, Dark Horse; (3) admission of Plaintiff's

Exhibit 58, "Naked News;" and (4) admission of testimony by Pastor Jim Polanzke.  The Court

will address these issues seriatim.  To the extent the Court finds that evidentiary errors were

made, the Court will consider whether the cumulative effect of those errors warrants a new trial.

Defendants first argue that the Exhibit 2, the book Memoirs of a Class President written

by Defendant Smith, should not have been admitted because Plaintiff did not read it.  At trial, the

Court ruled that Plaintiff could not introduce Memoirs of a Class President until Plaintiff had

established that she had read the novel.  (Doc. No. 296 at 12:22-24, 14:5-6, 14:18-20.)  The

Court ultimately admitted the novel over Defendants' objections, reasoning that, "Even though

Plaintiff didn't read it, her mother identified it, said she read it, and provided it to the school

district as one of the sources of her complaints."  (Doc. No. 304 at 504:11-14.)  Defendants do

not dispute that the novel was relevant on this basis.  Because the novel was only relevant as to the claims of Plaintiff Patricia and William Young, a limiting instruction may have been warranted.  Defendants did not, however, request that the Court issue a limiting instruction to the jury instructing them that they were not to consider the novel in evaluating Plaintiff M. Young's claims.  Accordingly, the Court finds no error in the admission of Memoirs of a Class President.

Defendants next argue that Exhibit 3, the screenplay Dark Horse written by Defendant Smith, should not have been admitted because Plaintiff did not read it and because the text of the screenplay did not include any content relevant to Plaintiff's claims of a sexually hostile educational environment.  When Plaintiff moved for the admission of Dark Horse, the Court denied the motion finding that Plaintiff had failed to lay the foundation for the evidence because Plaintiff had failed to establish that she had ever read Dark Horse.  (Doc. No. 296 at 15:15-16:10.)  It was later established that Plaintiff had never read Dark Horse.  (Doc. No.303 at 204:4-6.)  The exhibit was ultimately not admitted into evidence.  (Doc. No. 278.)  The Court did, however, permit Plaintiff's counsel to question Plaintiff Patricia Young about those potions of the screenplay she read, over the objection of Defendants.  (Doc. No. 303 at 287:2-9.)  Upon reflection, this was in error.  Because Plaintiff never read the screenplay, logically the screenplay could not have formed part of a sexually hostile educational environment.  Further, even if one were to rely on Plaintiff's second-hand understanding of the book, the Court cannot say that it was objectively sexually hostile.  As Plaintiff explained it, the book was similar to The Wave,[23]

---

[23] The Wave is a made-for-television movie based on a true story of a high school teacher, who in attempting to explain the rise of the Nazi Party in Germany, conducts an experiment in which he begins preaching about strength through discipline, community, and action.  The experiment quickly devolves to the point where the students begin engaging in pseudo-fascist behavior and ends with the teacher speaking to an auditorium of students where he reveals that if

and depicted "echo[ed] events in society that [she] didn't find should be condoned." (Id. at
204:16-205:22.) Her primary objection was that she believed that female characters in the
screenplay had committed murders. (Doc. No. 206:1-2.) Moreover, upon a review of the
testimony at trial, it appears that Plaintiff Patricia Young, who was permitted to read those parts
of the screenplay that she had read, never actually read the screenplay before this lawsuit was
filed. At trial, defense counsel questioned Plaintiff Patricia Young, "Is it fair to say you never
read Dark Horse?" (Doc. No. 303 at 277:21.) To which Plaintiff Patricia Young responded,
"Actually, now, through [discovery], I've seen some of it."[24] (Id. at 277:22.) Ultimately, neither
Plaintiff M. Young nor Plaintiff Patricia Young read the screenplay prior to filing the present
action. Accordingly, Plaintiff Patricia Young should not have been permitted to testify about the
content of the screenplay.

 Defendants' third claim of error is the admission of a video clip of a program titled
"Naked News," in which women deliver the news wearing only undergarments, on the basis that
Plaintiff never testified to having seen the clip. At trial, following an objection from Defense
counsel, the Court ruled that the video clip would only be admissible if there was testimony that
Plaintiff was in class when Defendant Smith showed it. (Doc. No. 296 at 24:7-18.) A review of
the record reveals that no competent witness testified that Plaintiff had seen the Naked News
video clip. When Plaintiff moved for the admission of the video clip, however, Defense counsel

---

their group had a leader it would be Adolf Hitler. The film won an Emmy in 1982 for
"Outstanding Children's Program" as well as a Peabody Award in 1981.

