IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PATRICIA YOUNG, et al.,       :     Civil Action No.  3:07-cv-00854
           Plaintiffs      :
                        :     (Judge Brann)
         v.                :
                        :
PLEASANT VALLEY SCHOOL     :
DISTRICT, et al.,             :
            Defendants    :

## MEMORANDUM

July 9, 2013

In a May 2, 2013 Order, the Court gave defendant Bruce Smith (hereinafter,

"Smith") leave to file a motion for partial summary judgment with respect to

plaintiff M. Young's claim that Smith, a former history teacher, is liable under 42

U.S.C. § 1983 because he created a sexually hostile classroom environment that

deprived M. Young, Smith's former pupil, of the equal protection of the laws.

(ECF No. 445). The circumstances leading to, and the rationale for, that Order

were set forth in a previous Memorandum and are not repeated here.[1]

---

[1]The Court has rejected M. Young's arguments in opposition to the Court's
Order elsewhere. (See Ct. Mem. & Order, May 2, 2013, ECF No. 445; Ct. Order,
May 22, 2013, ECF No. 465 n.1). Plaintiff's "Brief in Opposition to Defendant
Smith's Untimely Motion for Summary Judgment" expresses continued vexation

Smith filed a motion for partial summary judgment and papers in support on

May 6, 2012 (respectively, ECF Nos. 456 & 457); M. Young filed papers in

opposition on May 24, 2013 (ECF No. 467); and Smith filed papers in reply on

June 17, 2013 (ECF No. 470). On July 2, 2013, the Court issued an Order granting

Smith's motion. (ECF No. 480). This Memorandum explains the Court's reasons.

_____

with the Court's Order, but does not raise arguments the Court has not already
considered. (See Pl.'s Opp'n Br., May 24, 2013, ECF No. 467 at 26-31).

    In summary, the Court holds that giving Smith leave to file a motion for
partial summary judgment was proper in light of the following: (1) The Honorable
Yvette Kane's Memorandum & Order of May 18, 2012 (ECF No. 333), which
concluded that the evidence adduced at the first trial was insufficient to prove M.
Young's § 1983 claim against Smith as a matter of law; (2) Rule 56 of the Federal
Rules of Civil Procedure (especially Fed. R. Civ. P. 56(b) (permitting Court to
determine when summary judgment motion may be made) & Fed. R. Civ. P. 56(f)
(permitting Court to consider summary judgment on its own initiative)); (3)
circumstances in which the "law of the case" doctrine does not require adherence
to a prior ruling; (4) the Court's interest in limiting trial to issues in genuine
dispute; (5) the fairness of the summary judgment procedure to all parties under the
circumstances; and (6) the inapplicability of Fed. R. Civ. P. 6(b)(1)(B) to the
Court's Order.

    Furthermore, the Court rejects M. Young's contention that "[t]he evidence
has not changed" since the Honorable James M. Munley denied Smith's motion for
summary judgment in 2010. (See Pl.'s Opp'n Br., May 24, 2013, ECF No. 467 at
31-40). In particular, the trial revealed that the context surrounding specific
instances of Smith's speech is materially undisputed by the parties.

## I.     Summary Judgment Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" where it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is "genuine" where "the evidence is such that a reasonable jury," giving credence to the evidence favoring the nonmovant and making all reasonable inferences in the nonmovant's favor, "could return a verdict for the nonmoving party." Id.

For movants and nonmovants alike, the assertion "that a fact cannot be or is genuinely disputed must" be supported by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2).

Thus, where the moving party's motion is properly supported and his evidence, if not controverted, would entitle him to judgment as a matter of law, the nonmoving party, to avoid summary judgment in his opponent's favor, must answer by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 250. In the face of the moving party's evidence, the nonmoving party's mere allegations, general denials or vague statements will not create a genuine factual dispute. Bixler v. Cent. Pennsylvania Teamsters Health & Welfare Fund, 12 F.3d 1292, 1302 (3d Cir. 1993). Only citation to specific facts is sufficient to show a need for trial. Anderson, 477 U.S. at 250.

## II.    Hostile Environment Standard

This is an unusual case. M. Young alleges that Smith is liable under 42 U.S.C. § 1983[2] because he created a sexually hostile classroom environment that

_____

[2]

42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought

deprived M. Young of the equal protection of the laws in violation of the Fourteenth Amendment to the United States Constitution. There is no serious dispute that Smith's allegedly improper classroom speech occurred while he, a public school teacher, was acting under color of state law, but the parties dispute whether M. Young can prove that Smith deprived her "of any rights, privileges, or immunities secured by the Constitution."

The strange twist in the case involves the law to be applied. Whether Smith created a hostile classroom environment that deprived M. Young of the equal protection of the laws is determined by applying standards developed not for the classroom, but in the employment arena under Title VII of the Civil Rights Act of 1964. (See Mem. & Order, May 18, 2012, ECF No. 333 at 23) (noting that the Honorable James M. Munley held in this case that "Title VII standards should be used in determining whether a sexually hostile educational environment existed in violation of Plaintiff's equal protection rights."). See also Hayut v. State Univ. of

---

against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

New York, 352 F.3d 733, 744 (2d Cir. 2003) ("Section 1983 sexual harassment claims that are based on a 'hostile environment' theory. . . are governed by traditional Title VII 'hostile environment' jurisprudence."). This is noteworthy because courts applying Title VII are to give "careful consideration [to] the social context in which particular behavior occurs and is experienced by its target." Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75, 81 (1998).

In any case, to survive summary judgment M. Young must set forth enough admissible evidence to permit a reasonable jury to conclude that Smith created "a sexually objectionable environment . . . both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998). See also Caver v. City of Trenton, 420 F.3d 243, 262 (3d Cir. 2005) (quoting Cardenas v. Massey, 269 F.3d 251, 260 (3d Cir. 2001) (stating the formulation developed by the Third Circuit: "Under Title VII, the evidence must establish that: (1) [plaintiff] suffered intentional discrimination because of [sex]; (2) the discrimination was pervasive and regular; (3) it detrimentally affected [plaintiff]; (4) it would have detrimentally affected a reasonable person of the same protected class in [plaintiff's] position; and (5) there is a basis for vicarious

liability."). Determining whether an environment is "hostile" or "abusive" is a holistic endeavor that requires looking at "all the circumstances . . . includ[ing] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," among other relevant factors. Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). "[A] showing of some minimal level of harassment is necessary before a case is submissible to a jury [and a] court . . . may decide this issue of submissibility on summary judgment." Jackson v. Flint Ink N. Am. Corp., 382 F.3d 869, 869 (8th Cir. 2004). See also Vera v. McHugh, 622 F.3d 17, 27 (1st Cir. 2010) (citations and internal quotation marks omitted) (explaining that "[i]t is the jury's job to weigh [the relevant] factors and decide whether the harassment was of a kind or to a degree that a reasonable person would have felt that it affected the conditions of her employment. The court's role in evaluating such claims [on summary judgment] is to polic[e] . . . the outer bounds.")

Because hostile environment claims risk turning Title VII into a "general civility code," in a number of opinions the Supreme Court has reminded lower courts of the limitations that govern such claims. First, "[c]onduct that is not severe

or pervasive enough to create an objectively hostile or abusive work environment –
an environment that a reasonable person would find hostile or abusive – is beyond
Title VII's purview." <u>Harris</u>, 510 U.S. at 23.

Second, sexually hostile environment claims are actionable only because
Title VII prohibits discrimination in the "terms" or "conditions" of employment,
and "conduct must be extreme to amount to a change in the terms and conditions of
employment." <u>Faragher</u>, 524 U.S. at 788.

Third, "Title VII does not prohibit all verbal or physical harassment in the
workplace; it is directed only at 'discriminat[ion]. . . because of . . . sex.'" <u>Oncale</u>,
523 U.S. at 80 (alteration in original) (quoting Title VII). Thus our Supreme Court
has "never held that workplace harassment, even harassment between men and
women, is automatically discrimination because of sex merely because the words
used have sexual content or connotations." <u>Id.</u> However, the inference of
discrimination because of sex can be based on evidence of "explicit or implicit
proposals of sexual activity" because it is reasonable to assume the proposer would
not have made the same solicitation if the recipient was a man instead of a woman
or a woman instead of a man. <u>Id.</u> It would also be reasonable to infer
discrimination because of sex when the "victim is harassed in such sex-specific and

derogatory terms [so] as to make it clear that the harasser is motivated by general

hostility to the presence of [the victim's sex] in the workplace." Id.[3] These are just

examples, but "[w]hatever evidentiary route the plaintiff chooses to follow, he or

she must always prove that the conduct at issue was not merely tinged with

---

[3]In Oncale, the Court held that same-sex sexual harassment is actionable under Title VII. Unaltered, the paragraph from which this Court quotes says:

> Courts and juries have found the inference of discrimination easy to draw in most male-female sexual harassment situations, because the challenged conduct typically involves explicit or implicit proposals of sexual activity; it is reasonable to assume those proposals would not have been made to someone of the same sex. The same chain of inference would be available to a plaintiff alleging same-sex harassment, if there were credible evidence that the harasser was homosexual. But harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex. A trier of fact might reasonably find such discrimination, for example, if a female victim is harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace. A same-sex harassment plaintiff may also, of course, offer direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace. Whatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted "discrimina[tion] . . . because of . . . sex."

Id. at 80-81 (alteration in original).

offensive sexual connotations, but actually constituted 'discrimina[tion] ... because of ... sex.'" <u>Oncale</u>, 523 U.S. at 81.