 [24] When answering she initially responded that she had seen it "through deposition" but
immediately corrected herself to note that it was in "discovery" that she had seen portions of the
screenplay. (Id. at 277:21-24.)

informed the Court that he did not object to the exhibit's admission.  (Doc. No. 304 at 512:21-24.)  The Court followed up, asking counsel, "That portion of [Exhibit] 58 referenced as Naked News, you have no objection?"  (Id. at 513:4-5.)  To which counsel responded, "That's correct, Your Honor."  (Id. at 513:6.)

Plaintiff contends that this statement constitutes an explicit waiver of Defendant Smith's right to object to the evidence.  Although the admission of this evidence was contrary to the Court's earlier order, the Court is inclined to agree with Plaintiff.  Defense counsel did not simply fail to object to a piece of evidence.  Rather, a piece of evidence was identified by both exhibit number and with an unambiguous description of what that evidence was.  Counsel verbalized some concern he had with the exhibit – responding to Plaintiff's motion for the exhibits admission, "I'm not sure how that comes in in the physical sense.  We don't have a physical exhibit."  (Id. at 512:21-24.)  And then counsel expressly stated that there was no objection.  When the Court confirmed with counsel a second time that he had no objection, counsel repeated his statement.  Accordingly, Defendants appear to have explicitly waived their objection to this piece of evidence and the Court did not err in admitting it.  United States v. Simpson, 182 F. App'x 84, 86 (3d Cir. 2006) (holding that where the defense waived an objection to the admissibility of evidence the admissibility of that piece of evidence is not subject to review); Gov't of the Virgin Islands v. Rosa, 399 F.3d 283, 290-91 (3d Cir. 2005).

Finally, Defendants contend that the Court should not have permitted Pastor Jim Polanzke to testify as to Patricia and William Young's emotional distress.  Defendants' only basis for the exclusion of this evidence appears to be that it was cumulative of two prior witnesses and because Pastor Polanzke is a leader of Plaintiff Patricia and William Young's

church.  The Court finds that it was well within its discretion in permitting this testimony.  The Court further observes that the Pastor never testified to Plaintiff's damages or even mentioned having met Plaintiff.  As M. Young is the only Plaintiff to whom damages were awarded, the Court cannot find – even if there were error in admitting the testimony of Pastor Polanzke – that Defendants were disadvantaged in any way.

In sum, the Court concludes that it did not err in admitting Exhibit 2, Exhibit 58, or the testimony of Pastor Polanzke.  The Court acknowledges that Exhibits 2 and 58 were potentially deeply damaging to Defendant Smith's case.  The potential to inflame the jury with this evidence was obvious.  Any concerns with this evidence, however, should have been addressed at trial. Defendants were given ample opportunity to object to the admission of Exhibit 58, and they explicitly declined to do so twice.  Likewise, although Exhibit 2 was admissible as to Plaintiff Patricia and William Young's claims, Defendants could have requested a limiting instruction directing the jury to not consider the evidence as to Plaintiff M. Young's claims.  They did not. Finally, the Court agrees with Defendants that, in light of the scant evidence that anyone read Dark Horse, Plaintiff Patricia Young should not have been permitted to testify about the content of the screenplay.  The Court cannot find, however, that this testimony was actually damaging to Defendant Smith.  Plaintiff Patricia Young's testimony regarding the content was limited to agreeing that the screenplay included the following two sentences: (1) "She told me when she lost her virginity, when she tried pot and booze for the first time;" and (2) "There's too many parties to go to, too many beers to drink, too much sex on the brain to worry about Mr. Jones's class or anyone else's class."  (Doc. No. 303 at 287:15-23.)  Plaintiff had already testified that she did not read the screenplay and the Court is satisfied that these statements about the

screenplay alone would not inflame the jury to the point where they could not render a fair verdict. Accordingly, the Court finds that any alleged evidentiary errors do not warrant a new trial.