### III.  Factual Background[4]

### a)  The Evidence at the Conclusion of the First Trial

The claims of M. Young and her co-plaintiff parents, Patricia Young and William Young, were tried before a jury nearly two years ago. On August 26, 2011, the jury returned a verdict for the Young plaintiffs on two of their claims, one alleging that teacher Bruce Smith was liable under 42 U.S.C. § 1983 because he created a sexually hostile classroom environment that deprived M. Young of equal protection of the laws, and another alleging that defendant Pleasant Valley School District (hereinafter "Pleasant Valley") violated the First Amendment rights of M. Young and her parents when it retaliated against the Youngs for reporting Smith's wrongdoing. On May 18, 2012, the Honorable Yvette Kane (who presided over the trial) issued a Memorandum & Order in which she vacated judgment and ordered a new trial. (ECF No. 333) (hereinafter "Ct. Mem. & Order in re New Trial").

---

[4]The Court includes only the facts necessary to decide the motion. Chief Judge Kane's Memorandum of May 18, 2012 granting defendants's motion for new trial includes additional background and facts relevant to the other claims.

Although Chief Judge Kane determined that the resulting verdict was defective, the evidence adduced at the first trial remains part of the record to be considered on summary judgment. Fed. R. Civ. P. 56(c)(1)(A) & (c)(3). Viewing the evidence in the light most favorable to M. Young – as the Court must, <u>see</u> <u>Sheridan v. NGK Metals Corp.</u>, 609 F.3d 239, 250 n.12 (3d Cir. 2010) (the Court considering a summary judgment motion must "draw all inferences in a light most favorable to the nonmoving party") – the trial transcript and previously filed papers on record reveal the facts as follows.

In 2007, Smith taught a Twentieth Century History course at Pleasant Valley High School. (Def.'s Facts, May 24, 2013, ECF No. 456-1 ¶ 1) (hereinafter, "Def.'s Facts"). He taught in an unorthodox manner – without a textbook, in reverse chronological order, and making departures from the prescribed curriculum – using a combination of lecture, powerpoint, and video and audio clips. (Pl.'s Facts, May 24, 2013, ECF No. 466 ¶ 5 (hereinafter, "Pl.'s Facts 2013"); M. Young Trial Test. at 174; M. Young Dep. at 32). He had shown some of the allegedly offensive images at issue in this litigation (images, at least, of the Manson family and Ed Gein murder victims) to his classes for five consecutive years when M. Young joined his course. (Pl.'s Facts 2013 ¶ 10; Pl.'s Facts, June 3, 2009, ECF No.

96 ¶¶ 4-5). Smith was a popular teacher, and M. Young (a Pleasant Valley student) and her peers looked forward to joining his class, having learned "how great a teacher [Smith] was" from one of Smith's colleagues, (M. Young Trial Test. at 209; M. Young Dep. at 19), although today M. Young believes that "Smith was only popular because he talked about sex" (Pl.'s Facts 2013 ¶ 1).

When she was age sixteen, M. Young was assigned to Smith's course for the second semester of her junior year, which began at the end of January or beginning of February 2007. (M. Young Trial Test. at 172-74; M. Young Dep. at 16). To say the least, her expectations met with disappointment.

M. Young's quarrels with Smith's manner and methods are manifold. But many of these disagreements are irrelevant to her claim to have been discriminated against because of sex.[5] Facts falling under the "irrelevant" heading are the decor of Smith's classroom – it was painted black and had a large Nazi flag on the wall (Pl.'s Facts 2013 ¶ 4; M. Young Trial Test. at 174); Smith's telling of a story about himself as a high school student hosting a "keg party" as a prom fund-raiser (M. Young Trial Test. at 179); his exhibition of a home video of a "keg party from

---

[5]Evidence is relevant when "it has any tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401(a).

when he was in high school" (Id. at 185); his discussion of the "homosexuality of the Third Reich" and "Adolf Hitler's personal life"[6] (Id. at 180); Smith's distribution (to a course e-mail list) of an article reporting that it was Osama Bin Laden's birthday (Id. at 181); Smith's exhibition of a video showing "someone being decapitated" (M. Young Aff., May 6, 2013, ECF No. 456-1 ¶ 12) (hereinafter, "M. Young Aff."); and Smith's assignment requiring his students to write an essay about the "riskiest or craziest things" they had ever done and his recommendation to students who would write about things they did not "want [their] parents to see" to not "leave [the essay] out on the kitchen counter" (M. Young Trial Test. at 181). The Court fails to see how these facts make it more probable that Smith's classroom was objectionable because of sex.

A number of M. Young's allegations, on the other hand, are relevant to her claim. In the course of his lectures, Smith displayed photos of the female victims –

---

[6] M. Young rightfully, if irrelevantly, expressed concern that her class learned of Hitler's "family and that he wanted to be an artist but . . . didn't get into art school, but we did not learn the Holocaust." (Id. at 180).

In addition to homosexuality, Smith discussed which Third Reich leaders "had a liking for little boys, and there were rumors of . . . bootlicking and one was a Jew baiter . . .." (Id. at 226).

naked, mutilated, beheaded, and defiled[7] – of the infamous murderer and grave

robber Ed Gein. Most, if not all, of these images were in black and white. (M.

Young Trial Test. at 176, 178). Smith also mentioned that Gein's mother "took

care of his teenage urges." (Id. at 179).

Smith taught "about the undercurrent of the hippies" (M. Young Trial Test.

at 180), displaying Tate-LaBianca crime scene photos of 1969, specifically one of

Sharon Tate "with a rope tied around her neck, bloody,"[8] and another of her

"bloodied, pregnant body right as they found her in her living room." (Id. at 177-

78). One of these photographs was in color (id.) and one (perhaps the same one –

the record is not clear) was a "very well known photo that was in Time or

Newsweek Magazine." (Yozwiak Trial Test. at 318). One or both photographs

were printed from the Discovery Channel's website. (Def.'s Facts ¶ 11; Pl.'s Facts

---

[7](M. Young Trial Test. at 176 ("That photo is a picture of one of the victims of Ed Gein. At this time I cannot recall the decade, but she was hung up by her ankles and slit from her vagina to her sternum, beheaded by Ed Gein, and it was a basis for Texas Chainsaw Massacre and the like"); id. at 178 ("I'll start with the black and white images on the left side. These are images of the Ed Gein murders, the heads allegedly found in the freezer with semen in their mouths, decapitated heads of women. . . . I do recall that [Smith] stated the police reports reported the semen in their mouths, which I believe was postmortem."))

[8](Id. at 177 ("This is an image of Sharon Tate, one of the victims of the Manson murders, with a rope tied around her neck, bloody. She was stabbed multiple times. She was pregnant, as well, and there's tape over her nipples.")

2013 ¶ 11). Tate had been a model and actress, and prior to displaying images of

Tate's dead body, Smith displayed "one of her modeling pictures . . ., and he asked

if the boys in the class thought she was hot or if she was pretty." (M. Young Trial

Test. at 177).

Prior to showing the photographs of the victims of Manson and Gein, Smith

warned that they were graphic and gave students permission to look away or leave

the room. (Smith Trial Test. at 617, 622).[9]

M. Young was also offended by Smith's display of "an individual in a Nazi

Sturmabteilung uniform and an individual in plain clothes burning books, two of

which appear to have images of a woman with her breasts exposed on the cover."

---

[9]Asked if Smith offered such a warning, M. Young twice did not remember, testifying, "At this time I don't recall if he said that. But I would not know if material is gruesome or not unless I see it first" (M. Young Dep. at 25), and "Again, at this time I don't remember. I don't recall. But I would not know if they were going to be gruesome unless I saw them first to determine if I could handle looking at them or not." (Id. at 27). Her failure to recall does not place the context of the photo's display in dispute, since a "failure to remember an event is not a specific denial that the event occurred." See Hideout Records & Dist. v. El Jay Dee, Inc., 601 F. Supp. 1048, 1053 (D. Del 1984). See also Bixler v. Cent. Pennsylvania Teamsters Health & Welfare Fund, 12 F.3d 1292, 1301-02 (3d Cir. 1993) (internal quotation marks omitted) (alteration in original)  (construing statement – "I don't. I really don't. I mean, I could have, but I don't remember at this time." – as plaintiff's admission, explaining that a nonmoving party may not "rest upon mere allegations, general denials, or . . . vague statements" to defeat summary judgment).

(Ct. Mem. & Order in re New Trial at 25). But "neither of the two objectionable book covers . . . [was] larger than approximately one hundredth of the total area of the photograph" (Id. at 27), and the picture – which shows Nazis "burning porn" and, in the context of Smith's lesson, was evidence of the Nazis's "hypocri[sy]" – was just one picture shown during "an entire week about the Nazis." (P. Young Trial Test. at 266-67).

Smith admitted that all of the nude images displayed in his classroom were of females. (Smith Trial Test. at 8).

In addition to these offensive images, M. Young asserts that Smith's in-class comments manifested  disrespect of women. According to her:

• He voiced that he "didn't believe women should be president because [they] get [their] monthly visitor each month." (M. Young Trial Test. at 179).

• He "commented [that] cars in the 1920s [were] prostitution on wheels" and showed an illustrative cartoon – entitled "Flaming Youth" – drawn by artist John Held, a well-known magazine illustrator of the 1920s. (Id.) (the cartoon is described in n.19 infra).

• He explained that the flapper of the 1920s was a woman who "drank, . . . smoked, [and had] sex when she want[ed] it." (Id. at 179). The "comments about

drinking and sex were not appropriate," according to M. Young, although she admitted that more liberal attitudes towards drinking and sex were aspects of the changing societal role of women "to an extent." (Id. at 206-07).

•  Making a comparison with the popular standard of beauty typified by the "Gibson Girl" of the early twentieth century, Smith "discussed Victoria's Secret models and pushup bras," asking students if they thought one model's "breasts were firm enough," and inquiring generally "what the ideal woman would be for the men in the class" and "what the ideal size of a breast should be," reporting that "a boy in another class said that one handful was enough." (Id. at 179; P. Young Trial Test. at 248-49). He asked the female students if "these pushup bras [are] comfortable? Because they don't look it." (P. Young Dep. at 46).