### B.      Errors in Verdict Slip

Defendants raise three objections to the verdict slip, which they contend warrant ordering a new trial. First, they argue that Question 11, regarding whether Defendant Pleasant Valley retaliated against Plaintiff for exercising her First Amendment right to speech failed to consider whether Plaintiff engaged in protected speech. Second, they argue that Question 14a imputes liability to Defendant Pleasant Valley for the conduct of Defendant Smith. Third, they argue that Question 16 creates a risk of duplicative damages. The Court finds that each of Defendants' arguments are without merit.

Defendants' first claim of error is that Question 11 on the verdict sheet failed to provide the jurors with an opportunity to consider whether Plaintiff engaged in protected activity. Defendants never objected to this question during the charging conference. Failure to object to a jury instruction at the time the jury receives it constitutes waiver of the objection. Inter Med. Supplies, Ltd. v. Ebi Med. Sys., Inc., 181 F.3d 446, 463 (3d Cir. 1999). Because the Court finds this objection is waived, the Court will not grant a new trial on this basis.

Defendants next contend that a new trial is warranted based on a typographical error in the verdict slip. Specifically, they object to the portion of the verdict slip relating to Plaintiff's equal protection claim against Defendant Bruce Smith, which provides:

### As to Defendant Bruce Smith

14.      Did Plaintiff Patricia Young, on behalf of her daughter [M.

49

Young], prove, by a preponderance of the evidence, that Defendant **Bruce Smith** violated [M. Young's] right to equal protection by creating a sexually hostile environment?

YES _____          NO _____

14a.   If you answered "Yes" in Question 14, did Plaintiff Patricia Young, on behalf of her daughter [M. Young], prove, by a preponderance of the evidence, that [M. Young] suffered injury as a result of Defendant Pleasant Valley School District's conduct described in Question 14?

YES _____          NO _____

(Doc. No. 280 at 7 (emphasis in original).)  In question 14a, the Court inadvertently referred to "Defendant Pleasant Valley School District's conduct," rather than "Defendant Bruce Smith's conduct."  The jury answered "YES" to both questions and found that Defendant Bruce Smith had caused $25,000 worth of damages.  (Id.)

In reviewing the final version of the verdict slip, neither party objected to this error. Further, the Court is satisfied that the erroneous reference to Defendant Pleasant Valley School District was not prejudicial.  The questions were in a section titled "**As to Defendant Bruce Smith**."  Question 14 refers to "**Defendant Bruce Smith**."  And Question 14a refers to the Defendant's "conduct described in Question 14."  The only conduct described in Question 14 was Defendant Bruce Smith's.  Moreover, the jury instructions make clear that the only Defendant against whom equal protection claims were advanced was Defendant Bruce Smith. (Doc. No. 315 at 870:18-873:6.)  Finally, the jury's decision to award compensatory damages to Plaintiff from Defendant Bruce Smith in the amount of $25,000, where the only claim on which they found Defendant Bruce Smith liable was the equal protection claim in Question 14, indicates that they understood that the question on damages suffered as a result of the "conduct

50

described in Question 14" referred to Defendant Bruce Smith.  See generally United States v.

Frazier, 48 F. App'x 222, 224 (8th Cir. 2002) (finding an error on the verdict form harmless

when viewed in the context of the entire verdict slip and jury instructions).

Defendants' final claim of error as to the verdict sheet is that Question 16 invited the jury

to award duplicative damages.  Question 16 provides as follows:

> If you answered "Yes" to either Questions 11a, 12a, 13a, 14a, or 15a
> state the amount to be paid by each Defendant that would fairly
> compensate Plaintiff [M. Young] for injuries she actually sustained:
>
> Defendant Pleasant Valley School District:   $ _____
>
> Defendant John Gress:                         $ _____
>
> Defendant Bruce Smith:                        $ _____

(Doc. No. 280.)  The jury returned an award of $200,000 against Defendant Pleasant Valley, an

award of $25,000 against Defendant Smith, and an award of $0 against Defendant Gress.  (Id.)

The Court finds Defendants' claim of error entirely unconvincing.  The basic principle of

compensatory damages is that the plaintiff may be made whole only once, no matter how many

legal grounds may support recovery for a particular injury.  See, e.g., EEOC v. Waffle House,

Inc., 534 U.S. 279, 297 (2002); Theme Promotions, Inc. v. News Am. Mktg. FSI, 546 F.3d 991,

1005 (9th Cir. 2008); Valentin-Almeyda v. Municipality of Aguadilla, 447 F.3d 85, 102 (1st Cir.