M. Young also recalls Smith making a number of sexualized remarks:

•  In connection with a lesson covering the Clinton-Lewinsky affair, Smith explained that the President reasoned "oral sex isn't sex." (M. Young Aff. ¶ 18). Smith then offered students a questionable homework assignment: "go home and have oral sex and make sure [your] parents [are] watching." (Id. at 179, 213-15).

• He "talked about glow-in-the-dark condoms and seeing in the dark while having sex." (Id. at 179).

• He distributed (to a course e-mail list) an article "about HIV and AIDS," which reported that it is "not as easy to get as you think," and which discussed unprotected sex. (Id. at 181).

• He directly asked M. Young "what [she] was wearing during a pillow fight, if [she] was in [her] underwear."[10] (Id. at 179; Pl.'s Facts 2013 ¶ 20).

Finally, M. Young also recalls Smith remarking on his personal sexual history:

• He "talked about how he would skip class to bang the cheerleader in college." (Id. at 179).

• He "talked about a girl who slept around at school with all of his guy friends and he knew about it and . . . he didn't want to stick his where all theirs was." (Id. at 179).

---

[10]Patricia Young testified that Smith asked this after showing an 1897 video of the great inventor Thomas Edison pillow-fighting with girls in nightgowns (P. Young Dep. at 44-45), but this may conflict with Smith's own version of events. (Def.'s Facts ¶ 20).

•       He recommended and then supplied a copy of his autobiographical

"Memoirs of a Class President" to M. Young (and six other students) with the

intent that she would read the unpublished manuscript to partially fulfill

Pennsylvania System of School Assessment course reading requirements. (Id. at

182; M. Young Dep. at 22). M. Young requested a copy "because students said that

they started reading it and it seemed really good, so I thought, okay, it might be

worth a shot," but she was disappointed.[11] (M. Young Trial Test. at 182). Page six

of Smith's "Memoirs" included a particularly bothersome passage – "I didn't like

the guy I caught my mom having sex with. He was planning to marry her and move

us to Stroudsburg. I was ten years old and pissed off at the world." (Id. at 184). The

manuscript, which is 739 pages long, features a number of salacious passages, but

M. Young put the book down early on when she "noticed something was weird

about it" and nowhere avers that she learned of them while she was in Smith's

course.[12] (Id. at 201; M. Young Dep. at 22).

_____

[11]Giving the phrase "required reading" its ordinary meaning, M. Young's
representation that Smith's "Memoirs" was "required reading" (Pl.'s Facts 2013 ¶
22-23; M. Young Dep. at 22) is not supported by the citations to the record.

[12]While evidence of workplace discrimination of which a plaintiff was not
aware may be relevant for certain purposes, see generally Hurley v. Atlantic City
Police Dept., 174 F.3d 95, 109-11 (3d Cir. 1999), when determining whether M.
Young perceived her environment as hostile, or whether a reasonable person in her

In general, M. Young claimed of her experience in Smith's course: ""[I]t always came back to women. It was always degrading women." (M. Young Trial Test. at 180).

M. Young's parents brought some of Smith's materials and methods to the attention of Pleasant Valley administrators on March 8, 2007.[13] (See Pl.'s Ex. 28a, ECF No. 467-6). After an investigation, Smith was suspended for thirteen days, ten without pay; administrators began previewing his lesson plans; his class sessions were monitored (although M. Young disputes the adequacy of the monitoring); and he received an unsatisfactory evaluation for the year. (Def.'s Facts ¶¶ 30-32; Pl.'s

---

shoes would have perceived the environment as hostile, the Court considers "only the . . . evidence of harassment that [M. Young] personally experienced or harassment of other[s] . . . that [M. Young] witnessed or had knowledge of during her [time in Smith's classroom]." Hallberg v. Eat'n Park, 1996 WL 182212, at *9 (W.D. Pa. Feb. 28, 1996). Accordingly, in addition to those parts of Smith's "Memoirs" to which M. Young was not exposed, the Court also disregards evidence relating to Dark Horse, Smith's screenplay. M. Young never read Dark Horse, and in any case, her primary opposition to what she heard of it was that it "echo[ed] events in society [the Virginia Tech massacre] that [she] didn't find should be condoned." (M. Young Trial Test. at 204–06).

[13]On March 19, 2007, parent Laura Berthel, after a conversation with her daughter, e-mailed Smith to complain that the "display of graphic photos of one of the worst homicides in recent history [i.e., the Manson murders] was completely inappropriate for an 11th gr[ade] classroom!" (Pl.'s Ex. 31, ECF No. 467-7). Also, "some time in March," parent Connie Saba, after another parent provided her with a packet that collected Smith's questionable course materials and quotes, complained to Pleasant Valley administrators. (Saba Trial Test. at 138).

Facts 2013 ¶¶ 30-32). For the most part, these measures appear to have put a damper on Smith, but M. Young claims that he – on suspension at the end of March, 2007 – retaliated against her by having a substitute show a DVD on "the Nixon scandal and whistleblowing [i.e., Daniel Ellsberg] and if it's really worth it" (M. Young Trial Test. at 232), and the photo of Nazis burning pornography slipped past the censors on April 20, 2007. (W. Young Trial Test. at 410). The Young's filed their lawsuit at the beginning of May, 2007.

All of this evidence was before Chief Judge Kane when she concluded that, "[u]pon a review of all of the evidence of alleged sexually offending material and resolving all doubts in favor of Plaintiff, the Court cannot find that Defendant Smith's actions meet the high legal standard for a sexually hostile educational environment." (Ct. Mem. & Order in re New Trial at 26). In the view of Chief Judge Kane, "the totality of the allegations, even viewed out of context and in a light most favorable to Plaintiff, d[id] not reasonably support a finding that the environment was 'permeated with discriminatory intimidation, ridicule, and insult,' such that it changed the terms and conditions of Plaintiff's education." (Id. at 31).

**(b)    Evidence Introduced by M. Young after Trial**

In response to Smith's motion for partial summary judgment, M. Young had

the opportunity to proffer additional evidence of a sexually hostile classroom

environment. To this end, she offered by way of affidavit that:

• Smith too-vividly detailed Manson Family member Sexy Sadie's

supposed participation in a murderous menage a trois (Pl.'s Facts 2013 ¶ 12; M.

Young Aff. ¶ 8-10; P. Young Trial Test. at 249)[14];

• he "showed a video in which a woman was shot in the desert as

punishment"[15] (M. Young Aff. ¶ 11);

• he "showed images and discussed [the] Abby and Andrew Borden

murders and how Lizzie Borden had killed her parents" (Id. ¶ 22)[16];

• Smith "discussed female masturbation in connection with Cindy

Lauper" (Id. ¶ 23);

---

[14]Some of this evidence was discussed at trial, but apparently was not considered by the Court, perhaps because it was introduced by way of hearsay statements. (See, e.g., P. Young Trial Test. at 249 ("two girls, one guy, one girl sat on him while the other rode his face, and when they orgasmed, I believe they cut off his penis.").

[15]Given this syntax, it is not clear whether the woman or the students were being punished – possibly both.

[16]Lizzie Borden was acquitted of the gruesome 1892 murder of her stepmother and father, but some remain skeptical of the verdict.

• in connection with his discussion of the Gibson Girl, he commented on "women's breasts . . . sag[ging] halfway down their chests as they age" (Id. ¶ 26);

• he "discussed FDR's mistress, which has nothing to do with 20th Century history" (Id. ¶ 45; P. Young Trial Test. at 255);

• Smith "asked the class how much money it would take to get [members] to strip and run down the hall in their underwear or naked" (M. Young Aff. ¶ 46);

• he "told the class how to trick girls into getting in a car near dusk" under the pretense of going to "watch for baby deer," after which the driver could "find a secluded spot near a field to lock the doors" (Id. ¶ 44); and

• Smith gave an off-color example of the supposed implications of communism: "When we were discussing communism, . . . [Smith] used two guys in the class and asked[,] '[H]ow would you like to swap girlfriends for the night'? Under communism what's yours is mine and what's mine is yours. [He was] [t]reating girls like an object. And then [he] said, 'Oh, is one girl not hot enough, how about if I throw in two cases of beer?'" (M. Young. Dep. at 37; M. Young

Aff. ¶¶ 13-14).[17]

---

[17]Smith moved to strike M. Young's affidavit in its entirety. (Def.'s Mot. Strike, June 17, 2013, ECF No. 471). Upon consideration, the Court will disregard a number of M. Young's representations: (1) "Defendant Smith subjected me to comments criticizing, sexualizing, or demeaning women almost every class period I had him" (M. Young Aff. ¶ 2); (2) "Contrary to Judge Kane's conclusion that the comments, images, and discussions related to criticizing, sexualizing and demeaning women, occurred sporadic [sic], the comments, images [sic] occurred nearly every time I was in Defendant Smith's classroom" (id. at 4); (3) " I was singled out when Defendant Smith touched my arm" (id. at 5); (4) "Defendant Smith talked about his sex life often" (id. at 7); (5) "Defendant Smith showed the nakednews.com clip in class" (id. ¶ 49).

Averments (1), (2), and (4) are too "conclusory and lacking in specific facts" to provide a basis for opposing Smith's motion. Bailey v. Viacom Inc., 435 F. App'x 85, 91-92 (3d Cir. 2011) (in the absence of other employees's names or an explanation of how other employees were terminated, plaintiff's representation that he was aware of similarly situated employees who had been terminated was inadequate to defeat summary judgment). See also Dreshman v. Henry Clay Villa, 733 F. Supp. 2d 597, 613 (W.D. Pa. 2010) ("While Plaintiff testified that he was subject to sexual harassment half the time that he worked, when questioned about this estimate at his deposition, he only identified a number of discrete events or incidents of harassing conduct, thus, the Court will not credit Plaintiff's unsubstantiated estimation."); Stephenson v. City of Philadelphia, 2006 WL 1804570, *11 n.2 (E.D. Pa. June 28, 2006) (refusing to credit plaintiff's "unsubstantiated allegations that discriminatory treatment occurred 'all the time'").