2006); Guy. Tel. & Tel. Co. v. Melbourne Int'l Communs., 329 F.3d 1241, 1249 (11th Cir.

2003); Bender v. City of New York, 78 F.3d 787, 793 (2d Cir. 1996); Pate v. Nat'l Fund Raising

Consultants, 20 F.3d 341, 345 (8th Cir. 1994); Fineman, 980 F.2d at 218.  Where double

recovery has been found juries have awarded multiple damages where a single course of conduct

supports multiple causes of action.  That is not the case here.  To the contrary, Plaintiff has

alleged two entirely different courses of conduct by two different Defendants resulting in injuries.  As to Defendant Smith, she alleged that she suffered injury because he created a hostile educational environment.  As to Defendant Pleasant Valley, she alleged that she suffered injury because she was retaliated against for exercising her First Amendment rights.  In light of the prohibition in tort law on awarding damages where intervening acts cause the injury, the Court finds it likely would have been error to not separately identify each Defendant when asking the jury to assign damages.[25]  See Egervary v. Young, 366 F.3d 238, 246 (3d Cir. 2004) (explaining that "an intervening act of a third party, which actively operates to produce harm after the first person's wrongful act has been committed, is a superseding cause which prevents the first person from being liable for the harm which his antecedent wrongful act was a substantial factor in bringing about"); see also Kneipp v. Tedder, 95 F.3d 1199, 1213 (3d Cir. 1996) (explaining that a Section 1983 plaintiff must establish that the defendant's acts were the proximate cause of his injuries).  The fact that the jurors found Defendant Pleasant Valley liable for a compensatory damages award eight times greater than that assigned to Defendant Smith suggests the jury followed the instructions and verdict sheet and distinguished between the damages caused by the conduct of the two different defendants.  Accordingly, the Court finds no basis for concluding that Question 16 invited the jury to award duplicative damages.

### C.    Errors in Jury Instructions as to Defendant Pleasant Valley

Defendants raise three objections to the Court's jury instructions: (1) the Court should not

---

[25] The sole danger of duplicative recovery in this matter would have been if the jury had awarded damages against Defendant Gress and Defendant Pleasant Valley, as Defendant Pleasant Valley could only have acted through Defendant Gress and thus the awards would have been for the same course of conduct.

have instructed that the complaints to Defendant Gress were protected speech because those

complaints did not address matters of public concern; (2) the jury instructions failed to

distinguish between Plaintiff's speech and her parents' speech; and (3) the Court should not have

instructed the jury on damages related to the loss of a normal education.  Each of these issues has

been addressed by the Court.  Defendants offer no basis for concluding that a private individual's

speech is only entitled to First Amendment protection if it is on a matter of public concern.

Defendants' objection to the jury instructions failing to distinguish between Plaintiff's speech

and her parents' speech was not preserved.  And the Court finds no error with its instruction on

the loss of a normal education.  Accordingly, the Court declines to grant a new trial on the basis

of any alleged error in the jury instructions.

## V.     CONDUCT OF OPPOSING COUNSEL

Finally, Defendants contend that the conduct of opposing counsel warrants a mistrial.

Specifically, Defendants argue that Plaintiff's counsel intentionally inflamed the jury by

repeatedly asking improper questions, improperly characterizing evidence, and persisting in

asking improper questions after objections had been sustained.  Plaintiff argues that counsel had

a right to ask questions and that the Court instructed the jury that "questions of the lawyers for

the parties" and "objections by the lawyers" is not evidence.  (Doc. No. 315 at 862:1-3.)

A mistrial will only be granted based on the misconduct of counsel where counsel has

made improper remarks or engaged in improper conduct that engendered sufficient prejudice to

have made it "reasonably probable" that the verdict was influenced by the improper conduct.  See

Forrest v. Beloit Corp., 424 F.3d 344, 351 (3d Cir. 2005) (citing Greenleaf, 174 F.3d at 363-64);

Blanche Rd. Corp. v. Bensalem Twp., 57 F.3d 253, 264 (3d Cir. 1995); Fineman, 980 F.2d at 207

(citing <u>Draper v. Airco, Inc.</u>, 580 F.2d 91, 97 (3d Cir. 1978)).  Accordingly, the Court must first

consider whether counsel engaged in improper conduct.  The Court must then consider whether,

to the extent counsel did engage in improper conduct, that conduct made it "reasonably probable"

that the verdict was influenced thereby.