If there is any suggestion in M. Young's averment (3) that Smith touched her in a sexual way, this conflicts with her trial testimony, in which stated that Smith, "while he was lecturing," tapped her "on the outside of [her] right arm," "scar[ing] the life out" of her. (M. Young Trial Test. at 210). She clarified that she would "not call [the touching] sexual, but retaliation." (Id.) M. Young provides no explanation for the conflict between her affidavit and testimony, so the Court will not consider this incident in terms of its contribution to the allegedly sexually

24

hostile environment. <u>See Baer v. Chase</u>, 392 F.3d 609, 624 (3d Cir. 2004) (stating general rule that "a party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict.").

Averment (5) is not substantiated by M. Young's personal knowledge. Indeed, the Court is concerned that M. Young's entire affidavit makes no claim to be based on personal knowledge, leaving the distinct possibility that she has incorporated into her affidavit Smith's trial admissions respecting materials he showed to classes she may never have attended. Instead, the affidavit merely asserts that M. Young is "competent" (M. Young Aff. ¶ 1), that she "understand[s] that false statements . . . are . . . subject to penalties of perjury," and that she "attest[s] to the best of [her] knowledge the aforementioned [sic] correct" (<u>Id.</u> at 8). This falls short, <u>see PNY Tech, Inc. v. Samsung Elec. Co., Ltd</u>, 2011 WL 1630856, at *3 (D.N.J. Apr. 29, 2011 (rejecting affidavit that made conclusory assertion of personal knowledge, but provided no basis upon which court could conclude that affiant had personal knowledge of the facts stated); <u>Mirarchi v. Seneca Specialty Ins. Co.</u>, 2013 WL 1187065, at *1 n.1 (E.D. Pa. Mar. 22, 2013) (rejecting portions of affidavit where affiant "merely [stated] that whatever is written is true" and averments suggested they were not made upon personal knowledge); <u>Arrowood Indem. Co. v. Hartford Fire Ins. Co.</u>, 774 F. Supp. 2d 636, 648 (D. Del. 2011) (striking portions of affidavit where there was "no showing in the affidavit that [the affiant had] personal knowledge of any of the[] alleged facts" and averments appeared to be based on evidence and pleadings from a related case), especially where, on the first day of the previous five day trial, the attorneys hotly disputed whether M. Young had personal knowledge of the nakednews.com clip (Smith Trial Test. at 20 <u>et seq.</u>), and M. Young's personal knowledge was never subsequently established. Under these circumstances, the Court rejects paragraph 49 of M. Young's affidavit. The Court is willing to give M. Young the benefit of the doubt on other questionable averments respecting Smith's speech because it is likely that M. Young, as Smith's pupil, heard the speech, and some of the averments are independently supported in the record.

In further support of her position, M. Young offered as exhibits Smith's

Powerpoint slides related to flappers,[18] the social impact of the automobile,[19] and

the opening of "Storyville" in New Orleans. (Ex. 80, ECF No. 467-12). She also

offered Smith's Clinton/Lewinsky-related Powerpoint slide[20] and gave another

example of Smith's too-graphic description of the affair.[21] A final slide appears to

---

[18]The slide shows three black and white photographs of flappers accompanied by the caption: "She drinks, she smokes, she swears, she has sex when she wants it. She drinks rotgut and has her own 'jack.' Her skirts are high and [she] wears silk underwear."

[19]The slide shows a black and white cartoon – John Held's "Flaming Youth" – of a man and woman in evening clothes in the back of an automobile. The man has his face buried in the woman's neck, his right hand over the cover of her evening dress on her right breast, and his left hand midway up her left thy below the line of her dress. The slide is captioned: "The Car . . . Flaming Youth: Hell raising teenagers of the 20's." The caption includes in quotation marks: "The car is a house of prostitution on wheels," but the quote is not attributed. Finally, the caption appears to include a link that, when activated, will play the "Charleston."

[20]The slide shows a late 1990s cover of "Cigar Aficionado" magazine featuring Monica Lewinsky's photograph. One story previewed on the magazine's cover is entitled "The Truth About Bill . . . Did he smoke it or save it?" Another photo on the slide shows a parade-sized caricature balloon of Bill Clinton holding the (blue) breasts of a Smurf-like Statue of Liberty surrounded by protesters. The caption for the entire slide says: "Most will remember Clinton for his scandals, & one involving a young intern, Monica Lewinsky. The scandal reflected a society focused on tabloid journalism & junk food entertainment."

[21](M. Young Aff. ¶ 17 ("Smith discussed how Monica Lewinsky walked by President Clinton and she lifted her skirt and Bill Clinton put a cigar in her vagina."))

include overarching questions Smith expected or hoped students would consider in relation to his course: "Smith, how are you gonna relate history to my world? Why does any of this matter to me? Who the hell do I believe? What can be done about anything? How did this whole mess begin? Does . . . 1/3 of the world really hate us? Why are people so f****** stupid?!"[22]

M. Young's response to Smith's motion is also noteworthy for what it did not include. She submitted no evidence to dispute Smith's testimony regarding the context in which Tate-LaBianca crime scene photos were shown.[23] (Smith Trial Test. at 616; Pl.'s Facts 2013 ¶ 9). She submitted no evidence to dispute that Smith showed the photos of the Gein victims in the context of a lesson communicating that the 1950s were "not as 'sanitary' as 'Leave It to Beaver' or Happy Days'

---

[22]The asterisks are Smith's.

[23]"[A]lso . . . Susan Atkins [a.k.a. "Sexy Sadie"] was up for parole, in which she said she had found God and that she should be reprieved and she had ovarian cancer and she should go home to die.

. . .

"And it's like well, Sharon Tate was denied that. And I showed testimony of [Tate's] sisters saying the same thing." (Smith Trial Test. at 616).

would suggest."[24] (Def.'s Facts ¶ 12; Pl.'s Facts 2013 ¶ 12). Likewise, in relation to Smith's questionable Clinton/Lewinsky-related homework assignment, M. Young admitted that Smith discussed President Clinton's quibbling over sex versus oral sex and submitted no evidence to dispute that "Smith told [students] to go home and have oral sex in front of their parents" so that students would see "if their parents would say 'that's okay because it's not sex.'"[25] (Def.'s Facts ¶ 13; Pl.'s Facts 2013 ¶ 13). She submitted no evidence to dispute that "Smith discussed Victoria's Secret and push-up bras in the context of the pressures American society places on women and has placed on women throughout the twentieth century," or

---

[24]"I made that available at the same time as we were talking about Charles Manson and the fact that there was this dark side going on which, again, the 1950s, which was, you know, not correlated with the '70s or the '60s, the fact is that there was this belief that everything was Leave it to Beaver, that it was Happy Days, and that there were these dark things going on underneath . . .." (Smith Trial Test. at 621).

Other than Smith's statement about police reports noting semen in the mouths of Gein's victims, M. Young cannot recall anything that Smith said in relation to the photos. (M. Young Trial Test. at 178). (See also n.9 supra).

[25]"I said, if you went home and had oral sex and you were caught by your parents, I said what do you think they're going to say? Do you think they're going to walk in and say, oh, okay, that's okay because it's not sex? I said, we all know what it is." (Smith Trial Test. at 627).

to dispute that the discussion also touched on Barbie Dolls and Marilyn Monroe.[26]

---

[26]". . . [A]nd what I did was, I brought up the Gibson Girl.

. . .

"Well, then I taught my students that not long after this became the adopted image that women were set to do and follow, then photography came into the picture and they actually held a nationwide search for a Gibson Girl and they modeled her on the proportions that were already drawn. And women, when they saw these photographs, again, a lot of women were trying to emulate these images.

". . . And what I was mentioning was that the corset is not like today. This was made of whale bone and iron and that it would compress a women's interior, also, as well, to damage them and cause great physical pain. . . . That's the kind of pressure that was going on.

". . . We took this all the way through from the 1920s, the '30s, we mentioned the flappers in the 1920s and the immense pressure on women.

. . .

". . . [I]t went through the 1940s and the 1950s, Marilyn Monroe, who became, also, an icon, in showing how women are basically still marginalized and that it's become now, with the advent of plastic surgery – and all you have to do is turn on the Learning Channel, that's what they call it, and to see what is going on here, the Miss America pageants where, again, this is objectification . . ..

. . .

"Then I went into Victoria's Secret, and I showed how these people do not look like this, they're airbrushed, they're slimmed down by Photoshop, okay, and that growing up – I asked students right out, growing up as little girls, especially my female students, you're given Barbies, and I said that if you actually took a human being and made them into the proportions of a Barbie doll, they would look

29

(Def.'s Facts ¶ 16-17; Pl.'s Facts 2013 ¶ 16-17; Smith Trial Test. at 628-). Instead of submitting specific facts disputing the context in which she experienced Smith's speech, M. Young merely reiterated her opinion that Smith's speech was inappropriate, asserted that his lessons departed from the curriculum, and reckoned that Smith was motivated by a desire to discuss sex rather than by bona fide educational objectives. These facts are deemed admitted for the purposes of this motion pursuant to Fed. R. Civ. P. 56(e)(2).