The Court finds that Plaintiff's counsel did engage in improper conduct during the course

of trial by persistently asking questions that had been ruled improper for the purpose of

characterizing, or mischaracterizing, evidence.  For example, during questioning of the first

witness, Defendant Smith, Plaintiff's counsel began inquiring about the content of the <u>Memoirs</u>

<u>of a Class President</u>.  Defendants objected, and the Court sustained the objection, explaining that

testimony regarding the content of the book would not be admissible until testimony was offered

that Plaintiff had read the book.  (Doc. No. 296 at 13:18-14:8.)  When counsel clarified, asking

the Court, "So am I allowed to go through the book?"  The Court responded, "No."  (<u>Id.</u> at 14:7-

8.)  After the Court reaffirmed that counsel could not ask about the content of the book before

she had elicited testimony that Plaintiff had read it, Plaintiff's next two questions were: "You

actually referenced real life people in the East Stroudsburg area in your book of your class

memoirs, right?" and "And you talk about how you caught your mom having sex, right?"  (<u>Id.</u> at

14:10-14.)  The Court then instructed counsel that "until a foundation is laid, I would ask you to

direct your questioning to some other topic."  (<u>Id.</u> at 14:18-20.)

Plaintiff's counsel then began questioning the witness about <u>Dark Horse</u>.  Defendants

again objected based on lack of foundation, and the Court advised counsel that "it may simplify

things to simply ask the witness whether he has any knowledge of Plaintiffs' having read the

book."  (<u>Id.</u> at 15:15-17.)  After the witness responded that he had no such knowledge, counsel

moved that the book be admitted into evidence, which drew an objection that the Court

sustained.  (Id. at 15:18-16:2.)  The first question after the Court ruled that the book was not

admissible was "That [book] was about a mass murder at a high school, correct?"  (Id. at 16:4.)

Later in questioning the same witness, counsel informed the Court that she was going to

show a DVD of what Defendant Smith taught in class.  (Id. at 20:7-8.)  Defendants again

objected noting that no evidence was introduced to suggest that Plaintiff had seen the video.  (Id.

at 20:9-11.)  The Court asked Defendants' counsel if he had reviewed it, to which he responded

"I don't know what she's going to show."  (Id. at 21:3-9.)  Unprompted and in the presence of the

jury, Plaintiff's counsel exclaimed:

> MS. POLLICK: I'm going to show his nakednews.com, what he
> showed the children, which absolutely goes to hostile educational
> atmosphere because of the fact that these girls had thongs, and he
> shows this to children that are 16 years old –
>
> THE COURT: Counsel.
>
> MS. POLLICK: – in their bras and thongs.

(Id.  at 21:10-15.)  The Court then excused the jury and sustained Defendants' counsel's

objection that the DVD was not admissible in the absence of testimony that Plaintiff had seen the

DVD.  (Id. at 24:12-17.)  The Court went on to explain to Plaintiff's counsel, that "unless Mr.

Smith can testify as to Plaintiff's perceptions that she did perceive [additional items alleged to be

part of Plaitniff's hostile educational environment], I think we need to hear from Plaintiff."  (Id.

at 25:1-26:3.)

Immediately after this instruction, which took place outside the presence of the jury, the

jury was returned to the courtroom and the following exchange occurred:

> Q. Mr. Smith, you remember talking about breast size of women in class; correct?
>
> A. I do remember speaking about that, yes.
>
> Q. You said that more than a handful would be too much, right?
>
> MR. FREUND: Your Honor, I'm going to make the same objection.
>
> THE COURT: Sustained.
>
> BY MS. POLLICK:
>
> Q. You talked about swapping girlfriends, and if the one girlfriend –
>
> MR. FREUND: Objection.
>
> THE COURT: Sustained.

(Id. at 26:16-27:3.)  The Court then reminded counsel that "as to each specific item, you are going to need to ask the witness as to Plaintiffs' presence on the day these things were mentioned." (Id. at 27:12-14.)  Plaintiff's counsel then went on for several minutes characterizing evidence in an inflammatory way preceded by a perfunctory "was Meagan there when." (Id. at 27:15-28:5.)  In response to nearly every question, Defendant Smith testified that he did not know if Plaintiff was present, and Plaintiff ultimately did not testify to having seen or heard many of the items about which Plaintiff's counsel inquired.