## IV. Discussion

### (a) The Court Agrees that M. Young's Trial Evidence was Insufficient as a Matter of Law on her § 1983 Claim

Since the Court agrees with Chief Judge Kane's thoughtful consideration of the trial evidence (Ct. Mem. & Order in re New Trial at 21-33), as well as her

---

like an alien, that this is an image that cannot be achieved unless through surgery, through plastic surgery, liposuction, that now, at a young age, pushup bras are being created to show this, to show, you know, these images that these girls must compete with and keep up with.

"And I said, you don't see the same thing, turnabout is not fair play for a man. I said, men can get old, they can get bald, they can get fat, and that seems to be perfectly acceptable, but a woman must keep up appearances." (Smith Trial Test. at 628-631).

conclusion that "the totality of the allegations, even viewed out of context and in a light most favorable to Plaintiff, do not reasonably support" M. Young's § 1983 claim against Smith, the Court will only revisit the issues considered by Chief Judge Kane summarily (and as necessary thereafter).

To M. Young's assertion that Chief Judge Kane's analysis "was a product of her assessment of Defendant Smith's credibility and believability" (Pl.'s Opp'n Br., May 24, 2013, ECF No. 467 at 42-48) (hereinafter, "Pl.'s Opp'n Br."), the Court can only reply that this ignores the plain import of Chief Judge Kane's words. In any case, to the extent Chief Judge Kane adverted to Smith's testimony in discussing the context of his speech, in only two instances does M. Young genuinely dispute that context,[27] and the Court will resolve the dispute in M.

---

[27]Smith asserts that his query as to girls's pillow-fighting attire was made to the class generally with the intent of encouraging students to rethink a stereotype. (Def.'s Facts ¶ 20). M. Young asserts that Smith specifically asker her if she was in her underwear when she had a pillow fight. (Pl.'s Facts ¶ 20).

Smith asserts that a student in his course, not Smith himself, was the source of the comment that women should not be president because they get their "monthly visitor," and claims that he (Smith) stated in class that it was "one of the most ridiculous statements [he had] ever heard." (Def.'s Facts ¶¶ 36-37). M. Young asserts that Smith talked about "how he didn't believe women should be president." (Pl.'s Facts ¶¶ 36-37).

Young's favor for purposes of this motion (as the Court believes Chief Judge Kane did in the first place).

These two instances aside, the statement of facts <u>supra</u>, which is based on the Youngs's own testimony, admissions, and exhibits, fully supports Chief Judge Kane's view that the images (<u>i.e.</u>, photos of Manson's and Gein's victims; Nazi's burning pornography) shown by Smith "ha[d] historical value" in the context of his course (Ct. Mem. & Order in re New Trial at 26-27), and that a number of Smith's questionable comments (<u>i.e.</u>, comments respecting Clinton/Lewinsky, flappers, the automobile, women's body image, Manson and Gein) were expressed in the context of making observations about history and society (<u>Id.</u> at 29-30), while other comments and materials (references to personal sexual exploits and glow-in-the-dark condoms; Smith's "Memoirs") were only tangentially relevant or unarguably irrelevant to Smith's Twentieth Century History course (<u>Id.</u> at 28-31).[28] Considering the totality of images and comments M. Young found troubling, Chief Judge Kane concluded, no reasonable jury could conclude that Smith created a sexually hostile classroom environment.

---

[28]The Court places Smith's decontextualized views on women's ability to preside over the free world and his interest in the sartorial aspects of pillow-fighting in this third, least exalted, category.

In reaching this conclusion, the relationship between Smith's speech and defensible course content was important to Chief Judge Kane because "the Court [was] wary of the chilling effect of subjecting legitimate – or even borderline – decisions regarding curriculum to routine federal judicial review." (Id. at 31). Ultimately, as summarized by Chief Judge Kane:

> Even viewing the comments without Defendant Smith's explanation, while crude, the Court cannot say they would alter the conditions of the educational environment. The book ["Memoirs"] was requested by Plaintiff and those portions she contends she read were mostly stories about a young child coping with moving to a new school and finding a father figure. The offending images shown all had historical value. Plaintiff concedes that most of the offending conduct was done in the context of a history lesson, albeit one she deemed "inappropriate."

(Id. at 32). The Court agrees with the Chief Judge that, with or without Smith's testimony, no reasonable person who experienced Smith's questionable classroom speech (as reflected in the trial evidence construed in M. Young's favor) could have considered it so sexually hostile or abusive that she was disadvantaged (relative to the opposite sex) in her ability to benefit from the edifying aspects of a semester in his Twentieth Century History course. See Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75, 80 (1998) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 25 (Ginsburg, J., concurring) ("'The critical issue, Title VII's text indicates, is whether members of

one sex are exposed to disadvantageous terms or conditions of employment to which

members of the other sex are not exposed.'").[29]

**(b)** **Even Considering the Evidence Newly Introduced by M. Young, Summary Judgment in Smith's Favor is Warranted**

---

[29]The Court adds to Chief Judge Kane's consideration of the trial evidence, firstly, that it is hardly clear that the course material M. Young found most offensive was discriminatory based on sex. "[P]hotographs of Ed Gein's and Charles Manson's victims" may have "made her feel 'scared,' 'sick,' 'disgusted,' and 'nauseated'" (Ct. Mem. & Order in re New Trial at 34), but these photographs were not pornography, where the assumption is that men are titillated or indifferent while women are burdened by the evils that flow from being objectified in the workplace. See Andrews v. City of Philadelphia, 895 F.2d 1469, 1485-86 (3d Cir. 1990) (internal quotation marks omitted) (reasoning that the "posting of pornographic pictures in common areas and in the plaintiffs' personal work spaces" may serve as evidence of a hostile environment because while "men may find these actions harmless and innocent, it is highly possible that women may feel otherwise" because they seek "to deal with [their] fellow employees and clients with professional dignity and without the barrier of sexual differentiation and abuse"). These were, rather, grisly photographs of murder victims that would sexually arouse only the extremely perverse individual and could make anyone, regardless of sex, feel scared, sick, disgusted, and nauseated to a degree. In other words, displaying the photographs – even recognizing that Smith admitted he showed such photographs of women only – was not discriminatory in that an adverse reaction to the photographs was not more likely in women than men.

Secondly, having viewed the actual slides Smith used to teach about flappers, the automobile, and the Clinton affair, it is plain that the slides could serve bona fide pedagogical purposes in the context of a Twentieth Century History course. (See supra n.18, 19 & 20).

Before the Court determines whether M. Young's post-trial evidence (considered cumulatively with the evidence Chief Judge Kane found inadequate) introduces a genuine dispute of material fact in relation to her § 1983 claim, the Court stresses that M. Young's claim is based completely on Smith's classroom expression. Taking notice of the classroom context is of paramount importance to understanding a reasonable person's experience of the images and statements M. Young found so troubling. See Oncale, 523 U.S. at 81-82 (the hostile environment "inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target. . . . The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.").

Smith taught a course in Twentieth Century History, "a subject that," Chief Judge Kane recognized, "is fraught with complex, and at times uncomfortable, questions of race, religion, violence, and also sex and sexuality." (Ct. Mem. & Order in re New Trial at 31). More broadly, "free speech rights apply in the classroom," and federal anti-discrimination laws are "not [intended] to regulate the content of speech"; they must, rather, be applied "so as to protect academic

freedom and [the] free speech rights" of "students and teachers."[30] U. S. Dept. of

Educ., Office for Civil Rights, <u>Revised Sexual Harassment Guidance: Harassment

of Students By School Employees, Other Students, or Third Parties (Title IX)</u> 22

(2001) (hereinafter "<u>Revised Sexual Harrassment Guidance</u>"). Needless to say,

offensive speech is generally protected. <u>See Sypniewski v. Warren Hills Reg'l Bd.

Of Educ.</u>, 307 F.3d 243, 265 (3d Cir. 2002) ("As a general matter, protecting

expression that gives rise to ill will – and nothing more – is at the core of the First

Amendment"). <u>See also</u> "First Amendment: Dear Colleague" letter from the

Assistant Secretary of the Office of Civil Rights of the Department of Education,

ED.gov, (July 28, 2003), http://www2.ed.gov/about/offices/list/ocr/firstamend

---

[30]In the following discussion, the Court should not be misunderstood as suggesting that Smith has a viable First Amendment claim <u>vis a vis </u>Pleasant Valley for the sanctions imposed upon him. <u>See Bradley v. Pittsburgh Bd. of Educ.</u>, 910 F.2d 1172, 1176 (3d Cir. 1990) ("no court has found that teachers' First Amendment rights extend to choosing their own curriculum or classroom management techniques in contravention of school policy or dictates."). The issue in this case is not whether Pleasant Valley could legally discipline Smith or order him to cease certain classroom practices. The issue, rather, is how Title VII should apply in the context of a Twentieth Century History course. The Court's discussion is merely intended to illustrate the interests, values, and understandings that make the classroom context unique.

.html ("Harassment, however, to be prohibited by the statutes within OCR's jurisdiction, must include something beyond the mere expression of views, words, symbols or thoughts that some person finds offensive.").