Plaintiff's counsel later repeated this tactic when questioning the school board president, asking repeatedly whether, in her opinion, conduct which counsel characterized in an inflammatory way was "appropriate." (Doc. No. 304 at 365:25-368:3.)  After counsel asked, "Are you familiar with what he testified to, that he made comments about banging the cheerleader, talked about masturbation, female masturbation?  Is that appropriate for a 16-year-

old in a public school environment?" the Court called the parties for a sidebar.  (Id. at 367:25-

368:3.)  At sidebar, the Court instructed counsel: "Don't ask any more questions concerning

whether items that were testified to as having been presented in class were appropriate in the eyes

of the witness, because every single question you've asked, you've characterized the testimony

and then you ask the witness, was this appropriate."[26]  (Id. at 371:19-24.)  Shortly after the

sidebar was concluded, counsel asked the same witness, "And [the school board policy] talks

about sexually explicit material is not appropriate.  Let me ask you this, is sexually explicit

material, is it appropriate – can you show it in the classroom?"  (Id. at 374:2-5.)

        Plaintiff's counsel employed this tactic again during trial when questioning Detective

Bentzoni Serfass, asking:

> Q. But you were concerned about what was going on [in Defendant
> Smith's classroom], that you didn't think it was appropriate. Correct?
>
> MR. FREUND: Objection. Leading.
>
> THE COURT: Sustained.
>
> BY MS. POLLICK:
>
> Q. What was your opinion of the material?
>
> MR. FREUND: Objection. No foundation, relevance.
>
> THE COURT: Sustained.

---

[26] Plaintiff responded to this directive from the Court by asking, "And why is that not acceptable?" (Doc. No. 304 at 371:25.)  Counsel's defiance was repeated when Detective Serfass testified.  In questioning Detective Serfass, Plaintiff's counsel asked, "And what were your thoughts as being a detective hearing that [Defendant Smith had shown a video on Daniel Ellsberg]?"  Defense counsel objected on the grounds that the question called for lay opinion evidence, at which point Plaintiff's counsel turned to the jury and began arguing "And lay opinion is permissible, and it helps the jury understand if it was retaliatory."  (Doc. No. 303 at 159:5-10.)

BY MS. POLLICK:

Q. Do you believe that Bruce Smith should have shown headless, naked females hanging?

MR. FREUND: Objection.

(Doc. No. 303 at 170:10-21.)

That Plaintiff's counsel's conduct was improper is obvious.  Throughout the course of trial counsel alternatively asked about evidence that had been ruled inadmissible, asked for lay opinion testimony, and asked for testimony without foundation.  The purpose of this tactic was apparently to inflame the jurors by repeating outrageous conduct that is alleged to have occurred as fact enough times so the jurors would believe it did occur – even if no evidence was introduced that would support such a finding.[27]  To cite just one example, the Court notes that counsel asked various witnesses about Defendant Smith discussing "masturbation" a total of seven times during trial in addition to mentioning it in her closing argument.[28]  (Doc. No. 296 at 29:8-9, 29:12, 83:22-23, 95:13-16; Doc. No. 304 at 368:1-3, 582:21-22; Doc. No. 305 at 677:18-678:9; Doc. No. 315 at 854:11.)  However, there is no evidence in the record that Defendant

---

[27] The Court observes that a secondary effect of counsel's conduct in persisting in asking improper questions and repeatedly arguing objections to the jury was to create a false impression with the jurors that she, and by extension her clients, were treated unfairly by the Court and Defendants.  Throughout these proceedings, even as counsel has ignored the Court's rulings, counsel has continually cried foul when the Court has entered orders not to her liking.  Indeed, this matter was transferred from Senior Judge Munley with the undersigned's consent following Plaintiff's motion that Judge Munley recuse himself.  In that motion counsel alleged that Judge Munley showed "partiality" to Defendants based on the judge's selection of a trial date that counsel viewed as preventing Plaintiff from proceeding with chosen counsel.

[28] On the fourth day of trial, Defendant Smith finally testified that the reason "masturbation" came up at all in class is because a student asked whether Cyndi Lauper's "Girls Just Want to Have Fun" was about female masturbation.  (Doc. No. 305 at 678:1-9.)