Two decisions from the United States Court of Appeals for the Ninth Circuit are useful for illustrating the unique complex of values, interests, and understandings that govern the classroom context where Smith's expression took place. The first, Cohen v. San Bernardino Valley Coll., 92 F.3d 968 (9th Cir. 1996), a case cited with approval in the U.S. Department of Education's Revised Sexual Harrassment Guidance (at 22 n.116), involved a female student's claim that her English professor had violated her community college's[31] sexual harassment policy, which prohibited "verbal, written, or physical conduct of a sexual nature . . . [that] has the purpose or effect of unreasonably interfering with an individual's academic performance or creating an intimidating, hostile, or offensive learning environment," Cohen, 92 F.3d at 971. The student was offended "by Cohen's

---

[31]For purposes of evaluating the perspective of a reasonable person in M. Young's shoes, the Court may "take judicial notice of the progressively higher levels of intellectual and emotional development of students in the later grades of secondary school. . . . High school students . . . are at an age approaching both adulthood and franchise," and schools need not "shield our children from political debate and issues until the eve of their first venture into the voting booth." Seyfried v. Walton, 668 F.2d 214, 219-20 (3d Cir. 1981) (Rosenn, J., concurring).

repeated focus on topics of a sexual nature, his use of profanity and vulgarities, and by his comments which she believed were directed intentionally at her and other female students in a humiliating and harassing manner." Id. at 970. Cohen's speech included beginning "a class discussion on the issue of pornography and play[ing] the 'devil's advocate' by asserting controversial viewpoints"; assigning "provocative essays such as Jonathan Swift's 'A Modest Proposal' and discuss[ing] subjects such as obscenity, cannibalism, and consensual sex with children in a 'devil's advocate' style"; "stat[ing] in class that he wrote for Hustler and Playboy magazines and [reading] some articles out loud in class"; and assigning an essay in which student were required to "defin[e] pornography." Id. The college agreed with the student that Cohen had violated its sexual harassment policy and sanctioned Cohen; the district court held that the college had not violated his First Amendment rights in doing so.

 The Ninth Circuit reversed. Conceding that Cohen "use[d] a confrontational teaching style designed to shock his students" by discussing "controversial" and "provocative" issues, employing "vulgarities and profanity in the classroom," and "plac[ing] substantial emphasis on topics of a sexual nature," the Ninth Circuit held that the college's sexual harrassment policy was "simply too vague as applied

to Cohen." Id. at 172. The Ninth Circuit was especially concerned that "the College, on an entirely ad hoc basis, applied the [sexual harassment] Policy's nebulous outer reaches to punish teaching methods that Cohen had used for many years," and which "had apparently been considered pedagogically sound and within the bounds of teaching methodology permitted at the College" before Cohen was punished. Id.

In a second case, Monteiro v. Tempe Union High Sch. Dist., 158 F.3d 1022 (9th Cir. 1998), an African-American student claimed she was discriminated against when the required reading in her high school English course included Twain's The Adventures of Huckleberry Finn and Faulkner's A Rose for Emily, each of which includes frequent use (over 200 times in Huckleberry Finn) of the word n***** – "the most noxious racial epithet in the contemporary American lexicon" – to refer to African-Americans. Id. at 1024, 1029, 1034. The student sought removal of the works from the curriculum's mandatory reading list. Id. at 1026.

In holding that "the requirement that students read books that were determined by the appropriate school authorities to have educational value" could not form the basis for a discrimination suit under the Equal Protection Clause and

Title VI, the Ninth Circuit was guided by its concern that such suits would "severely restrict" the First Amendment rights of students to receive material that the "school board or other educational authority determines to be of legitimate educational value." Id. at 1028. The mechanism by which restriction would occur would be the "the threat of future litigation" against schools and school officials, which "would inevitably lead many . . . to 'buy their peace' by avoiding the use of books or other materials that express messages—or simply use terms—that could be argued to cause harm to a group of students." Id. at 1029. The Ninth Circuit noted that the "range of literary products that might be considered injurious or offensive" to various groups is "extremely wide—if not unlimited." Id. at 1030. As a result,

> [t]he number of potential lawsuits that could arise from the highly varied educational curricula throughout the nation might well be unlimited and unpredictable. Many school districts would undoubtedly prefer to "steer far" from any controversial book and instead substitute "safe" ones in order to reduce the possibility of civil liability and the expensive and time-consuming burdens of a lawsuit – even one having but a slight chance of success. In short, permitting [such] lawsuits . . . could have a significant chilling effect on a school district's willingness to assign books with themes, characters, snippets of dialogue, or words that might offend the sensibilities of any number of persons or groups.

Id. Moreover, by removing books from the curriculum, school authorities "would likely be vulnerable to First Amendment actions brought by students desiring to study

those books . . .. Schools could be caught between those seeking to remove

Huckleberry Finn and those seeking to study it." Id. at 1030-31. Finally, the Ninth

Circuit reasoned that courts were simply the wrong forum for legitimate debates about

the appropriateness of course materials – "[s]uch judgments are ordinarily best left to

school boards and educational officials charged with educating young people and

determining which education materials are appropriate for which students, and under

what circumstances." Id. at 1031-32.[32]

This Court gleans a number of principles from these decisions. First, as

recognized in Cohen, the law of "hostile environments" is a blunt instrument to apply

to classroom speech that colorably serves pedagogical goals. The spectrum of

"pedagogically sound" teaching styles is broad, and unorthodox methods should not

---

[32]The Court recognizes that the Ninth Circuit's application of its logic to
teachers was inchoate at best. In one breath the court expressed concern that "it is
likely that claims such as these, and their outcomes, could have significant effect
on the First Amendment rights of teachers," id. at 1030 n.13, and in the next breath
qualified the reach of its opinion, explaining, "[w]e do not, of course, suggest that
racist actions on the part of teachers implementing a curriculum could not comprise
discriminatory conduct for the purposes of Title VI or the Fourteenth
Amendment," id. at 1032. As this Court discusses Monteiro only for the purpose of
illustrating certain principles, it is not necessary to determine precisely what the
Ninth Circuit meant to convey on this point.

be ensnared by the "nebulous outer reaches" of the law.[33] In this regard the Court

notes that creating pointed discomfort – or, put differently, a "hostile environment"

– for pupils is a <u>bona fide</u> pedagogical approach that a simplistic application Title VII

addresses inadequately. One need look no further than this case, where in support of

her claim M. Young testified that Smith's lecture on the Gibson Girl, Victoria's Secret

Models, Marilyn Monroe, Barbie Dolls, and his associated comments on sagging

breasts and the uncomfortable appearance of push-up bras made M. Young feel

"[in]adequate," and "horrible" because it caused her to "look around and compare

[her]self to everyone else constantly, more self-aware and just thinking about [her]

body image more and more." (M. Young Trial Test. at 179-80; Def.'s Facts ¶ 16-17;

Pl.'s Facts 2013 ¶ 16-17; M. Young Aff. ¶ 26).

But creating that discomfort could be precisely the point in the context of what

was admittedly a lesson raising the issue of whether American society has placed

---

[33]The Court notes at this juncture that, although Judge Munley held that Smith was not entitled to summary judgment on qualified immunity grounds, teachers in a position analogous to Smith's have been granted qualified immunity. See C.F. ex. rel. Farnan v. Capistrano Unified Sch. Dist., 654 F.3d 975, 987 (9th Cir. 2011) ("nothing in the law would make clear to a reasonable person that he might violate the Establishment Clause by making . . . statements [highly disparaging of religion] in the context of a classroom discussion in an Advanced Placement history course"). The parties did not raise the issue of qualified immunity on this motion and the Court does not consider it.

unrealistic, unnecessary, and unhealthy pressures on women historically and today. Having created such discomfort does not constitute evidence of a sexually hostile environment just because the attempt at "consciousness raising" did not succeed in moving students to the point where they, having recognized their shackles, shook off the chains.[34]

Second, applying Title VII to instruction in the arts, humanities and social sciences without giving due regard to the "classroom [being] peculiarly the 'marketplace of ideas,'" Keyishian v. Bd. of Regents of Univ. of State of N.Y, 385 U.S. 589, 603 (1967), will eliminate much that is valuable in education. Even the threat of litigation promises to stifle the employment of innovative, challenging, and stimulating classroom material and methods, and is likely to distort the presentation of any course of study that explores diverse ways of life and conflicting viewpoints. A teacher less dedicated to the quality of the curriculum than wary of avoiding lawsuits might altogether omit lessons on, for example, flappers – or present flappers as something less than they were – rather than guess the point at which a student will

---

[34]Likewise, a teacher arguing that media coverage of the Clinton-Lewinsky "scandal reflected a society focused on tabloid journalism & junk food entertainment" (see supra n.20) might make the point by discussing in graphic detail just exactly how much consumers of media learned of the affair.

decide when the subject has been discussed excessively (see M. Young Trial Test. at 206 (Q: "So it was okay to talk about flappers?" A: "Not as much as it was in the classroom.")), or that certain aspects of the flapper lifestyle were "not appropriate" for class discussion (id. at 207 (Q: "He talked too much about flappers. Is that what you're saying?" A: "The comments about drinking and sex were not appropriate. I feel like it could have been addressed in a more appropriate manner.")).

Third, not giving due regard to the nature of pedagogical decisionmaking puts teachers in a bind, with the possibility that they will embroil themselves and their institutions in litigation initiated by students seeking to eliminate course materials and methods on one side, and students claiming the right to learn from them on the other. See also Seyfried v. Walton, 668 F.2d 214, 218-19 (3d Cir. 1981) (Rosenn, J., concurring) (recognizing the "right of students to challenge on first amendment grounds actions of school officials which circumscribe the range of ideas to which students are exposed."). Again, one need look no further than this case – where Smith was admittedly a very popular, respected teacher (Pl.'s Facts 2013 ¶ 1; M. Young Trial Test. at 209; M. Young Dep. at 19) whose students nearly unanimously rallied

in his support when M. Young's allegations were publicized[35] – to recognize the reality of this possibility. As another Pleasant Valley parent whose daughter was in Smith's course testified at trial (under subpoena, to defense counsel's question – "Why did you send an e-mail to [the Pleasant Valley principal]?"): "I was really upset by the fact that one parent [i.e., the Youngs] could decide what the teaching of the other 200 kids should be and that Mr. Smith was a great teacher." (Dalmas Trial Test. at 574).