Smith ever even used the word in Plaintiff's presence.  The effect of counsel's conduct is obvious: the jury was inflamed and misled into believing there was evidence that Defendant Smith discussed masturbation with Plaintiff.

Counsel's conduct in repeatedly expressing her own personal outrage at Defendants' conduct was exacerbated in her closing argument when she informed the jury:

> And I'll give you – I used to teach employment and labor law for a local university in Wilkes-Barre, Pennsylvania.  And a lot of my students would often ask me questions about this because of the fact that they were all human resources professionals that were going to go out and work in the world, and they knew I was in human resources before I became a lawyer.  They'd always ask me, what do you do for this situation, what did you do with that.
>
> And in connection with their questions about, you know, Attorney Pollick, what do you do when someone comes forward and says that they're, you know, subjected to a hostile environment, the material or the banter is offensive to them, what do you do when you don't know it's true, without a doubt and absolutely, you remove that harasser from whoever is being victimized, regardless of whether it's true or not, because of the fact if you do that, you make sure that that victim is protected, because if those allegations are true, you've protected her or him. So you've done your job as a human resource person, which that's what human resource people are, we're supposed to look out for the people who are exposed to wrongdoing and inappropriate things.

(Doc. No. 315 at 821:8-822:3.)  Having provided the jurors with a brief outline of her experience as a professor and human resources professional, counsel's repeated characterization of the evidence and statements regarding the propriety of Defendant Pleasant Valley's conduct carried with it the imprimatur of a self-proclaimed expert in the field.

In sum, having observed counsel's behavior before the jury over the course of a five-day trial, coupled with a jury verdict that was internally inconsistent and provided for an award of

damages far in excess of what the evidence called for, the Court has no doubt that counsel's conduct was both improper and prejudicial.  The Court did instruct the jurors that counsel's statements and questions were not evidence; however, the Court finds that the instruction could not serve to cure the cummulative effect of counsel's conduct.  Accordingly, for the reasons cited above as well as many other instances of misconduct at trial, the Court finds that a new trial is warranted based on Plaintiff's counsel's conduct.  Blanche Rd. Corp., 57 F.3d at 264 (affirming the district court's decision to grant a new trial based on counsel mischaracterizing evidence and arguing with the court in the presence of the jury); Fineman, 980 F.2d at 208-10 (affirming the district court's decision to grant a new trial where plaintiff's counsel made improper references to opposing counsel in closing argument, improperly provided his personal opinion, injected his own credibility into the case, and made references to facts not in evidence); Draper, 580 F.2d at 95 (affirming the district court's decision to grant a new trial based on counsel's references to defendants' wealth, assertions of counsel's opinion of the justness of his client's case, reference to facts not in evidence, and insulting references to opposing counsel).

## CONCLUSION

The Court is mindful of the significant personal difficulty that Plaintiff has endured as a result of the events of 2007 and this litigation.  The Court does not doubt her sincerity in raising objections to some of what Defendant Smith taught in his classroom.  Sympathy alone, however, cannot form the basis of a judgment.  In the present matter, the Court finds that the jury's verdict against Defendant Pleasant Valley was internally inconsistent and the verdict against Defendant Smith was against the weight of the evidence.  Even if the jury's judgment on liability was supported by evidence, the Court could not find that Plaintiff established that she was entitled to

damages as a result of Defendants' conduct.  Further, the Court finds that the improper conduct of Plaintiff's counsel so infused the trial with prejudice that the Court can only conclude that the verdict was the result of this prejudice.  Accordingly, the Court will grant Defendant's motion for a new trial.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PATRICIA YOUNG, et al.,** | : | |
| **Plaintiffs** | : | |
| | : | **Civil Action No. 3:07-CV-00854** |
| **v.** | : | |
| | : | **(Chief Judge Kane)** |
| **PLEASANT VALLEY SCHOOL** | : | |
| **DISTRICT, et al.,** | : | |
| **Defendants** | : | |

## ORDER

   **AND NOW**, on this 18th day of May 2012, **IT IS HEREBY ORDERED THAT**

Defendants' motion for judgment as a matter of law (Doc. No. 289) is **DENIED** and Defendants'

motion for a new trial (Doc. No. 288) is **GRANTED**.  The Judgment entered on August 26, 2011

(Doc. No. 284) is **VACATED**.

S/ Yvette Kane
Chief Judge Yvette Kane
United States District Court
Middle District of Pennsylvania