Finally, in all but extraordinary circumstances, teachers, administrators and school boards (with the assistance of parents and pupils), as opposed to litigants, judges, and juries, are the proper decisionmakers when it comes to the appropriateness of classroom materials and methods, as well as the level of freedom teachers with different interests and abilities are permitted in the classroom. See also Sypniewski, 307 F.3d at 267 (quoting Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 273 (1988)) ("the education of the Nation's youth is primarily the responsibility of parents,

---

[35](M. Young Trial Test. at 190 ("Well, the pep rally for Mr. Smith, I didn't hear about a pep rally for anyone supporting me, they were all supporting the teacher."); id. at 197 ("[E]ven three years later there was a Facebook group that was put together to support the students when I was, I believe, a [college] sophomore, . . . rallying together to support Mr. Smith. So three years later they still supported him.")).

teachers, and state and local school officials, and not of federal judges"); Epperson v. State of Arkansas, 393 U.S. 97, 104 (1968) ("By and large, public education in our Nation is committed to the control of state and local authorities. Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values."); Seyfried, 668 F.2d at 217 (quoting Epperson, 393 U.S. at 104) (affirming school authorities's decision where it did not "'directly and sharply implicate'" First Amendment rights of students).

Indeed in Smith's case, prompted by a March 8, 2007 meeting with M. Young's parents, Pleasant Valley investigated Smith's conduct and by March 15, 2007 concluded that Smith, among other things, had provided students with "inappropriate reading material [i.e., his "Memoirs"]," that included "profanity, sexual and drinking experiences [sic] and foul language," and that "failed to follow the social studies reading initiative" and had "no link to the curriculum," and that Smith also took "inappropriate literal liberties in developing and referencing events in history," even if the references related to "time periods in the curriculum." (Pl.'s Ex., ECF No. 467-6 (Smith's "inappropriate literal liberties" related to his overly graphic descriptions of Manson Family's activities and the Clinton-Lewinsky affair)). Smith was

suspended a total of thirteen days, ten without pay; administrators previewed his lesson plans and subjected his classes to monitoring (although M. Young disputes whether the monitoring was adequate); and he received an "unsatisfactory" evaluation for the school year. (Def.'s Facts ¶¶ 30-32; Pl.'s Facts ¶¶ 30-32).

A jury in this case would act as a sort of 'super school board' with the power to enhance – based on jurors's views of proper course subject matter – the sanctions imposed on Smith by Pleasant Valley's administrators.[36] Unsurprisingly, portions of the previous trial read like debates over the proper makeup of a Twentieth Century History course curriculum.[37]

_____

[36] The Court can imagine teachers and administrators legitimately disagreeing with the plaintiffs's view that Smith's "job as a professional teacher [was in every case to] find ways to make it appropriate, not find ways to make it inappropriate, to . . . make it so the kids love you because you're talking about stuff you don't need to talk about." (W. Young Trial Test. at 418). Teachers and administrators may find that a certain amount of edginess and irreverence helps to engage students whose interests are not piqued by more traditional approaches in the classroom.

[37]In deciding whether Smith's lectures contributed to a sexually hostile classroom environment, inevitably jurors will base their decision to some degree on their view of the subjects that comprise a proper Twentieth Century History course in the first place, traditionally the province of teachers and school authorities. Testimony from the first trial speaks directly to these issues:

> A:      . . . And it was just – it was all constantly degrading women, highlighting the bad side of history, but I can't recall any highlights of the good side of history . . .

(M. Young Trial Test. at 180).

> Q:      What do you understand a flapper to be?
> A:      The flappers from the 1920s were women who could drink, smoke, have sex whenever they wanted. They were free to do what women couldn't do before in society.
> Q:      Is that part of a – would you say that that described, you know, a change or at least an aspect of the role of women in society in the early 20th century?
> A:      Yes, to an extent.
> Q:      So it was okay to talk about flappers?
> A:      Not as much as it was in the classroom.
> Q:      He talked too much about flappers. Is that what you're saying?
> A:      The comments about drinking and sex were not appropriate. I feel like it could have been addressed in a more appropriate manner.

(M. Young Trial Test. at 206-207).

> Q:      Do you think it would be a better course if they just had eliminated all the bad stuff in history?
> A:      While there are positive and negative points to history, I feel like the points that this class focused on were inappropriate, and there are more tactful ways about discussing them and bringing them up in a classroom conversation, if at all.

(M. Young Trial Test. at 227).

> A:      He's talking – first of all, he's talking – he's showing women in their underwear. What that has to do with 20th century history, I don't understand.

(P. Young Trial Test. at 265).

> A:      . . . There were also issues of emails coming home that were talking

Collectively, these principles govern the specific context in which M. Young

experienced Smith's speech. Guided by them and the notion that "[t]he real social

impact of . . . behavior often depends on a constellation of surrounding circumstances,

expectations, and relationships which are not fully captured by a simple recitation of

---

about just HIV and other issues that were totally not what I would see
as a history lesson.

(W. Young Trial Test. at 401).

> Q:     Franklin Delano Roosevelt is alleged to have had and I guess reputed
>        to have had a long-time affair with his wife's personal secretary. You
>        don't think that that has any relevance to history?
> A:     At that age, no. I mean, I've learned of that later as an adult.
> Q:     I mean, is there some age that history changes?
> A:     History doesn't change. What you can show to people changes. What
>        you can talk to people about – there's issues about what you can say
>        to people at what age.

(W. Young Trial Test. at 450). (See also M. Young Aff. ¶ 6 ("Bloody, murdered,
gutted, headless women do not have historic value for a minor to see in a public
classroom . . ."); id. ¶ 12 ("Defendant Smith showed a video of someone being
decapitated, which has no relevance to 20th Century history . . ."); id. ¶ 33
("Defendant Smith showed a picture when Sharon Tate was alive and asked
whether she was 'hot' and then showed her bloodied, dead, murdered body with
only tape around her nipples. That has no relevance to 20th Century history under
any circumstances."); id. ¶ 45 ("Defendant Smith discussed FDR's mistress, which
has nothing to do with 20th Century history.")).

the words used or the physical acts performed," <u>Oncale v. Sundowner Offshore Serv.,</u> <u>Inc.</u>, 523 U.S. 75, 81-82 (1998), the Court holds that no reasonable person in M. Young's shoes could experience Smith's speech – to the extent that it bore a colorable relationship to understanding aspects of Twentieth Century History over the course of a semester – as having contributed significantly to the creation of a sexually hostile classroom environment.[38] To hold otherwise – that is, to hold that students may expect that much of what society values in education generally, and modern history education in particular, can be bought at a price less than students's provocation or offense – would be to ignore the nature of democratic education in a pluralistic society, and would result in the replacement of decisionmaking by educators with decisionmaking of an inexpert Court. The Court believes that its holding in this regard demonstrates the appropriate exercise of judicial restraint.

---

[38]In reaching this conclusion, the Court does not ignore the requirement that the relevant events be viewed in their totality. <u>See Brown-Baumbach v. B&B</u> <u>Auto., Inc.</u>, 437 F. App'x 129, 134 n.6 (3d Cir. 2011). The Court considers the relevant question to be whether <u>all</u> of Smith's questionable speech with a colorable relationship to Twentieth Century History, <u>taken together, not piece by piece</u>, could be part of a <u>bona fide</u> semester-long course. The Court also considers Smith's speech with a colorable relationship to Twentieth Century History in light of his questionable speech that did not bear such a relationship, and <u>vice versa</u>.

Smith's speech bearing a colorable relationship to the curriculum includes much of the evidence considered by Chief Judge Kane, see supra Section IV.(a), as well as certain averments in M. Young's post-trial affidavit: Smith's overly vivid recounting of Manson Family member Sexy Sadie's exploits; his comment on "women's breasts . . . sag[ging] halfway down their chests as they age" in the context of discussing the Gibson Girl and other icons of female beauty; and his discussion of FDR's mistress.

M. Young argues strenuously that the intent behind this expression – which includes much of what M. Young found most troubling in his classroom – was Smith's alleged desire to demean women and discuss sex, but that does not alter the Court's holding that no reasonable person in M. Young's shoes could experience the speech as significantly hostile or abusive, since the very same speech could be justified by legitimate educational objectives and advance a student's understanding of Twentieth Century History. At the very least, Smith's expression falls within the "breathing room" that must be allowed in the classroom in order not to stifle speech of value. Rosenbloom v. Metromedia, Inc., 415 F.2d 892, 894 (3d Cir. 1969) ("First Amendment guarantees must be applied broadly lest they suffocate for lack of breathing room"). For much the same reason, M. Young's objection that Smith strayed from what she understood to be the Twentieth Century History curriculum is of little

moment. Departing from the curriculum is cause for professional discipline; it does not necessarily violate the United States Constitution, and so long as the Smith's speech could be incorporated into a <u>bona fide</u> Twentieth Century History course curriculum, the Court cannot hold that M. Young could experience it as significantly hostile or abusive.

This leaves the Court to consider Smith's speech that was not colorably connected to his history course. Construing the evidence in M. Young's favor, this includes Smith's:

- display of images and discussion of the Borden murders,

- comment on women's supposed unfitness for the presidency,

- distribution of an article reporting that HIV/AIDS was not as easy to get as may be feared,

- discussion of glow-in-the-dark condoms,

- claim that he "bang[ed] the cheerleader in college,"

- recounting of his lack of interest in sexual relations with "a girl who slept around at school with all of his guy friends,"

- decision to make his "Memoirs" available,

•	display of a "video in which a woman was shot in the desert as punishment,"

•	discussion female masturbation in connection with Cindy Lauper,[39]

•	query regarding the price students, respectively, would accept to cause them to streak down the hallway,

•	instruction on how to "trick girls into getting in a car near dusk,"

•	discussion of girlfriend swapping under a Communist system,[40] and

---

[39]M. Young's averment does not place Smith's discussion in context, a problem throughout this litigation. (See, e.g., M. Young Trial Test. at 178, 212, 213, 226). Smith explained that "it was . . . originated by a student who asked the question, isn't – because we were looking at Girls Just Want to Have Fun, the video from the 1980s by Cyndi Lauper, a student in the class asked, I was told that that was about female masturbation. And I said, indeed, it is about female masturbation . . .." (Smith Trial Test. at 678). The Court nevertheless assumes that the discussion had no colorable connection to Smith's course.

[40]Again, M. Young's averment provides too little context. Smith's comment was apparently made in the context of explaining concepts related to communism, an ideology which the Court certainly does not sanction or endorse, where discussion of so-called "swapping" of significant others could be appropriate. Indeed, it is discussed in the Communist Manifesto –

But you Communists would introduce community of women, screams the whole bourgeoisie in chorus.

The bourgeois sees in his wife a mere instrument of production. He hears that the instruments of production are to be exploited in common, and, naturally, can come to no other conclusion, than that the lot of being common to all will likewise fall to the women.

•       question directed to M. Young regarding what she was wearing during a pillow fight.

Taking up the analysis of this speech (considered cumulatively with, and in relation to, Smith's speech related to Twentieth Century History), the Court first notes what is not at issue. <u>See Gleason v. Mesirow Fin., Inc.</u>, 118 F.3d 1134, 1145 (7th Cir. 1997) ("[W]e think it important to take into account what [defendant] did not do"). The record before the Court reveals that Smith never touched M. Young or any other student in a sexual manner. He did not ask her or any other student to have sex with him, or even suggest the possibility. He did not display pornography, <u>see supra</u> n.29, except for two diminutive images from the first half of the 20th century within a larger image that foregrounded fully-dressed Nazis. M. Young's claim is completely based

_____

. . .

Bourgeois marriage is in reality a system of wives in common and thus, at the most, what the Communists might possibly be reproached with, is that they desire to introduce, in substitution for a hypocritically concealed, an openly legalised community of women.

Karl Marx & Frederick Engels, <u>Manifesto of the Communist Party</u>, 40-41 (Frederick Engels ed. 1908).

Nevertheless, the Court assumes that the comment had no colorable connection to Smith's course.

on Smith's in-class lectures and his distribution of reading materials, the most offensive of which Chief Judge Kane found consisted "mostly [of] stories about a young child coping with moving to a new school and finding a father figure." (Ct. Mem. & Order in re New Trial at 32).

That said, construing the facts in M. Young's favor, Smith did disparage women's intelligence and abilities, as well as discuss sex and topics with sexual overtones, and it is well settled sexual innuendo and "pervasive use of derogatory and insulting terms relating to women generally and addressed to female employees personally may serve as evidence of a hostile environment." Andrews v. City of Philadelphia, 895 F.2d 1469, 1485 (3d Cir. 1990).

Nevertheless, the Court holds that a reasonable person in M. Young's shoes would not find Smith's questionable speech so sexually hostile or abusive that she was disadvantaged (relative to the opposite sex) in her ability to benefit from the edifying aspects of a semester in Smith's Twentieth Century History course.

The Court reaches this conclusion largely because, in all but one instance, M. Young was never the target of Smith's comments, and his generalized comments were directed to a classroom of students, not to her (or any other student, apparently) individually. Andrews contemplates the plaintiff's cognizance of offensive statements

"relating to women generally <u>and addressed to female employees personally</u>,"[41] <u>id.</u> at 1485 (emphasis added), and the caselaw shows that courts generally take the view that statements either not addressed to the plaintiff individually, or not about the plaintiff, are less significant contributors to a hostile environment. <u>See Caver v. City of Trenton</u>, 420 F.3d 243, 263 (3d Cir. 2005) (citing <u>Heitzman v. Monmouth Cnty.</u> 728 A.2d 297, 304-305 (N.J. 1999) for the proposition that "[A] derogatory comment about another person generally does not have the same sting as an ethnic slur directed at a minority group member.")<u>; Paris v. Christiana Care Visiting Nurse Ass'n</u>, 197 F. Supp. 2d 111, 117-19 (D. Del. 2002) (comments to plaintiff were "not severe in an objective sense" because they were not about plaintiff; explicit comment about Monica Lewinsky was "directed at Ms. Lewinsk[y], not [plaintiff]"); <u>Gautney v. Amerigas Propane</u>, 107 F. Supp. 2d 634, 644 (E.D. Pa. 2000) (emphasis added) (although co-worker "discussed the size of his sex organs and his escapades with other women," court noted that "[u]nlike other cases involving hostile work environments,

---

[41]The Court recognizes that "personally" could mean merely "in person" (such that a student in a classroom could say that she was "addressed personally"), but this does not seem to be the sense in which "personally" is being used in <u>Andrews</u>. Instead, "personally" would seem to mean "as an individual," as in the next sentence in <u>Andrews</u> – "Similarly, so may the posting of pornographic pictures in common areas and in the plaintiffs' <u>personal</u> work spaces." <u>Id.</u> at 1485 (emphasis added).

there is no evidence here that [plaintiff] was subjected to extensive inquiries into <u>her</u> sex life or that comments were made about <u>her</u> physical sexual anatomy "); <u>Cooper-Nicholas v. City of Chester</u>, 1997 WL 799443, *4 (E.D. Pa. Dec. 30 1997) (granting summary judgment for defendant, noting "Cooper–Nicholas has submitted no evidence that the comments were made to her directly or that she was the subject of those comments."); <u>Gleason</u>, 118 F.3d at 1145 ("the impact of 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff"). Discounting the offensiveness of speech that is not targeted makes sense because the Supreme Court in <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17 (1993), referred to a continuum of defendants's behavior ranging in seriousness from that which is "physically threatening or humiliating" to "a mere offensive utterance," and speech that is not targeted is, without more, the latter. <u>Id.</u> at 22. <u>Cf. Jennings v. Univ. of North Carolina</u>, 482 F.3d 686, 695-98 (4th Cir. 2007) (defendant coach serially "singled out individual players to find out whether, with whom, an how often they were having sex," which "provoked in several players acute feelings of humiliation and degradation that were directly linked to their gender").

Moreover, in the circumstances of this case, where Smith's comments were generally directed towards an audience and did not single out students, the First

Amendment limits the scope of the law of hostile environments. "Harassment law generally targets conduct, and it sweeps in speech as harassment only when consistent with the First Amendment." Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist., 605 F.3d 703, 710 (9th Cir. 2010) (Kozinski, J.) (the Honorable Sandra Day O'Connor, retired Associate Justice of the Supreme Court, sat on the Rodriguez three-judge panel by designation). When speech is directed at an audience and does not single out audience members, it is least likely to be offensive because of its non-expressive aspects (if any), and most likely to be offensive because of its message. See id. See also Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200, 208 (3d Cir. 2001) (Alito, J.) (reasoning from R.A.V. v. City of St. Paul, 505 U.S. 377 (1992), "that government may constitutionally prohibit speech whose non-expressive qualities promote discrimination," and giving the example of "a supervisor's statement 'sleep with me or you're fired,' which "may be proscribed not on the ground of any expressive idea that the statement communicates, but rather because it facilitates the threat of discriminatory conduct."); DeJohn v. Temple Univ., 537 F.3d 301, 317 (3d Cir. 2008) (noting that speech on "gender politics and sexual morality" is "core" political speech). M. Young's claim is explicitly based on her dislike of what Smith expressed and how he expressed it, not on the non-expressive aspects of his speech.

In addition to not being targeted, Smith's comments about his sexual past and sexual matters generally were tepid in comparison with defendants who have said much worse, and much more frequently, and have nevertheless been granted summary judgment in their favor. See Hancock v. Barron Builders & Mgmt. Co., Inc., 523 F. Supp. 2d 571, 574 (S.D. Tex. 2007) (allegations that defendant, on an at least weekly basis over a 3-5 month period, sometimes several times each week, "described the use of sex toys and demonstrated which sexual positions he preferred; discussed the sexual relations he had with his wife, often referring to her in demeaning terms; talked about videotaping his sexual encounters; talked about the number of sex partners he had and the occasions on which he had sex; graphically described situations in which he date-raped women in college; once, asked for an opinion on Hispanics as sex partners"). Again, it makes sense for courts to view a defendant's non-directed discussion of sex, either in the abstract or engaged in with other people (i.e., not the plaintiff), as less serious in that such speech is generally "merely tinged with offensive sexual connotations," not "discrimina[tion] ... because of ... sex." See Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75, 81 (1998). The Court agrees with M. Young that a number of Smith's comments in this regard were inappropriate, but they did not create a sexually hostile environment.

The one instance in which M. Young alleges she was addressed personally, when it comes down to it, was relatively innocuous. Smith allegedly asked her if she was pillow-fighting in her underwear. There is no allegation that Smith was using this query as a segue to more explicit conversation. The most M. Young can say of the comment is that Smith "did not say it sarcastically but rather to get me to tell him about whether I was in my underwear." (M. Young Aff. ¶ 31). But it is simply not that troubling to have to admit or deny (to the extent M. Young felt coerced) that a non-sexual activity such as pillow-fighting was performed in underwear.

Smith's most unfortunate comments are those that disparage women's intelligence and abilities. But these comments were few and far between and could not have bothered M. Young terribly. See Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment). She was living proof of their falsity: a respected member of her church and one of the best students at Pleasant Valley, with a bright future ahead at one of our nation's finest universities.

It is regrettable that M. Young's experience in Bruce Smith's Twentieth Century History was neither as she anticipated or desired. Be that as it may, the Court

holds that no reasonable jury considering the totality of the circumstances could find

that Mr. Smith sexually harassed her.

**V.      Conclusion**

For the foregoing reasons, the Court grants defendant Smith's motion for

partial summary judgment on M. Young's Section 1983 claim.

<u>s/Matthew W. Brann</u>
Matthew W. Brann
United States District Judge